# Exhibit 6



**OFFICE OF THE HENNEPIN COUNTY ATTORNEY**
MARY F. MORIARTY COUNTY ATTORNEY

February 19, 2026

<u>**VIA CERTIFIED U.S. MAIL**</u>
Daniel Rosen
U.S. Attorney for the District of Minnesota
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN  55415

Re:     *Touhy* Demand
        Investigation into the January 14, 2026, shooting of Julio Cesar Sosa-Celis

Dear Mr. Rosen,

On January 14, 2026, a federal agent shot Hennepin County resident Julio Cesar Sosa-Celis outside of his home in North Minneapolis. This shooting occurred just 7 days after federal agents shot and killed Renee Good, and 10 days before federal agents shot and killed Alex Pretti. Like the Good and Pretti cases, the people of Minnesota—indeed all Americans—demand a transparent and independent investigation into what occurred.

As is standard practice in officer-involved shootings—including incidents involving federal officers—the Minnesota Bureau of Criminal Apprehension (BCA) arrived promptly at the scene and began to investigate the incident. When the BCA arrived, a team of Immigration and Customs Enforcement (ICE) officers had established a perimeter and were preventing a growing crowd of onlookers from accessing the scene. Officers with the Minneapolis Police Department were also present, working to hold the scene for the BCA investigation. BCA agents arrived at about the same time as Federal Bureau of Investigation (FBI) agents. Following standard operating procedures that date back years, BCA and FBI agents began to collaborate on the investigation. The agents split into pairs to conduct joint investigation efforts and began to plan the investigative steps that needed to occur.

This initial collaboration quickly evaporated, however, after FBI agents at the scene received orders to stop collaborating with their BCA counterparts. FBI agents began to exclude the BCA agents from witness interviews and otherwise stopped collaborating. Indeed, FBI agents began preparing to seize evidence at the crime scene before the BCA had a chance to fully process the scene. The BCA was able to prevent the seizure of this evidence only by confronting the FBI about their lack of a search warrant for the premises at issue. The BCA had followed normal law enforcement procedures and obtained a search warrant, which they executed and obtained several pieces of evidence.

At around this same time that the BCA was executing the warrant, the FBI decided to leave the area. They notified the ICE team that was holding the crime scene perimeter that they were leaving, and the ICE team followed the FBI's lead and began to depart. Minneapolis Police Officers who were present on the scene attempted to take over for the departing ICE officers, with the goal of holding the scene so the BCA could continue to process it. The lack of coordination by the departing federal officers and the growing crowd made it unsafe for the number of BCA officers on scene to hold the perimeter, leading them to depart the area without completing a full investigation

To this day, despite repeated efforts to engage with federal agencies, the BCA has been unable to access critical information relevant to the shooting of Mr. Sosa-Celis that is in the exclusive custody of the federal government.

Minnesota is a sovereign State with the duty to investigate potential crimes committed within its borders. The Hennepin County Attorney's Office (the County) has jurisdiction to investigate and, if supported by the evidence, prosecute criminal matters related to this shooting. As a result, in furtherance of its duties to the citizens of the County, the County is currently conducting a criminal investigation into the shooting of Mr. Sosa-Celis and the circumstances surrounding it, with support from the BCA.

We write this letter pursuant to 28 C.F.R. §16.21 et seq. to formally demand production of information, documents, and physical items.[1] We ask that the U.S. Department of Justice (DOJ), and all of its respective subcomponents, provide the material described in Attachment A to this letter for a state-level criminal investigation in regard to the shooting of Mr. Sosa-Celis on January 14, 2026. We ask for a response to this request by March 5, 2026. Below, as required by Department regulations, we provide a summary of the evidence sought and its relevance to the proceeding. We also explain the core principles of federalism that vest the State and its instrumentalities with a constitutional interest in the requested evidence.

But at the outset, it bears emphasis: This demand should not even be necessary. The federal government's blanket refusal to cooperate with Minnesota law enforcement—after initial steps toward a joint investigation—is unmatched in recent memory.  Indeed, under the applicable regulatory structure for DOJ, "[n]othing in this subpart is intended to impede the appropriate disclosure, in the absence of a demand, of information by Department law enforcement agencies to federal, state, local and foreign law enforcement, prosecutive, or regulatory agencies."  28 CFR §§ 16.21(c). We trust that the government will reverse course and promptly respond to this demand.

---

[1] We have sent a similar demand letter to the Department of Homeland Security for evidence in its possession, custody, and control.  Setting forth our requests for evidence in a letter-demand comports with 28 CFR §§ 16.21 et seq., and with state and local procedure, which does not utilize grand juries with the same regularity as in the federal system as a means to obtain documentary and physical evidence.

**Background On Investigation Into the Shooting Of Julio Cesar Sosa-Celis**

A federal agent shot Julio Cesar Sosa-Celis on January 14, 2026, in Minneapolis, Hennepin County, Minnesota. Rather than investigating the circumstances under which Mr. Sosa-Celis was shot, the federal government initially charged him with allegedly attacking the federal agent who shot him. The United States recently dismissed that criminal, however, because the federal government learned of evidence that was materially inconsistent with claims it made in the charging document. Only after dismissing the criminal case did federal officials announce an investigation into the Sosa-Celis matter, but it is still unclear if there is a federal civil rights investigation into the incident.

This lack of transparency evidences the need for Minnesota to conduct a full and fair investigation into the incident. The State of Minnesota, together with its agencies and divisions, has an independent sovereign prerogative and responsibility to investigate possible violations of its criminal laws within its territory. The investigation of the shooting of a citizen is typically conducted by state and local authorities and only occasionally by the federal government.

Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the shooting of Mr. Sosa-Celis. The state offenses under investigation include, but are not limited to, assault in second degree and reckless discharge of a firearm. The investigation is led by the Hennepin County Attorney's Office, which has jurisdiction pursuant to Minn. Stats. § 388.051 to prosecute felonies that occur within Hennepin County. This office has reached no conclusion as to whether a violation of law has occurred and is committed to ensuring that a full and fair investigation is conducted at a local level based on all available evidence, whether inculpatory or exculpatory. Indeed, it is worth noting that Minnesota courts have already found probable cause to issue search warrants for evidence related to the shooting to Mr. Sosa-Celis.

In Minnesota, the law requires an independent investigation for any Minnesota Peace officer-involved death. Minn. Stats. § 626.5534. An independent investigation is also authorized for non-fatal shootings, and for incidents involving federal officers who are not licensed as Minnesota Peace officers. See Minn. Stats. § 299C.03.  Public transparency is vitally important in these cases—not just for the people of Hennepin County and Minnesota, but for the public nationwide. The only way to achieve transparency is thorough investigation conducted at a local level, and for the County Attorney in Hennepin County to review all the evidence—including evidence currently in the possession of federal authorities—and determine if a crime was committed.

**Reliance on Federal Cooperation Before Unexplained and Unjustified Deviation From Longstanding Practice of Joint Investigations**

The manner in which the scene was handled—and the fact that state officials were ultimately sidelined—has necessitated our current demand for evidence. In the initial response after the use of force, federal and local officials began to collaborate as they have in the past.  BCA and FBI agents split into teams and began a joint investigation into what occurred. This has been standard operating procedure in Minnesota for years—collaboration and evidence-sharing between federal and local officials when there are overlapping interests in investigating incidents of violence.

3

Indeed, two high-profile examples of this collaboration have occurred in Hennepin County within the last 12 months—namely, the murder and attempted murder of Minnesota lawmakers and their family members, and a mass shooting at a church service.  Following both of those incidents, state and federal officials worked together to ensure that a thorough investigation occurred.  Concurrent state and federal investigations have also been the widespread historical practice in federal officer-involved shootings.  This method of joint investigation allows the federal investigators to conduct their important work, while at the same time allowing the local investigators and County Attorney to do the work that the people of Minnesota require of them.

On the evening of January 14, 2026, the initial indication was that this longstanding practice of joint investigations would be followed in this case. Local investigators relied on these representations in decisions they made about the course of the investigation, including actions taken at the scene. This included partnering with federal agents to conduct interviews and relying on the federal team that was securing the crime scene. Then, without explanation or notice, the federal agents received orders to stop collaborating and the BCA investigators were excluded from interviews and prevented from completing a full investigation.

Despite these challenges, the BCA continued to press for a return to the well-established norm of cooperation in all three of the federal officer involved shooting cases – Good, Sosa-Celis, and Pretti. Indeed, in early February, federal officials reached out to the BCA to indicate an intent to resume normal cooperation in the Pretti matter, including evidence-sharing and the potential for a joint investigation. That progress unraveled when the Department of Justice dispatched a representative from Main Justice to Minneapolis, after which the contemplated cooperation did not materialize. On Friday, February 13, 2026, the FBI formally notified the BCA that it will not provide the BCA with access to any information or evidence related to the Pretti case. That refusal to cooperate or coordinate has, unfortunately, permeated the federal government's response to this matter as well.

**The State's Core Sovereign Interest**

This request for evidence for use in a state criminal investigation is supported by the State's core sovereign interest in exercising its police powers and in investigating possible violations of state law, as enshrined in the Tenth Amendment of the U.S. Constitution and longstanding principles of federalism going back to our Founding. This interest is particularly acute here, where local law enforcement acted in reliance on federal recognition of its right to access evidence, to its later detriment. This core sovereign interest creates a compelling need for the evidence sought herein. Conversely, federal withholding of the requested evidence, in an apparent effort to shield one or more federal officers from scrutiny following the shooting of a Minnesota resident, flatly contravenes core principles of federalism.

All of the information set forth in Attachment A bears on the County's pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. For example, physical evidence from the scene, including the firearm used in the shooting, will assist in reconstructing the incident. Audiovisual evidence (including contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist in establishing the sequence of events and shed light on the officer's

4

state of mind. And operations plans and employment and training records are relevant to discerning the officer's preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed his state of mind on January 14, 2026, as well as to assessing the objective reasonableness of the use of force.

At the same time, there is no risk that releasing this information will cause harm to the federal government, witnesses, or others. As explained above, federal/state cooperation is the norm—even in complex, high-profile, and sensitive cases, and Minnesota's law enforcement generally, and the BCA specifically, has always maintained a productive and cooperative working relationship with our federal counterparts. And as always, we stand willing to work with federal authorities to protect any sensitive investigative techniques or procedures that our requests may inadvertently implicate. Moreover, to the extent that our requests do implicate information protected by the law enforcement privilege, this is a case where the administration of justice requires disclosure, in light of compelling state interests in investigating this matter and the seriousness of the potential offenses at stake.

Moreover, local investigators conduct secure and appropriate investigations into serious incidents every day. They maintain appropriate protections, follow procedures for chain of custody, and otherwise preserve evidence for later use. In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as non-public. Minn. Stats. § 13.82, Subd. 7. This Act also creates procedures to protect witnesses who have legitimate fear for their safety and other protections that will ensure no negative result for the federal government in turning over the information requested in this letter.

This matter has attracted significant ongoing public attention. The public—not just in Minnesota but nationwide—deserves a prompt resolution to our pending investigation, in the interests of the orderly and impartial administration of justice and in ensuring public faith in the same. This prompt resolution depends on the Department's prompt compliance with our demand for evidence. Such compliance will not in any way hamper the performance of the Department's mission, as there is no conflict between the state's exercise of its lawful authority to shootings within its borders and the faithful enforcement of federal immigration and criminal laws.

**Request for Expedited Consideration**

This request is extraordinarily time-sensitive. The materials sought are needed to support investigative steps that are presently underway, and delay in obtaining them may materially affect the direction, scope, and timing of the investigation. It is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. This is in part because the passage of time can result in dissipation and deterioration of evidence. Most obviously, witness memories fade. Prompt access to federal law enforcement witnesses is essential to ensuring that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

Prompt access to documentary and physical evidence is equally important for the same reason. Investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed interviews of other witnesses, including non-federal witnesses.

5

Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost. Delays in access to such evidence thus compound the risk of evidentiary dissipation by impairing the effectiveness of witness interviews as well as the preservation of documentary and physical proof.

The physical evidence sought is also subject to the risk of deterioration, amplifying our need for swift access. For example, if not stored properly, biological evidence and other forensic evidence will deteriorate beyond testing capabilities. This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in other recent ICE-involved shooting incidents. For example, federal authorities removed Ms. Good's vehicle from the scene before local investigators were able to respond and complete their normal processing.  Local investigators would have completed 3D scans of the entire incident scene, conducted detailed analysis of trajectory, and obtained precise measurements of the location of key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators conducted a rushed analysis of the incident scene and then removed key physical evidence before local investigators could conduct their normal work.  As another example, based on images posted by DHS on social media, a gun alleged to belong to Mr. Pretti, who was killed in a different ICE-involved shooting in Minneapolis, was not handled according to normal law enforcement processes governing the securing of evidence, creating issues with forensic testing and chain of custody.

Prompt disclosure of the requested evidence is also important to ensure compliance with United States and Minnesota law. These include the rights of the accused to due process under the Fifth Amendment of the United States Constitution and to be charged within three years for most relevant felonies, other than those resulting in death, under Minnesota law; as well as the rights of crime victims under Minnesota law to notice, participation, a speedy trial, and restitution should a prosecution result.  Minn. Stat. Ann. §§ 611A.01, 611A.02, 611A.033.

For that reason, we respectfully request expedited processing of this demand for evidence and information in federal custody. We are prepared to work with your office to prioritize categories of information, if helpful, to facilitate prompt processing, and to discuss the practicalities of the transfer of evidence to preserve chain of custody.  But at minimum, given the government's changing posture, we need an initial response to this demand for information by no later than **March 5, 2026**, to allow us to pursue other legal remedies, if necessary.

\* \* \*

On January 14, 2026, a man was shot in Hennepin County.  My office must conduct a full and transparent investigation this incident.  We ask that the federal government provide the information necessary for us to complete this important investigation.

Thank you,



Mary F. Moriarty, Hennepin County Attorney

**CC (with enclosure) via Electronic Mail to:**
- Brett Shumate, U.S. Department of Justice, Civil Division, Assistant Attorney General
- Eric J. Hamilton, U.S. Department of Justice, Civil Division, Deputy Assistant Attorney General
- Alex Haas, Civil Division, Federal Programs Branch, Director
- Jacqueline Snead, Civil Division, Federal Programs Branch, Assistant Director
- Sam Ramer, Federal Bureau of Investigation Office of the General Counsel

**CC (with attachment) via Certified Mail**:
Office of General Counsel
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C.  20530

Office of General Counsel
Federal Bureau of Investigation
1501 Freeway Blvd
Brooklyn Center, MN  55430



**OFFICE OF THE HENNEPIN COUNTY ATTORNEY**
**MARY F. MORIARTY** COUNTY ATTORNEY

**Attachment A**

1.  We request any and all physical evidence relevant to the January 14, 2026, shooting of Julio Cesar Sosa-Celis in Minneapolis, Minnesota (the "January 14 shooting").  This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting or the pursuit leading up to the shooting, such as: discharged cartridge casings; any and all firearms; any physical objects used by any individuals involved in the incident; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; motor vehicles and the contents thereof, including any GPS technologies; any other item collected on the scene; and any item related to the January 14 shooting collected pursuant to a search warrant.  This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting or traffic stop and pursuit leading to the shooting, who interacted with Mr. Sosa-Celis, Alfredo Alejandro Aljorna, or Gabriel Alejandro Hernandez-Ledezma, or who were present on the scene of the shooting at any time on January 14, 2026.  We also request a chain of custody for any and all such evidence.

2.  We request any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 14 shooting or the traffic stop and pursuit leading to the shooting; who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026; or who were present on the scene of the shooting at any time on January 14, 2026.  We also request a chain of custody for any and all such evidence.

3.  We request any and all photographs, videos, measurements, and other imaging relevant to the January 14 shooting.  This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, and investigators; and material recorded by members of the public that was obtained by any federal agent, officer, or investigator.  It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems.  It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4.  We request any and all radio communications from 4:00 p.m. Central time on January 14, 2026, through 1:00 a.m. Central time on January 15, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5.  We request any and all immigration and federal law-enforcement reports related to the January 14 shooting, including but not limited to: incident reports; use-of-force reports, including those concerning Mr. Sosa-Celis, Mr. Aljorna, Mr. Hernandez-Ledezma, or any other individual at the scene of the January 14 shooting; injury reports; arrest reports; property damage reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers involved in or at the scene of the January 14 shooting or the pursuit leading to the shooting; weapons discharge reports for weapons assigned to or used by any and all federal agents and officers involved in or at the scene of the January 14 shooting or the pursuit leading to the shooting; investigative assessments, openings, or closing and related communications; administrative warrants; maps, measurements, and diagrams of the January 14 shooting scene and any area related to any pursuit leading to the scene; affidavits drafted in connection with the January 14 shooting incident; judicial search warrants sought and/or executed related to the January 14 shooting incident, including any affidavits and search warrant return documents; after-action reports and memoranda; any and all reports concerning the detention, questioning, or arrest of individuals who were at or near the scene of the January 14 shooting; and any and all reports concerning the arrest and detention of Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma.

6.  We request any and all personnel and assignment logs listing the federal agents and officers on duty on January 14, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 14 shooting, were at the scene of the shooting at any point, or were involved in any traffic stop or pursuit leading up to the shooting.  Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7.  We request any and all travel and assignment logs showing the subsequent assignment or reassignment of any federal agents and officers involved in the January 14 shooting and any traffic stop or pursuit leading up to the shooting, including, but not limited to, documentation of any assignments to locations outside Hennepin County, Minnesota, following the January 14 shooting.

8.  We request any and all communications from witnesses pertaining to the January 14 shooting and to the circumstances leading up to and surrounding that shooting, including, but not limited to: statements to, from, or among federal agents and officers regarding the shooting, the circumstances leading up to and surrounding the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; statements to or from civilian witnesses; and any statements by Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma.  These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

9.  We request any and all operation plans that cover or pertain to January 14, 2026, in Minneapolis, Hennepin County, Minnesota, including any plans involving traffic stops and any plans that relate to federal agents and officers involved in the January 14 shooting or who

2

interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026.

10. We request any and all policies, regulations, procedures, and briefings in place on January 14, 2026, that pertain to: use of force and tactics; firearms, chemical weapons, and other weapons use; traffic stops; pursuits; legal authority and tactical guidance for entry of homes or other private places; de-escalation and risk mitigation; incident and use-of-force reporting; evidence handling and processing; and any duty to or procedures for securing or providing medical assistance or treatment.

11. We request any and all training materials for federal agents and officers involved in the January 14 shooting or the pursuit leading up to the shooting, who were present on the scene of the January 14 shooting at any time that day, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026.  These materials should include, but are not limited to: records related to classroom instruction, hands-on training, and scenario training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

12. We request the following material from the personnel files for the federal agents and officers involved in the January 14 shooting or the traffic stop or pursuit leading up to the shooting, who were present on the scene of the January 14 shooting at any point that day, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

13. We request any and all documentation related to any interaction between Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma and federal agents and officers at any time prior to the January 24 shooting.  These materials should include, but are not limited to, reports, logs, video recordings, audio recordings, photographs, notes, communications in any format, and radio traffic.

14. We request any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 14 shooting or the pursuit leading up to the shooting, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026.

15. We request any and all reports of medical assessment, diagnosis, and treatment for any person, including any civilian or any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 14 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

3