# Exhibit 1



**OFFICE OF THE HENNEPIN COUNTY ATTORNEY**
MARY F. MORIARTY COUNTY ATTORNEY

February 2, 2026

<u>**VIA CERTIFIED U.S. MAIL**</u>
Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485

Re:     Touhy Demand
        Investigation into the January 7, 2026, Death of Renee Nicole Good

Dear Sir or Madam,

On January 7, 2026, a federal agent shot and killed Hennepin County resident Renee Nicole Good on a public street in downtown Minneapolis. That shooting was captured on video by bystanders for Minnesotans—indeed all Americans—to see.

As is standard practice in officer-involved shootings—including incidents involving federal officers—the Minnesota Bureau of Criminal Apprehension (BCA) arrived at the scene and began investigating the incident alongside federal investigators. But in the late afternoon on January 7, the BCA was informed that—despite the initial agreement to jointly work the case and share files—the federal government would immediately cease cooperating with State authorities.

This is unprecedented. To this day, despite repeated efforts to engage with federal agencies, the BCA has been unable to access critical information about Ms. Good's death that is in the exclusive custody of the federal government. Meanwhile, the federal government—at the highest levels— has publicly indicated that there will be no federal criminal investigation of this incident.

Minnesota is a sovereign State with the duty to investigate potential crimes committed within its borders.  That duty is at its height in cases—like this one—involving the loss of life of one if its citizens within its borders. The Hennepin County Attorney's Office (the County) has jurisdiction to investigate and, if supported by the evidence, prosecute criminal matters related to this tragic incident. As a result, in furtherance of its duties to the citizens of the County, the County is currently conducting a criminal investigation into Ms. Good's death and the circumstances surrounding it, with support from the BCA and the Minnesota Attorney General's Office.

We write this letter pursuant to 6 CFR §§ 5.41 et seq. and 19 C.F.R. §103.21 et seq., to formally demand production of information, documents, and physical items.[1] We ask that the U.S. Department of Homeland Security (DHS), and all of its respective subcomponents, provide the material described in Attachment A to this letter for a state-level criminal investigation in regard to the death of Renee Nicole Good on January 7, 2026. We ask for a response to this request by February 17, 2026. Below, as required by Department regulations, we provide a summary of the evidence sought and its relevance to the proceeding. We also explain the core principles of federalism that vest the State and its instrumentalities with a constitutional interest in the requested evidence.

But at the outset, it bears emphasis: This demand should not even be necessary. The federal government's blanket refusal to cooperate with Minnesota law enforcement—after initially agreeing to jointly investigate this matter—is unmatched in recent memory. Indeed, under the applicable regulatory structure for DHS, "[n]othing in this subpart affects the disclosure of official information to … federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings … ." 6 C.F.R. §5.41(i). Likewise, the regulatory structure for Customs and Border Protection, states "[n]othing in this subpart is intended to impede the appropriate disclosure of information by CBP to federal, state, local, and foreign law enforcement." 19 C.F.R. §103.21(e).  We trust that the government will reverse course and promptly respond to this demand.

**Background On Investigation Into the Death of Renee Nicole Good**

A federal agent shot and killed Renee Nicole Good on January 7, 2026, in Minneapolis, Hennepin County, Minnesota. Public statements by U.S. Department of Justice and other federal officials indicate that there is not, and will not be, any federal investigation into the shooting. That choice is the prerogative of the federal government. But the State of Minnesota, together with its agencies and divisions, has an independent sovereign prerogative and responsibility to investigate possible violations of its criminal laws.

Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the death of Ms. Good on a Minneapolis public street. The state offenses under investigation include, but are not limited to, murder, manslaughter, and failure to render aid. The investigation is led by the Hennepin County Attorney's Office, which has jurisdiction pursuant to Minn. Stats. § 388.051 to prosecute felonies that occur within Hennepin County. This office has reached no conclusion as to whether a violation of law has occurred and is committed to ensuring that a full and fair investigation is conducted at a local level based on all available evidence, whether inculpatory or exculpatory. Indeed, it is worth noting that Minnesota courts have already found probable cause to issue search warrants for evidence related to the death of Ms. Good.

---

[1] We have sent a similar demand letter to the Department of Justice for evidence in their possession, custody, and control.  Setting forth our requests for evidence in a letter-demand comports with 6 CFR §§ 5.41 et seq. and 19 C.F.R. §103.21 et seq., and with state and local procedure, which does not utilize grand juries with the same regularity as in the federal system as a means to obtain documentary and physical evidence.

In Minnesota, the law requires an independent investigation for any Minnesota Peace officer-involved death.  Minn. Stats. § 626.5534. An independent investigation is also authorized for deaths involving federal officers who were not designated as Minnesota Peace officers.  See Minn. Stats. § 299C.03; Minn. Stats § 390.11.  Public transparency is vitally important in these cases—not just for the people of Hennepin County and Minnesota, but for the public nationwide. The only way to achieve transparency is thorough investigation conducted at a local level, and for the County Attorney in Hennepin County to review all the evidence—including evidence currently in possession of federal authorities—and determine if a crime was committed.

**Reliance on Federal Assurance that Access Would Be Permitted**

The manner in which the scene was handled—and the fact that state officials were ultimately sidelined—has necessitated our current demand for evidence. In the minutes and hours after the use of force, federal officials informed the local investigators that there would be a joint investigation into the incident. This has been standard operating procedure in Minnesota for years—collaboration and evidence-sharing between federal and local officials when there are overlapping interests in investigating incidents of violence.

Indeed, two high-profile examples of this collaboration have occurred in Hennepin County within the last 12 months—namely, the murder and attempted murder of Minnesota lawmakers and their family members, and a mass shooting at a church service.  Following both of those incidents, state and federal officials worked together to ensure that a thorough investigation occurred.  Concurrent state and federal investigations have also been the widespread historical practice in federal officer-involved shootings.  This method of joint investigation allows the federal investigators to conduct their important work, while at the same time allowing the local investigators and County Attorney to do the work that the people of Minnesota require of them.

On the morning of January 7, 2026, local investigators were told by federal officials that this longstanding practice of joint investigations would be followed in this case. Local investigators relied on these representations in decisions they made about the course of the investigation, including actions taken at the scene. For example, local investigators trusted that important evidence that was gathered by federal investigators would be made available for local analysis. This includes the vehicle in which Ms. Good was shot, shell casings discharged at the scene, and the shooter's gun. In the initial hours after the shooting, federal officials continued to lead local investigators to believe that this would be a joint investigation. In reliance on this settled expectation and de facto standard operating procedures, local investigators prioritized other investigative steps. Had local investigators known that federal authorities would thereafter refuse them access to physical and other evidence taken at the scene into exclusive federal custody, they would have taken different measures to secure the availability of evidence.

In the afternoon on January 7, 2026, the position of the federal government abruptly changed. Local investigators were excluded from interviews, prevented from following standard investigative procedures, and blocked from access to key physical evidence. It was eventually made clear through public statements from high-ranking DHS and DOJ officials that there would be no federal cooperation with the local investigation. At that point, however, key pieces of evidence were already within the possession and control of federal investigators.

3

**The State's Core Sovereign Interest**

This request for evidence for use in a state criminal investigation is supported by the State's core sovereign interest in exercising its police powers and in investigating possible violations of state law, as enshrined in the Tenth Amendment of the U.S. Constitution and long-standing principles of federalism going back to our Founding. This interest is particularly acute here, where local law enforcement acted in reliance on federal recognition of its right to access evidence, to its later detriment. This core sovereign interest creates a compelling need for the evidence sought herein. Conversely, federal withholding of the requested evidence, in an apparent effort to shield one or more federal officers from scrutiny following the death of a Minnesota citizen, flatly contravenes core principles of federalism.

All of the information set forth in Attachment A bears on the County's pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. For example, physical evidence from the scene, including the firearm used in the shooting and the vehicle operated by Ms. Good, will assist in reconstructing the incident. Audiovisual evidence (including contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist in establishing the sequence of events and shed light on the officer's state of mind. And operations plans and employment and training records are relevant to discerning the officer's preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed his state of mind on January 7, 2026, as well as to assessing the objective reasonableness of the use of force.

At the same time, there is no risk that releasing this information will cause harm to the federal government, witnesses, or others. The federal government has already repeatedly stated that it does not intend to investigate the shooting death of Ms. Good, having apparently already concluded (without investigation) no crime was committed. Accordingly, compliance with our request would not impair any federal investigation. And in any event, as always, we stand willing to work with federal authorities to protect any sensitive investigative techniques or procedures that our requests may inadvertently implicate. Moreover, to the extent that our requests do implicate information protected by the law enforcement privilege, this is a case where the administration of justice requires disclosure, in light of compelling state interests in investigating this matter and the seriousness of the potential offenses at stake.

Moreover, local investigators conduct secure and appropriate investigations into serious incidents every day. They maintain appropriate protections, follow procedures for chain of custody, and otherwise preserve evidence for later use. In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as non-public. Minn. Stats. § 13.82, Subd. 7. This Act also creates procedures to protect witnesses who have legitimate fear for their safety and other protections that will ensure no negative result for the federal government in turning over the information requested in this letter.

This matter has attracted significant ongoing public attention. The public—not just in Minnesota but nationwide—deserves a prompt resolution to our pending investigation, in the interests of the orderly and impartial administration of justice and in ensuring public faith in the same. This prompt resolution depends on the Department's prompt compliance with our demand for evidence. Such

4

compliance will not in any way hamper the performance of the Department's mission, as there is no conflict between the state's exercise of its lawful authority to investigate homicide deaths within its borders and the faithful enforcement of federal immigration and criminal laws.

**Request for Expedited Consideration**

This request is extraordinarily time-sensitive. The materials sought are needed to support investigative steps that are presently underway, and delay in obtaining them may materially affect the direction, scope, and timing of the investigation. It is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. This is in part because the passage of time can result in dissipation and deterioration of evidence. Most obviously, witness memories fade. Prompt access to federal law enforcement witnesses is essential to ensuring that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

Prompt access to documentary and physical evidence is equally important for the same reason. Investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed interviews of other witnesses, including non-federal witnesses. Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost. Delays in access to such evidence thus compound the risk of evidentiary dissipation by impairing the effectiveness of witness interviews as well as the preservation of documentary and physical proof.

The physical evidence sought is also subject to the risk of deterioration, amplifying our need for swift access. For example, if not stored properly, biological evidence and other forensic evidence will deteriorate beyond testing capabilities. This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in this and other recent ICE-involved shooting incidents. For example, federal authorities removed Ms. Good's vehicle from the scene before local investigators were able to respond and complete their normal processing.  Local investigators would have completed 3D scans of the entire incident scene, conducted detailed analysis of trajectory, and obtained precise measurements of the location of key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators conducted a rushed analysis of the incident scene and then removed key physical evidence before local investigators could conduct their normal work.  As another example, based on images posted by DHS on social media, a gun alleged to belong to the subject of different fatal ICE-involved shooting in Minneapolis was not handled according to normal law enforcement processes governing the securing of evidence, creating issues with forensic testing and chain of custody.

Prompt disclosure of the requested evidence is also important to ensure compliance with United States and Minnesota law. These include the rights of the accused to due process under the Fifth Amendment of the United States Constitution and to be charged within three years for most relevant felonies, other than those resulting in death, under Minnesota law; as well as the rights of crime victims under Minnesota law to notice, participation, a speedy trial, and restitution should a prosecution result.  Minn. Stat. Ann. §§ 611A.01, 611A.02, 611A.033.

5

For that reason, we respectfully request expedited processing of this demand for evidence and information in federal custody. We are prepared to work with your office to prioritize categories of information, if helpful, to facilitate prompt processing, and to discuss the practicalities of the transfer of evidence to preserve chain of custody.  But at minimum, given the government's changing posture, we need an initial response to this demand for information by no later than **February 17, 2026**, to allow us to pursue other legal remedies, if necessary.

\* \* \*

On January 7, 2026, a woman was shot and killed in Hennepin County.  My office must conduct a full and transparent investigation into this death.  We ask that the federal government provide the information necessary for us to complete this important investigation.

Thank you,



Mary F. Moriarty
Hennepin County Attorney

**CC (with attachment) via Electronic Mail to:**
- Office of the General Counsel, U.S. Department of Homeland Security, OGC@hq.dhs.gov
- Brett Shumate, U.S. Attorney's Office, Civil Division
- Alex Haas, U.S. Attorney's Office, Federal Programs Branch Director
- Jacqueline Snead, U.S. Attorney's Office, Federal Programs Branch Assistant Director
- Eric J. Hamilton, Assistant Director, Federal Programs Branch Deputy Assistant Attorney General

**CC (with attachment) via Certified Mail**:

General Counsel
Immigration, Customs, and Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN  55111

Chief Counsel
U.S. Customs and Border Protection
Minnesota Field Office
5600 W American Blvd. Suite 760
Bloomington, MN  55437

General Counsel
Homeland Security Investigations
Minnesota Field Office
1 Federal Drive, Suite 1340
Fort Snelling, MN  55111

U.S. Attorney for the District of Minnesota
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN  55415



**OFFICE OF THE HENNEPIN COUNTY ATTORNEY**
MARY F. MORIARTY COUNTY ATTORNEY

**Attachment A**

1.  Any and all physical evidence relevant to the January 7, 2026, shooting of Renee Good on Portland Avenue near 34th Street in Minneapolis, Hennepin County, Minnesota (the "January 7 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting, such as: discharged cartridge casings; any and all firearms; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; motor vehicles and the contents thereof; and any other item(s) collected on the scene. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting or who were present on the scene at or near Ms. Good's vehicle. We also request a chain of custody for any and all such evidence.

2.  Any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle, on the day of the shooting. We also request a chain of custody for any and all such evidence.

3.  Any and all photographs, videos, measurements, and other imaging relevant to the January 7 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, analysts, and investigators. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4.  Any and all radio communications from 8:00 a.m. through 8:00 pm Central time on January 7, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5.  Any and all immigration and federal law-enforcement reports related to the January 7 shooting, including but not limited to: incident reports; use-of-force reports; injury reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; weapons discharge logs for weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; investigative assessments, openings, or closing and related communications; and after-action reports and memoranda.

6.  Any and all personnel and assignment logs listing the federal agents and officers on duty on January 7, 2026, in Minneapolis Hennepin County, Minnesota, who were involved in the January 7 shooting, or were at the scene of the shooting at any point on January 7.  Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7.  Access to interview federal agents and officers on duty on January 7, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 7 shooting, or were at the scene of the shooting at any point that day.

8.  Any and all communications from witnesses pertaining to the January 7 shooting and to the circumstances surrounding that shooting, including, but not limited to: statements from federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; communications to, from, or among federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; and statements to or from civilian witnesses.  These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

9.  Any and all operation plans in effect or in use on January 7, 2026, applicable to and/or provided to any of the federal agents or officers present at the scene of the shooting.

10. Any and all policies, regulations, procedures, and briefings in place on January 7, 2026, that pertain to: use of force and tactics; use of force and tactics regarding moving vehicles; firearms and other weapons use; de-escalation and risk mitigation; incident and use-of-force reporting; securing a crime scene and processing evidence; and any duty to or procedures for securing or providing medical assistance or treatment.

11. Any and all training materials for federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle, including but not limited to: records related to classroom instruction, hands-on training, and scenario training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

12. The following material from the personnel files for the federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

13. Any and all documentation related to a June 2025 vehicle encounter involving U.S. Immigration and Customs Enforcement Agent Jonathan Ross in Bloomington, Minnesota,

2

including, but not limited to, incident reports, use-of-force reports, weapons discharge reports, injury reports and medical records, affidavits and other statements related to the incident by Agent Ross or any other federal agent or officer involved in or who responded to the incident.

14. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle.

15. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 7 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.