**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*; MARY MORIARTY, *in her official capacity as the Hennepin County Attorney*; and DREW EVANS, *in his official capacity as Superintendent of the Minnesota Bureau of Criminal Apprehension*;

*Plaintiffs*,

v.

U.S. DEPARTMENT OF JUSTICE; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD BLANCHE, *in his official capacity as Attorney General of the United States*; and MARKWAYNE MULLIN, *in his official capacity as Secretary of the U.S. Department of Homeland Security*;

*Defendants*.

No. 26-cv-1007 (EGS)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....... iii

INTRODUCTION ....... 1

BACKGROUND ....... 2

I. In Minnesota, Parallel State-Federal Investigations and Evidence Sharing in Use-of-Force Investigations Are the Norm ....... 2

A. Minnesota's Sovereign Investigative Responsibilities and the Longstanding Practice of Federal-State Evidence Sharing ....... 2

B. The Framework Governing Requests for Evidence from Federal Agencies ....... 4

II. Defendants Block Plaintiffs from Gathering Evidence in Three Shootings by Federal Officers Deployed During Operation Metro Surge ....... 6

A. Initial Exclusion from Evidence Related to the Fatal Shooting of Renee Good ....... 7

B. Initial Exclusion from Evidence Related to the Shooting of Julio Sosa-Celis ....... 11

C. Initial Exclusion from Evidence Related to the Fatal Shooting of Alex Pretti ....... 13

D. Plaintiffs' Formal Written *Touhy* Demands to DOJ and DHS ....... 15

E. Defendants' Response to Plaintiffs' *Touhy* Requests ....... 17

LEGAL STANDARD ....... 22

I. Defendants' Denials Are Reviewable under the APA ....... 24

A. Defendants' Denials Constitute Final Agency Action ....... 24

B. Defendants' Decision Is Not Committed to Agency Discretion by Law ....... 25

II. It Was Arbitrary and Capricious for DOJ and DHS to Bar Plaintiffs from Accessing Evidence ....... 28

A. Barring Plaintiffs from Evidence After the Shootings Was Arbitrary and Capricious ....... 28

B. DHS's March Letter Was Substantively Unlawful and Arbitrary and Capricious ....... 31

C. DOJ's Subsequent Actions and Statements Confirm that the Denial of Access to Information was Arbitrary and Capricious ....... 33

III. Defendants' June Letters Only Underscore the Arbitrariness of Their Decision-making ....... 34

A. DOJ's and DHS's June Letters Are Impermissible *Post Hoc* Rationalizations,

and Defendants' Embrace of DHS's Belated Reasoning in Its Motion to Dismiss Fails for the Same Reasons ....................34

B. DOJ's and DHS's *Post Hoc* Assertion That Their *Touhy* Regulations Do Not Apply Is Meritless ....................35

C. Defendants' June Letters Were Arbitrary and Capricious Because They Unreasonably Rejected the Option to Share Information Pursuant to the Law Enforcement Sharing Provision in the *Touhy* Regulations ....................39

IV. The Federal Government's Decision to Block State and Local Criminal Investigations Violates the Tenth Amendment ....................40

V. The Court Should Grant Plaintiffs' Requested Relief ....................43

VI. The Court Should Deny Defendants' Request to Change Venue ....................45

CONCLUSION ....................45

## TABLE OF AUTHORITIES

### CASES

*Abbott v. Perez*,
585 U.S. 579 (2018) ....................44

*Adaya LL v. DEA*,
826 F. Supp. 3d 115 (D.D.C. 2026) ....................31

*Advocates for Human Rights v. DHS*,
26-cv-00749 (D. Minn. Feb. 12, 2026) ....................7

*Alden v. Maine*,
527 U.S. 706 (1999) ....................40

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
778 F.2d 850 (D.C. Cir. 1985) ....................44

*Am. Hosp. Ass'n v. Azar*,
385 F. Supp. 3d 1 (D.D.C. 2019) ....................44

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ....................23, 40, 41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................22

*Bain v. Gary, Williams, Parenti, Watson & Gary, P.L.*,
53 F. Supp. 3d 144 (D.D.C. 2014) ....................22

*Barrick Goldstrike Mines Inc. v. Browner*,
215 F.3d 45 (D.C. Cir. 2000) ....................24

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................24

*Calcutt v. Fed. Deposit Ins. Corp.*,
598 U.S. 623 (2023) ....................35

*Camp v. Pitts*,
411 U.S. 138 (1973) ....................23

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ....................27

*Ciba-Geigy Corp. v. E.P.A.*,
801 F.2d 430 (D.C. Cir. 1986) ....................25

*Ctr. for Bio. Diversity v. Ross*,
310 F. Supp. 3d 119 (D.D.C. 2018) ....................45

*Citizens to Preserve Overton Park v. Volpe*,
401 U.S. 402 (1971) ....................23, 38

*Comm. for Nuclear Resp., Inc. v. Seaborg*,
463 F.2d 788 (D.C. Cir. 1971) ........................................................................ 5

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........................................................................28, 30, 35

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................26, 27, 29, 34, 40

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ........................................................................40

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................................40

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ........................................................................23, 32, 40

*Flytenow, Inc. v. FAA*,
808 F.3d 882 (D.C. Cir. 2015) ........................................................................24

*Foster v. Mabus*,
895 F. Supp. 2d 135 (D.D.C. 2012) ........................................................................27

*Gomez v. Trump*,
485 F. Supp. 3d 145 (D.D.C. 2020) ........................................................................29

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020) ........................................................................26

*Heath v. Alabama*,
474 U.S. 82 (1985) ........................................................................ 2, 29, 41

*Houston Bus. J., Inc. v. OCC*,
86 F.3d 1208 (D.C. Cir. 1996) ........................................................................ 5, 24

*Hussen v. Noem*,
No. 26-cv-324 (D. Minn. Mar. 9, 2026)........................................................................ 7

*In re Elko Cty. Grand Jury*,
109 F.3d 554 (9th Cir. 1997)........................................................................37

*In re Neagle*,
135 U.S. 1 (1890) ........................................................................29

*Johnson v. Maryland*,
254 U.S. 51 (1920) ........................................................................29

*Kansas v. Garcia*,
589 U.S. 191 (2020) ........................................................................41

*Kirwa v. DOD*,
285 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................30

*McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*,
606 U.S. 146 (2025) ....................27

*Michigan v. EPA*,
576 U.S. 743 (2015) ....................35

*Mich. Welfare Rights Organization v. Trump*,
600 F. Supp. 3d 85 (D.D.C. 2022) ....................44

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................23, 28, 32, 40

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ....................41, 42

*Nat'l Ass'n of Home Builders v. EPA*,
675 F. Supp. 2d 173 (D.D.C. 2009) ....................45

*Nat. Res. Def. Council v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ....................25

*Nat. Res. Def. Council v. Daley*,
209 F.3d 747 (D.C. Cir. 2000) ....................23

*Ohio v. EPA*,
603 U.S. 279 (2024) ....................23

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) ....................29

*Pollard v. Hagan*,
3 How. 212 (1845)....................29

*Puerto Rico v. Sanchez Valle*,
579 U.S. 59 (2016) ....................2

*Ramah Navajo Sch. Bd., Inc. v. Babbitt*,
87 F.3d 1338 (D.C. Cir. 1996) ....................26

*Safe Extensions, Inc. v. FAA*,
509 F.3d 593 (D.C. Cir. 2007) ....................27

*Scahill v. District of Columbia*,
909 F.3d 1177 (D.C. Cir. 2018) ....................25

*Schroeder v. U.S. Dep't of Veterans Affs.*,
673 F. Supp. 3d 1204 (D. Kan. 2023) ....................29

*Shinn v. Ramirez*,
596 U.S. 366 (2022) ....................41

*Spence v. NCI Info. Sys., Inc.*,
530 F. Supp. 2d 739 (D. Md. 2008) ....................36

*State v. Kaiser*,
486 N.W.2d 384 (Minn. 1992) ....................17

*Trump v. CASA*,
606 U.S. 831 (2025) ....................44

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ....................37

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ....................24

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ....................24

*United States v. Aljorna*,
No. 26-mj-23 (D. Minn. Jan. 16, 2026) ....................12

*United States v. Morrison*,
529 U.S. 598 (2000) ....................3, 41

*United States ex rel. Touhy v. Ragen*,
340 U.S. 462 (1951) ....................5

*Watts v. SEC*,
482 F.3d 501 (D.C. Cir. 2007) ....................5

*Wyeth v. Levine*,
555 U.S. 555 (2009) ....................42

*Yousuf v. Samantar*,
451 F.3d 248 (D.C. Cir. 2006) ....................24

**STATUTES**

5 U.S.C. § 301 ....................5, 27, 33, 42

5 U.S.C. § 552a ....................18

5 U.S.C. § 552a(b)(7) ....................32

5 U.S.C. § 701(a)(2) ....................26

5 U.S.C. § 702 ....................24

5 U.S.C. § 706(2)(A) ....................23

5 U.S.C. § 706(2)(B) ....................23, 41

5 U.S.C. § 706(2)(C) ....................23

5 U.S.C. § 706(2)(D) ....................23

28 U.S.C. § 1404 ....................44

Minn. Stat. § 299C.03 ....................3, 38

Minn. Stat. § 299C.80 ....................3

Minn. Stat. § 388.051 ........ 3, 38

Minn. Stat. § 611A.01 ........ 17

Minn. Stat. § 611A.02 ........ 17

Minn. Stat. § 611A.033 ........ 17

Minn. Stat. § 626.5534 ........ 3

Minn. Stat. § 628.26 ........ 17

Pub. L. No. 85-619 ........ 5

**RULES AND REGULATIONS**

6 C.F.R. § 5.41 ........ 18,19

6 C.F.R. § 5.41(a)(2) ........ 36

6 C.F.R. § 5.41(d) ........ 36, 38

6 C.F.R. § 5.41(i) ........ 6, 31, 37, 42

6 C.F.R. § 5.48 ........ 6, 33

19 C.F.R. § 103.21(a)(1) ........ 35

19 C.F.R. § 103.21(e) ........ 6, 42

28 C.F.R. § 16.21(a)(2) ........ 35

28 C.F.R. § 16.21(c) ........ 6, 26, 42

28 C.F.R. § 16.26(c) ........ 6

Fed. R. Civ. P. 56(a) ........ 22

Minn. R. Crim. P. 2 ........ 38

Minn. R. Crim. P. 17.01 ........ 38

**OTHER AUTHORITIES**

Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* (2d ed. 1899) ........ 36

The Federalist No. 39 ........ 41

H.R. Rep. No. 85-1461 (1958) ........ 5, 27

Immigration and Customs Enforcement, Use of Force Handbook, (Sept. 15, 2025) ........ 4

John G. Roberts, Jr., *What Makes the D.C. Circuit Different? A Historical View*, 92 Va. L. Rev. 375, 389 (2006) ........ 45

*Moore's Federal Practice* (3d ed. 2006) ........ 5

## INTRODUCTION

This case concerns an extraordinary attempt by federal officials to frustrate the State of Minnesota's sovereign authority to investigate deadly violence by obstructing state criminal investigations. Federal immigration officers deployed to Minnesota during Operation Metro Surge shot three Minnesota residents—killing two of them—in separate incidents. The Departments of Justice and Homeland Security then blocked Minnesota law enforcement from witnesses and materials, took exclusive control of critical evidence, withheld the identities of the involved officers, and refused to comply with requests for disclosure. In doing so, Defendants departed from longstanding practice by attempting to put these incidents beyond the reach of ordinary state criminal process and, thereby, beyond meaningful scrutiny.

Minnesota seeks to vindicate its right, as a sovereign state, to investigate potential criminal activities. After Defendants obstructed state officials from collecting evidence themselves, Minnesota and its law enforcement officials sought access to evidence in Defendants' possession. First, Minnesota attempted traditional cooperation with its federal counterparts. When that failed, it submitted formal requests through the agencies' *Touhy* regulations, to no avail. DHS's and DOJ's decisions to block state law enforcement from collecting evidence and then to deny them access to evidence in DHS's and DOJ's possession are unlawful. Federal agencies may not deny requests for evidence without providing a reasoned decision consistent with their own actions, regulations, the Administrative Procedure Act (APA), and the Constitution. They may not use their exclusive control over evidence to thwart a state's exercise of lawful investigative authority.

The record here shows exactly that. Federal authorities initially indicated that ordinary cooperation would occur, consistent with longstanding practice in matters where federal and state investigations overlap. But then senior federal officials abruptly and inexplicably reversed course. Federal officials excluded state investigators from crime scenes and witness interviews, physically

blocked them from examining evidence, and denied them entry to public streets to which they undoubtedly have a right of access. Defendants never identified any privilege, security concern, or investigative need to justify withholding information and evidence across all three shooting incidents. Instead, federal officials asserted that Minnesota had no legitimate role at all because the shootings were supposedly a purely "federal" matter.

Defendants' obstruction cannot stand. Plaintiffs are the State of Minnesota; Mary Moriarty, the elected official charged with prosecuting crimes in Hennepin County, which includes Minneapolis; and Drew Evans, Superintendent of the Minnesota Bureau of Criminal Apprehension (BCA), the state entity with jurisdiction to investigate use-of-force incidents. They bring this suit to challenge DHS's and DOJ's apparent collusion to shield federal officers from scrutiny into their uses of force against Minnesota residents—two of whom tragically died. Defendants' decision to obstruct access to evidence, denials of Plaintiffs' *Touhy* requests, and refusal to otherwise share evidence are contrary to law and arbitrary and capricious under the APA. And their decisions violate the Tenth Amendment by interfering with Minnesota's inviolable sovereign power to enforce its criminal code. The Court should grant summary judgment in favor of Plaintiffs and deny Defendants' motion to dismiss.

## BACKGROUND

### I. In Minnesota, Parallel State-Federal Investigations and Evidence Sharing in Use-of-Force Investigations Are the Norm

#### *A. Minnesota's Sovereign Investigative Responsibilities and the Longstanding Practice of Federal-State Evidence Sharing*

Under our system of federalism, states exercise criminal enforcement authority with "ancient roots in an 'inherent sovereignty'" that predates the Constitution and is preserved within it. *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) (quoting *Heath v. Alabama*, 474 U.S. 82,

93 (1985)). The states—not the federal government—retain primary sovereign authority to define and enforce criminal law through their police powers, of which there is "no better example" "than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). In Minnesota, state and local officials, including Plaintiffs here, exercise this core sovereign power by investigating violence and enforcing Minnesota criminal law. The Hennepin County Attorney's Office (HCAO) is vested with the power to prosecute felonies in Hennepin County. Minn. Stat. § 388.051, subd. 1. The BCA is responsible for investigating crimes, *id.* § 299C.03, including use-of-deadly-force incidents, *id.* §§ 299C.80, subd. 2 & 626.5534, subd. 3(c).

Consistent with these federalism principles, cooperation and evidence sharing between federal, state, and local law enforcement has long been a routine and essential feature of criminal investigations in Minnesota. Decl. of Drew Evans (Evans Decl.) ¶ 5. Intergovernmental cooperation allows federal investigators to conduct their important work, while allowing state and local investigators to do the work that the people of Minnesota require of them. *Id.* As one example, federal and state authorities cooperated after the murder and attempted murder of Minnesota state lawmakers in 2025. *Id.* ¶ 6. BCA and FBI agents conducted joint witness and subject interviews, shared physical evidence and other information, and met regularly and jointly with federal and state prosecutors. This collaboration led to ongoing state and federal prosecutions. *Id.* As another example, federal and state investigators collaborated in the immediate aftermath of a mass shooting at the Church of the Annunciation in Minneapolis in August 2025. *Id.* Minnesota authorities then completed the investigation with assistance from federal officers as needed. *Id.*

Such cooperation likewise has been the practice in federal officer-involved shootings. *Id.*

¶ 7. For example, in November 2019, after a Deputy U.S. Marshal shot a suspect in St. Paul, the BCA led the investigation into federal agents' use of force, and state prosecutors handled related criminal cases against the suspect. *Id.* Similarly, in June 2021, after two members of a U.S. Marshals' task force shot and killed a suspect in Minneapolis, the BCA led the investigation into this shooting, with the support and cooperation of federal authorities. *Id.* Indeed, Immigration and Customs Enforcement's (ICE's) Handbook on Use of Force contemplates state and local law enforcement investigation into its employees' use of force, acknowledging that "Local, State, Tribal, and Federal law enforcement agencies may investigate use of force incidents occurring within their jurisdictions, including those resulting in serious bodily injury or death of an individual (critical incidents)." ICE, Use of Force Handbook, Chapter 4 (Sept. 15, 2025), https://perma.cc/ZGB7-CZUV. It therefore directs "ICE employees involved in a critical incident" to "anticipate an investigation by other appropriate outside law enforcement agencies," including being required to submit to law enforcement interviews. *Id.*

Thus, until the incidents described below, it was essentially a given that Minnesota and federal law enforcement would work collaboratively on parallel investigations, including by sharing evidence. Evans Decl. ¶ 7. Indeed, in all other matters, including complex homicide cases, mass shootings, drug and gun cases, and many other types of cases, collaboration and information sharing between the HCAO, BCA, and federal officials continues as normal. Moriarty Decl. ¶ 39.

***B. The Framework Governing Requests for Evidence from Federal Agencies***

State authorities request and obtain evidence from federal authorities based on longstanding intergovernmental practice, as discussed above, and through the legal framework governing evidentiary demands directed to the United States and its agencies, as discussed below.

Many federal agencies, including DOJ and DHS, have promulgated regulations governing

requests for testimony or documents for use in litigation or investigations in which the agency is not a party. These regulations—commonly known as "*Touhy* regulations," after *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)—were promulgated under authority from the Federal Housekeeping Act, 5 U.S.C. § 301 et seq. *Touhy* regulations typically require that requests for testimony or records be directed to designated agency officials and establish procedures for those officials to determine whether to authorize disclosure. *See Houston Bus. J., Inc. v. OCC*, 86 F.3d 1208, 1213 (D.C. Cir. 1996) ("When the documents are sought from a federal agency . . . the proper procedure is to make an administrative request, from which review may be had under the APA."). The regulations centralize agency decisionmaking regarding disclosure of official information, ensure consistency in responses, and prevent unauthorized disclosures by individual employees. *Watts v. SEC*, 482 F.3d 501, 508–09 (D.C. Cir. 2007). The Housekeeping Act, however, "does not authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301.[1] An agency must have an independent authority to withhold information. *Watts*, 482 F.3d at 509 ("[T]hough an agency regulation may provide the method by which an agency head will comply with or oppose a [legal demand], the legal basis for any opposition to the [legal demand] must derive from an independent source of law such as a governmental privilege or the rules of evidence or procedure." (quoting MOORE'S FEDERAL PRACTICE § 45.05(1)(b) (3d ed. 2006))); *see also, e.g.*, *Comm. for Nuclear Resp., Inc. v. Seaborg*, 463 F.2d 788, 793 (D.C. Cir. 1971) ("This statute does permit centralization of responsibility in a department whether to claim a privilege. But . . . it does not confer a privilege.").

Many agencies, including DOJ and DHS, expressly permit agency officials to disclose

[1] Following the Supreme Court's decision in *Touhy*, Congress added this sentence to the Housekeeping Act to stop agencies from using the Act to withhold information. H.R. Rep. No. 85-1461 (1958) ("Concealment has been the result of the application of [the Housekeeping Act] . . . The purpose of this bill is to correct that situation."); *see also* Pub. L. No. 85-619.

information to state and local law enforcement in conjunction with criminal law enforcement investigations and prosecutions *without* needing to comply with the agency's *Touhy* regulations. *See* 28 C.F.R. § 16.21(c); 6 C.F.R. § 5.41(i); 19 C.F.R. § 103.21(e). This practice reflects the longstanding norm of information sharing in matters of overlapping jurisdiction, through which each sovereign may carry out its own law enforcement responsibilities. *See supra* 2–4.

When it comes to demands for evidence outside of informal law enforcement cooperation, DOJ's and DHS's *Touhy* regulations are similar. DOJ's regulations provide that the decisionmaker "will authorize disclosure" unless specified countervailing considerations—such as privilege, procedural rules, or an adverse impact on active federal investigations—counsel otherwise. 28 C.F.R. § 16.26(c). DHS's regulations direct officials to consider similar factors, including: the public interest; whether disclosure would be consistent with DHS's mission and responsibilities; the need to avoid spending the time and money of the United States for private purposes; and whether the information is otherwise protected by privilege or confidentiality obligations. 6 C.F.R. § 5.48.

## II. Defendants Block Plaintiffs from Gathering Evidence in Three Shootings by Federal Officers Deployed During Operation Metro Surge

In late 2025, the Trump Administration initiated "Operation Metro Surge"—the largest immigration-enforcement operation in American history. *See* Ex. 1 to Decl. of Kyle R. Freeny (Freeny Decl.). Thousands of federal officers from agencies including ICE and U.S. Customs and Border Protection (CBP) descended on Minnesota to conduct immigration-enforcement activities, often in residential areas. *See* Ex. 2 to Freeny Decl. This operation represented an unprecedented concentration of federal immigration personnel and was undertaken without coordination with state and local authorities, including police forces charged with maintaining public safety and order. *See id.* One district court in Minnesota found, after an evidentiary

hearing, that federal authorities "adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws." *See* Findings of Fact and Conclusions of Law ¶ 45, *Hussen v. Noem*, No. 26-cv-324, ECF No. 191 (D. Minn. Mar. 9, 2026). Another district court found that ICE infringed on the constitutional right to counsel of detainees held at the Federal Whipple Building as part of Operation Metro Surge. *See* Order at 28, *Advocates for Human Rights v. DHS*, 26-cv-00749, ECF No. 95 (D. Minn. Feb. 12, 2026). And as described below, the longstanding practice of cooperation and evidence sharing between federal and Minnesota law enforcement abruptly ended during Operation Metro Surge when Defendants repeatedly blocked Plaintiffs from obtaining evidence in three separate federal officer-involved shootings.[2]

### *A. Initial Exclusion from Evidence Related to the Fatal Shooting of Renee Good*

On the morning of January 7, 2026, ICE Agent Jonathan Ross shot and killed 37-year-old U.S. citizen Renee Good in her car on a residential street in Minneapolis. *See* Ex. 3 to Freeny Decl. Video of the shooting has been widely publicized by the media. *See id.* Ms. Good lived in Minneapolis with her wife and young child, and friends and family describe her as a prize-winning poet and hobby guitarist who was extremely compassionate, loving, forgiving, and affectionate. *Id.*; see also Decl. of Mary Moriarty (Moriarty Decl.) ¶ 4.

As is standard practice in officer-involved shootings, including incidents involving federal officers, the BCA promptly arrived at the scene and began investigating alongside federal

---

[2] In another break from longstanding law enforcement practices, federal officers in Operation Metro Surge frequently concealed their identities with masks. Evans Decl. ¶ 29. This practice can make it extremely difficult for state and local investigators to identify federal agents involved in shootings and other potentially unlawful conduct without federal cooperation, which Defendants continue to withhold. *Id.*

investigators. Evans Decl. ¶ 11. The BCA has extensive experience investigating officer-involved use-of-force cases and maintains a team of investigators specially trained to conduct such investigations. *Id.* ¶ 3. On the morning of Ms. Good's death, the BCA and leadership in the FBI's Minneapolis Field Office agreed to conduct a joint investigation. *Id.* ¶ 11. They reached this decision after consulting with the HCAO and the U.S. Attorney's Office for the District of Minnesota. Moriarty Decl. ¶ 5. Also that morning, the First Assistant U.S. Attorney confirmed to the HCAO that the FBI and the BCA would collaborate on a joint investigation. *Id.*

BCA investigators relied on federal officials' representations in making decisions about the course of their own investigation, including any actions they took at the scene. Evans Decl. ¶ 12. For example, BCA investigators trusted that important evidence gathered by federal investigators would be made available to them for inspection and analysis, including the vehicle in which Ms. Good was shot, shell casings from the scene, and the shooter's firearm. *Id.* Had BCA investigators known that federal authorities would refuse them access to critical evidence, they would have taken different measures to secure its availability. *Id.* For example, the BCA would have attempted to process portions of the scene and take possession of Ms. Good's vehicle. Instead they relied on the federal officials' representations that evidence would be available. *Id.*

As another example, in the hours after the shooting death of Ms. Good, BCA agents went to the Whipple Federal Building to interview the federal officers involved. *Id.* ¶ 13. FBI agents told their BCA counterparts that they would be included in the interviews. *Id.* Less than an hour later, however, BCA agents were told that the federal government's position had changed, abruptly and inexplicably, such that Homeland Security Investigations (HSI), the DHS subcomponent leading the investigation, would not allow BCA agents to be present. *Id.* BCA's requests for even the most basic information—such as the names of federal officers involved—

were ignored. *Id.* And the point of contact given to the BCA agents, the Acting Director of the ICE St. Paul Field Office, did not respond to multiple outreach attempts. *Id.*

The FBI informed the BCA that—despite the initial agreement earlier that day to jointly work the case and share files—the federal government would immediately cease any and all cooperation with State authorities. *Id.* ¶ 14. BCA investigators were excluded from interviews, prevented from following their standard investigative procedures, and blocked from accessing key physical evidence. *Id.* When the BCA asked the FBI why it would no longer cooperate, the FBI directed the BCA to the U.S. Attorney for the District of Minnesota. *Id.* On the evening of January 7, 2026, the U.S. Attorney confirmed to the BCA Superintendent that there would be no joint investigation and no federal cooperation or evidence sharing with State officials. *Id.* ¶ 15. The only justification given was that the shooting was a "federal" matter. *Id.*

Public statements from high-ranking federal officials confirmed that there would be no federal cooperation with the BCA investigation into Ms. Good's death. The day after the shooting, then-DHS Secretary Kristi Noem incorrectly asserted that "they [the State of Minnesota] don't have any jurisdiction in this investigation." Ex. 4 to Freeny Decl. President Trump stated that there would be no federal cooperation because Minnesota officials were "crooked." Ex. 5 to Freeny Decl. And in response to a reporter's question about why federal authorities "cut off" state access to evidence for use in their investigation, Vice President Vance asserted that state and local law enforcement should not "go after" the officer because his conduct was a "federal issue," that any state prosecution would be barred by immunity, and that any charges would "get tossed out by a judge." Freeny Decl. ¶ 7. At the time of these statements, federal authorities could not have completed an investigation capable of supporting conclusions about either criminal liability under state or federal law or immunity. But by then, federal

authorities had already taken exclusive possession of key pieces of evidence. Evans Decl. ¶ 12.

Federal officials not only blocked the BCA from accessing evidence important to the BCA's own investigation, but they simultaneously halted any *federal* investigation into Ms. Good's killing. Then-Deputy Attorney General Todd Blanche stated during a news interview that "[w]e investigate when it's appropriate to investigate. And that is not the case here. . . . So no, we are not investigating." Freeny Decl. ¶ 8. According to public reporting, multiple prosecutors and agents within the Justice Department resigned due at least in part to the federal government's sharp departure from typical practice by refusing to even investigate the federal agent who killed Ms. Good. *See* Ex. 6 to Freeny Decl. The officials who resigned included an FBI agent pressured to discontinue a civil rights inquiry into the shooting and to instead pursue an investigation of Ms. Good's wife. *Id.* The federal government's decision not to investigate the killing of Ms. Good ignores evidence suggesting that the shooting may have violated federal law; the decision thus marks a sharp departure from longstanding federal practice to conduct criminal investigations in such circumstances. *See* Exs. 7 and 8 to Freeny Decl.

Notwithstanding the federal government's stonewalling, Minnesota is fulfilling its sovereign duty to conduct a thorough and fair investigation into Ms. Good's death. The BCA and the HCAO are leading this investigation, and the HCAO will be responsible for determining whether to bring any charges for violations of state law after it considers the available evidence. Evans Decl. ¶ 16. In connection with that investigation, the BCA has sought, and Minnesota courts have found probable cause to issue, search warrants for evidence related to the death of Ms. Good. Evans Decl. ¶ 17. For example, the BCA obtained a search warrant for Ms. Good's clothing and the cell phone of the agent who killed Ms. Good. *Id.*

On March 18, 2026, the FBI confirmed to the BCA that DOJ and DHS had decided that

they would not make available or release evidence related to Ms. Good's killing to the BCA. *Id.* ¶ 18. According to the FBI, DOJ and DHS had directed it to turn over the evidence related to Ms. Good's killing to DHS's Office of Inspector General only. *Id.*

***B. Initial Exclusion from Evidence Related to the Shooting of Julio Sosa-Celis***

On the evening of January 14, 2026, a federal immigration agent shot and wounded Julio Cesar Sosa-Celis in Minneapolis. Ex. 9 to Freeny Decl. At the time he was shot, Mr. Sosa-Celis, a Venezuelan national, lived in Minneapolis with his wife and young child. *Id.* Video of the incident shows Mr. Sosa-Celis enter through the front door of a home; it then shows ICE agent Christian Castro stand several feet from that front door to the home and fire a gun at the door. Ex. 9 to Freeny Decl. Mr. Sosa-Celis suffered a gunshot wound to the leg. *Id.*

Initially, federal agents again led state investigators to believe they would cooperate, as they historically had, in parallel investigations. Evans Decl. ¶ 19. Local investigators again relied on those representations to make decisions about their investigation. *Id.* ¶ 20. For instance, immediately after the shooting, BCA and FBI agents initially paired together to begin witness interviews, canvass the area, and process the scene. *Id.* However, this collaboration ended abruptly when the FBI Assistant Special Agent in Charge directed that BCA agents would not be allowed to collaborate with the FBI. *Id.* ¶ 21. In one instance, a BCA agent learned of this direction from the FBI agent with whom he was paired to interview a key ICE agent witness. *Id.* During the interview, the BCA agent could hear the FBI agent's phone dinging with message alerts. *Id.* After the interview, the FBI agent checked her phone, apologized to the BCA agent, and stated that the FBI could no longer work with state agents. *Id.* As a result of the FBI's directive, BCA investigators were excluded from witness and subject interviews going forward and no longer had access to the evidence FBI agents had collected. *Id.*

After the FBI terminated the short-lived joint investigation, but before federal investigators left the scene of the shooting, BCA agents secured a judicial search warrant for evidence at the scene. *Id.* ¶ 22. In executing that warrant, the BCA was able to obtain several pieces of physical evidence, but they were unable to obtain the shooter's handgun or any other evidence in possession of the federal agents involved. *Id.* Local police and federal agents established a perimeter around the scene, but as protestors arrived, it became increasingly difficult to hold the scene. *Id.* ¶ 23. Federal officers began to leave the area, and BCA investigators made the decision to collect as much evidence as possible via the search warrant before departing. *Id.* BCA agents returned to the scene in subsequent days and obtained additional evidence that they could not gather on the night of the incident. *Id.* ¶ 24.

Within days of the incident, the federal government charged Mr. Sosa-Celis with attacking the federal agent who shot him. *See United States v. Aljorna*, No. 26-mj-23, ECF No. 1 (D. Minn. Jan. 16, 2026). But DOJ moved to voluntarily dismiss that criminal case with prejudice less than a month later, citing "newly discovered evidence" that was "materially inconsistent with" the allegations it had filed. *See id.*, ECF No. 48 (D. Minn. Feb. 12, 2026). News media reported it had become "clear that the federal agents involved lied during sworn testimony." Ex. 10 to Freeny Decl.

Indeed, on May 18, 2026, the HCAO charged ICE officer Castro with four counts of second-degree assault and one count of falsely reporting a crime in connection with the above-described incident, based on the evidence gathered and investigation conducted by the BCA. *See* Moriarty Decl. ¶ 8. Prior to filing these charges, Plaintiffs repeatedly asked federal officials to permit access to investigative information about that shooting. *Id.* ¶ 8, 15. Despite these efforts, federal officials refused to provide access to the requested information. *Id.*

In response to the HCAO charging Castro, a DHS spokesperson claimed that "[t]his is a federal issue, and it must be handled at the federal level." *See* Freeny Decl. Ex. 11. The fact that Minnesota was able to bring charges without gaining access to evidence in Defendants' possession does not, however, obviate its interest in obtaining evidence from federal authorities. Evidence relevant to proceedings in that charged case still remains in the exclusive control of federal officials, including grand jury testimony and physical evidence, including but not limited to the gun used by the federal agent during the incident. *Id.*

### *C. Initial Exclusion from Evidence Related to the Fatal Shooting of Alex Pretti*

Mid-morning on January 24, 2026, federal immigration agents shot and killed U.S. citizen Alex Jeffrey Pretti on a public street in Minneapolis—the third federal officer-involved shooting of a Minneapolis resident that month. Ex. 12 to Freeny Decl. Based on available video, which has been publicized by the media, it appears that Mr. Pretti was restrained by multiple officers when two masked officers shot and killed him. *Id.* Mr. Pretti worked as an intensive care unit nurse in the Minneapolis Veterans Administration Health Care system. *Id.*

Shortly after the shooting, BCA investigators arrived at the scene to carry out their investigative duties. Evans Decl. ¶ 26. A federal agent serving as the incident commander informed them that he had been ordered not to allow the BCA access to the scene and to instead permit only the FBI to process it. *Id.* When the BCA asked if its Crime Scene Team could assist with scene processing, the FBI refused. *Id.* Federal authorities then blocked the BCA from even *entering* the area of the crime scene, even though it was a public street in Minneapolis that the BCA had the legal right and authority to access. *Id.* The BCA sought and secured a warrant to access the scene, but before BCA officers could arrive on scene with the warrant, federal authorities left the scene with key pieces of evidence in their possession. *Id.*

As a result, federal investigators took exclusive possession and control of important evidence before the BCA had any opportunity to examine, photograph, or document it. Evans Decl. ¶ 27. This evidence includes, but is not limited to, the firearms used by the involved officers, a firearm taken from Mr. Pretti before officers shot him, the cell phones of the involved officers, and other physical evidence, including projectiles and casings. *Id.* All of this evidence was covered by the search warrant that the BCA obtained. *Id.*

Federal agents also excluded the BCA from participating in witness interviews. *Id.* ¶ 28. The day of the shooting, BCA agents went to the Whipple Federal Building to interview the federal agents involved. *Id.* After waiting for hours, they were eventually told by the HSI Assistant Special Agent in Charge that HSI was leading the use-of-force investigation with the FBI's assistance and that the BCA would not be allowed to participate in any part of the investigation. *Id.*

Despite the federal government's earlier refusals to cooperate, the BCA continued to press for a return to the well-established norm of cooperation to investigate the shooting of Mr. Pretti. Evans Decl. ¶ 30. In early February, the U.S. Attorney's Office and the FBI contacted the BCA to indicate a desire to resume normal cooperation that would include evidence-sharing and the potential for a joint investigation into Mr. Pretti's killing. *Id.* Senior DOJ officials dispatched an attorney from Main Justice to Minneapolis, who arrived on or about February 9, 2026. *Id.* There were indications that the plan for federal-state cooperation on the Pretti investigation had been approved by the Deputy Attorney General (DAG). *Id.*

About a week later, it became apparent that the DAG had been overruled. *See* Evans Decl. ¶ 31. On or about February 13, 2026, the FBI formally notified the BCA that it would not provide the BCA with access to any information or evidence related to the death of Mr. Pretti.

*Id.* DOJ expected the BCA to share its evidence with federal authorities, but federal authorities had no intention of sharing their evidence with Minnesota. *Id.* Based on the sequence of events, it is apparent that this decision was made at the highest levels of DOJ and/or by the White House.

Taken together, this sequence of events—including the cessation of cooperation across multiple investigations, the involvement of senior DOJ officials, and the ultimate categorical refusal to provide investigative materials—reflects more than isolated decisions not to share evidence in individual cases. Instead, it reveals a decision to obstruct state investigations into shootings involving federal officers deployed during Operation Metro Surge, including by withholding investigative information, based on the legally erroneous premise that such shootings are matters of exclusive federal concern.

### *D. Plaintiffs' Formal Written* **Touhy** *Demands to DOJ and DHS*

After being blocked from obtaining investigative materials through ordinary channels, Plaintiffs submitted formal *Touhy* requests to DOJ and DHS seeking disclosure of investigative information and material relating to all three Operation Metro Surge shootings. Moriarty Decl. ¶ 12. Plaintiffs took this step, notwithstanding Defendants' demonstrated unwillingness to cooperate, to ensure that all avenues of redress were pursued. Defendants' responses to those *Touhy* requests—and, in certain instances, their failure to respond at all—reflect the decision to withhold evidence from Minnesota law enforcement. *Id.*

On February 2, 2026, the HCAO submitted substantively identical, formal *Touhy* demands to DHS and DOJ for evidence relevant to the HCAO's investigation of the fatal shooting of Ms. Good. *Id.* ¶ 13. The HCAO requested a response by February 17, 2026, because of the urgent need and the fact that it appeared federal authorities had already decided not to share evidence with state authorities. *Id.* ¶ 13 & Exs. 2-3 thereto. After the February 13, 2026, final

decision, as announced by the FBI, that federal authorities would not share evidence with the State on the Pretti matter, Evans Decl. ¶ 31, the HCAO and the BCA jointly submitted substantively identical, formal *Touhy* demands on February 17, 2026, to DHS and DOJ for evidence relevant to their investigation of the killing of Mr. Pretti. Moriarty Decl. ¶ 14 and Exs. 4-5. The HCAO and the BCA requested a response by March 3, 2026. *Id.* ¶ 14. Although Plaintiffs understood that the February 13 decision to deny evidence sharing constituted the agencies' final determination on the matter, the HCAO and the BCA nonetheless submitted a second *Touhy* demand. On February 18, 2026, the HCAO submitted substantively identical, formal *Touhy* demands to DHS and DOJ for evidence relevant to their investigation of the shooting of Mr. Sosa-Celis by March 5, 2026. *Id.* ¶ 15 & Exs. 6-7 thereto. They requested a response by March 5, 2026. *Id.*

Each of the demand letters explained Minnesota law enforcement officials' need for evidence to facilitate a comprehensive investigation of each incident. *See generally* Exs. 2–7 to Moriarty Decl. For example, the letters explained that physical evidence, including the firearms used in the shootings, will assist Plaintiffs in reconstructing the incidents. *See, e.g.,* Ex. 2 to Moriarty Decl. at 4. Audiovisual evidence (including footage with contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist Plaintiffs in establishing the sequence of events and shed light on the officers' states of mind. *Id.* And operational plans, along with employment and training records, are relevant to discerning the officers' preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed their states of mind at the times of the incidents and may bear on the objective reasonableness of the uses of force. *Id.* Each demand letter complied with the relevant agency's *Touhy* regulations and explained why the

regulatory factors clearly favored disclosure. *See generally* Exs. 2-7 to Moriarty Decl.

Each of the demand letters further explained that the need for evidence was extraordinarily time sensitive. *See e.g.,* Ex. 2 to Moriarty Decl. at 5–6. The letters also noted that it is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. *Id.* This is in part because the passage of time can dissipate and deteriorate evidence. *Id.* Plaintiffs' prompt access to federal law enforcement witnesses is essential to ensure that evidence is not lost because of fading memories, external factors influencing recollection, or witness unavailability. *Id.* And there are serious concerns about the possibility of evidence spoliation here. Indeed, only hours after the shooting of Alex Pretti, President Trump posted on social media a photograph of a firearm that the President claimed belonged to Mr. Pretti. Ex. 13 to Freeny Decl. The photograph shows the gun on the seat of a car, surrounded by charging cords, *id.*, which indicates it was not protected or handled according to normal law enforcement processes meant to properly preserve evidence, *see* Exs. 6–7 to Moriarty Decl. at 5.

Plaintiffs also explained in each *Touhy* demand letter that prompt disclosure of the requested evidence is important to ensure compliance with federal and Minnesota law, including the right of the accused to due process and the Minnesota statute of limitations. *See generally State v. Kaiser*, 486 N.W.2d 384 (Minn. 1992); *see also* Minn. Stat. § 628.26. Minnesota law also provides crime victims with the rights of notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. §§ 611A.01, 611A.02, 611A.033.

### *E. Defendants' Response to Plaintiffs'* **Touhy** *Requests*

#### *i. DHS's Original Response*

On February 18, 2026—one day after the date by which it had requested a response from

DHS in the Good matter—a senior attorney at ICE e-mailed to acknowledge receipt of the "DHS Touhy demand" for records in the Good matter and to "request an extension to March 3, 2026" to respond. ICE-AR 117. The HCAO agreed to the requested extension given the agency's commitment to respond no later than March 3, 2026, but reiterated the urgency. ICE-AR 99.

On March 3, 2026, the HCAO received a final written response from DHS. Ex. 9 to Moriarty Decl. Citing 6 C.F.R. § 5.41, the response claimed that DHS's *Touhy* regulations "do not apply to disclosure of official information to federal, state or local law enforcement authorities related to criminal law enforcement investigations." *Id.* at 1. DHS indicated that it was therefore considering the HCAO's demand as a request under the Privacy Act, 5 U.S.C. § 552a. *Id.* It stated that DHS was "refer[ring]" the HCAO "to DOJ" for a response, because "the U.S. Department of Justice (DOJ), Federal Bureau of Investigation (FBI) is leading the investigation into the subject matter of your demand." *Id.* DHS did not separately respond, nor request extensions to respond, to the Pretti or Sosa-Celis demands, by the March 3 and March 5 deadlines. Plaintiffs filed this lawsuit on March 24, 2026.

*ii. DOJ's Initial Response*

DOJ did not provide any written responses to the three *Touhy* demands by the requested deadlines, nor did it seek an extension. Moriarty Decl. ¶ 20. As noted above, DOJ repeatedly and definitively refused to share any evidence in these cases, both before and after the demand letters were sent. DOJ did not identify any specific considerations permitting it to withhold the evidence, other than the (legally erroneous) view that the shootings were exclusively a "federal" matter. Notably, DOJ did not invoke any privilege or allege any impairment of an ongoing investigation.

*iii. Defendants' Post-Litigation Letters*

On June 4, 2026, more than two months after this lawsuit was filed, DOJ and DHS (acting through ICE) issued new written responses to the *Touhy* demands. DHS's "supplemental" Good response purported to "clarify[]" the original March 3 letter, for the first time articulating DHS's position that *Touhy* regulations only apply to requests submitted in connection with litigation and declining to process the Good demand because "[t]he information [sought] is not associated with an ongoing court action." ICE-AR 135. The *post hoc* written responses to the Pretti and Sosa-Celis requests articulated the same position. DHS declined those requests on the ground that "[t]he information [sought] is not associated with an ongoing court action." ICE-AR 121, 128. CBP also separately issued a letter denying the Pretti request on similar grounds, stating that Plaintiffs' request "is not a *Touhy* request." CBP-AR 22.

In each matter, DHS also refused to share the requested information pursuant to the law enforcement exception set forth in 6 C.F.R. § 5.41. It did so on the basis of a series of boilerplate justifications that lacked any factual connection to the requests, including that the requests "*may* seek information protected from disclosure by statute or federal regulations" (emphasis added), the requests seek "law-enforcement sensitive" information, and responding to the requests would "divert[] agency resources." *Id.* DHS did not provide any explanation for these conclusory statements; did not consider Plaintiffs' well-established ability to protect law enforcement-sensitive information; and did not purport to weigh the burden of production against the public interest in allowing the state to investigate and enforce its laws. In fact, each letter made the extraordinary assertion that Plaintiffs lacked a "need to know" the information requested. *Id.*

The DOJ issued similar letters on the same day. Each substantially identical response stated that the request "does not comply with the procedural requirements of the Department's

*Touhy* regulations." DOJ-AR 30, 32, 34. DOJ cited 28 C.F.R. § 16.21(a)(2) for this proposition but did not identify any specific purported defect and provided no further explanation of why it refused to consider the requests under its *Touhy* regulations.

DOJ also purported to consider whether to authorize disclosure under the law-enforcement exception to the *Touhy* regulations. DOJ declined such authorization on the basis that "the federal government has an open investigation into the incident, and disclosure would improperly reveal investigatory records and/or interfere with federal law enforcement investigations." *Id.* As with the DHS letters, DOJ provided no support for this boilerplate conclusion; nor did it explain how these three cases differed from the vast run of cases where voluntary law-enforcement sharing is sought and routinely made—cases that inevitably also involve disclosure of investigatory records and very commonly involve parallel investigations.

*iv. Defendants Briefly Cooperate with Plaintiffs' Requests for Evidence Before Reversing Course.*

On June 26, 2026, three months after this lawsuit was filed, the Chief of the Criminal Division of the U.S. Attorney's Office sent a letter to Plaintiff Drew Evans, Superintendent of the BCA. Moriarty Decl. ¶ 28; Evans Decl. ¶ 38. This letter stated that the federal government, "is prepared to share evidence and collaborate as appropriate in the investigative matters relating to the federal officer-involved shootings." Moriarty Decl. ¶ 28; *see also* Ex. 17 to Moriarty Decl. at 1. The U.S. Attorney's Office acknowledged that the position "represent[ed] a change to this office's previous stance vis a vis the sharing of evidence and cooperation between our office and BCA in these investigations," as set forth in the June 4 denial letters. Ex. 17 to Moriarty Decl. at 2. The letter acknowledged that, "ultimately, the best course for these investigations will be impartial and open sharing of information and evidence between the USAO and BCA." *Id.*

After this agreement was finalized, the U.S. Attorney's Office began sharing evidence

with the HCAO and the BCA, including providing electronic hard drives with body-worn camera footage, officer statements, and other evidence. Moriarty Decl. ¶ 29. Almost immediately, however, Defendants reversed course. On July 13, 2026, the HCAO publicly announced the cooperation agreement, thanking the U.S. Attorney's Office for its cooperation. *Id.* ¶ 31. Shortly after that announcement, the U.S. Attorney's Office stopped cooperation. *Id.* ¶ 32. Despite repeated requests, the U.S. Attorney's Office stopped sharing evidence or information with the HCAO and the BCA, even though there were multiple, key pieces of evidence that had not yet been turned over to the HCAO and the BCA. *Id.* ¶ 33; Evans Decl. ¶ 41. Plaintiff Moriarty spoke with the U.S. Attorney multiple times about his office's decision to terminate the evidence-sharing agreement. Moriarty Decl. ¶ 33. Throughout these conversations, the U.S. Attorney confirmed sharing was paused and repeatedly noted that he was "optimistic" that he would be able to restart information sharing "soon." *Id.* No such restart occurred.

On September 10, 2026, Plaintiff Moriarty again spoke with the U.S. Attorney. *Id.* ¶ 35. During that call, the U.S. Attorney explained that evidence sharing and cooperation from the U.S. Attorney's Office would be on pause indefinitely "in light of challenges with D.C." *Id.* He could not provide a timeline for when he believed his office would be able to restart sharing evidence with the HCAO and BCA. *Id.* ¶ 36. A short time later, a Deputy Hennepin County Attorney met with the U.S. Attorney's Office's Criminal Chief. *Id.* ¶ 37. The Criminal Chief confirmed that the U.S. Attorney's Office would not be sharing evidence with the HCAO and the BCA and rejected a request to allow investigators to visit the U.S. Attorney's Office to watch video evidence that had not yet been shared with the HCAO and the BCA. *Id.* However, the Criminal Chief indicated there would be continued collaboration on matters unrelated to the three shootings. *Id.* ¶ 38. All of this signals that the U.S. Attorney's Office will not be able to share

any more evidence with the HCAO or the BCA unless and until there is a change in policy at the highest levels of DOJ. *Id.*

As a result, it has been months since Defendants have provided evidence or information related to the federal officer-involved shootings that occurred in Minnesota during Operation Metro Surge to the HCAO or BCA. Evans Decl. ¶ 41. Defendants have important evidentiary material, such as a recorded interview with one of the agents who shot Mr. Pretti, that Plaintiffs have never seen. *Id.* ¶ 42. Moreover, access to Defendants' employees, including those who were witnesses to the shootings, is important to conducting Plaintiffs' investigations and to presenting testimony at potential future criminal proceedings. But Defendants have decided that Plaintiffs are not entitled to this evidence and testimony, obstructing Plaintiffs' power and duty to investigate and potentially prosecute criminal activity within their jurisdiction.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a)). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "The Court must accept the plaintiff's factual allegations as true and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Bain v. Gary, Williams, Parenti, Watson & Gary, P.L.*, 53 F. Supp. 3d 144, 148 (D.D.C. 2014) (citation modified).

Under the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; "in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right"; or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D). Arbitrary and capricious review is not a "rubber stamp." *Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000). Though deferential, it still requires "thorough, probing, in-depth review," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), to determine whether an agency action was both "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency's decisionmaking is not reasonable if it "relied on factors which Congress has not intended," "failed to consider an important aspect of the problem," "runs counter to the evidence before the agency," or lacks a "rational connection between the facts . . . and the choice made." *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In the typical APA case, the focal point for judicial review is "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). But that principle presupposes that the agency has in fact generated a reviewable record reflecting the basis for its action. Where, as here, the agency has communicated definitive decisions orally while initially declining to issue written determinations, courts may consider extra-record materials as necessary to determine what action was taken, whether it is final, and whether it was reasonable. *See, e.g.*, *Citizens to Preserve Overton Park*, 401 U.S. at 420 (permitting inquiry beyond the existing record where there are no formal findings or where the record is inadequate for review).

In addition to their APA claim, Plaintiffs bring a claim under the Tenth Amendment. This Court has the equitable power to "enjoin unconstitutional actions by state and federal officers." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015).

## I. Defendants' Denials Are Reviewable under the APA

### A. Defendants' Denials Constitute Final Agency Action

As an initial matter, Defendants' denials of Plaintiffs' access to evidence are final agency actions subject to immediate judicial review. Indeed, Defendants do not offer any argument to the contrary, which is itself dispositive. *Flytenow, Inc. v. FAA*, 808 F.3d 882, 889 (D.C. Cir. 2015) ("Because finality is non-jurisdictional, we accept the [agency's] decision not to pursue any such defense it might have had.").[3]

Nor could they. Agency action is "final" for purposes of APA review if it "mark[s] the consummation of the agency's decisionmaking process," is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted). Courts take a "pragmatic approach" to finality, *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quotations omitted), and "final agency action may result 'from a series of agency pronouncements rather than a single edict,'" *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (quotations omitted). "An agency's denial of a request [to access information] is final agency action for the purpose of § 704." *Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006); *see also Houston Bus. J., Inc.*, 86 F.3d at 1212 ("If the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court under the APA.").

[3] Defendants' brief does include the inscrutable sentence that "Because [Plaintiffs' letters] are not Touhy requests, there is no final agency action and no waiver of sovereign immunity." Mot. at 11. It is unclear how the conclusion follows from the premise; whether Defendants' actions are final does not depend on whether or not Plaintiffs' requests fit within *Touhy* regulations. In any event, the D.C. Circuit has squarely rejected the argument that final agency action is needed to fit within the waiver of sovereign immunity contained in 5 U.S.C. § 702. *Trudeau* v. FTC, 456 F.3d 178, 187 (D.C. Cir. 2006).

As demonstrated through word and deed, Defendants had made final agency decisions not to give Plaintiffs access to evidence shortly after the shootings. First, Defendants unequivocally informed Plaintiffs that they could not cooperate in the investigations and would not be given access to evidence. Evans Decl. ¶¶ 13-15, 21, 26, 28, 31; *see also*, *Ciba-Geigy Corp. v. E.P.A.*, 801 F.2d 430, 436 (D.C. Cir. 1986) (finding finality satisfied "[o]nce the agency publicly articulate[d] an unequivocal position" that effected the parties). This decision was not tentative, but conveyed to Plaintiffs repeatedly as an authoritative command from high in the agency's hierarchy. Indeed, subsequent communications—such as the March DHS letter, ICE-AR 119—confirmed the same decision that had already been made. Second, Defendants' decisions had an immediate and substantial effect on Plaintiffs—the agencies adhered to their decision and in fact did *not* give Plaintiffs access to evidence throughout the period leading up to the filing of the complaint. And they continue to refuse to do so today.[4] This refusal has deprived Plaintiffs of access to evidence that would aid them in their sovereign duty to investigate potential violations of Minnesota law. These denials were final and are properly before this Court for judicial review.[5]

**B. Defendants' Decision Is Not Committed to Agency Discretion by Law**

In their motion to dismiss, Defendants contend that their refusal to provide evidence to Plaintiffs cannot be reviewed under the APA because it is "committed to agency discretion by

[4] The DOJ briefly provided access to evidence during this litigation, but that does not make their earlier denials any less final. *See, e.g.*, *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020). Moreover, DOJ promptly reconsidered its temporary cooperation, reverting back to their initial decisions not to provide evidence to the Plaintiffs. Moriarty Decl. ¶¶ 32-37. Thus, Plaintiffs continue to be harmed by Defendants' decision not to provide them access to evidence.

[5] If there was any doubt, DHS's June letters—its "supplemental" response to its earlier Good response, ICE-AR 135, and its substantively identical responses to the Pretti and Sosa-Celis requests, ICE-AR 121; ICE-AR 128—place finality beyond question. *See, e.g., Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) (allowing courts to deny a motion to dismiss based on facts included in an amended complaint that post-date the original filing).

law." 5 U.S.C. § 701(a)(2). Thus, although Defendants acknowledge that "an APA action is appropriate to challenge a response to a *Touhy* request," Def. Mot. 11 n.4, they contend that rule only applies when the agency applies the full procedure set forth in its *Touhy* regulations. By contrast, in Defendants' view, when "requests for evidence do not fit within Defendants' applicable *Touhy* regulations," Mot. 10, or when the requested evidence could be shared under the law enforcement sharing provisions of the regulations, *id.* at 12, there is no judicial review. This argument does not withstand scrutiny.

There is a "'well-settled' and 'strong presumption'" favoring judicial review of agency action. *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020) (citations omitted). Accordingly, the Supreme Court has "read the § 701(a)(2) exception for action committed to agency discretion quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (internal quotation marks omitted). Moreover, courts "generally limited the exception to certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,' such as a decision not to institute enforcement proceedings." *Id.*

Defendants' argument seems to be that when an agency's *regulations* do not set forth specific considerations for the agency to apply, then agency decisions have been committed to its discretion. *See* Def.'s Mot. at 11-12; *see also id.* at 3 ("DOJ's decision to disclose official information to external law enforcement agencies is a matter "committed to agency discretion by law. 28 C.F.R. § 16.21(c)."). But the analytical focus in "committed to agency discretion" disputes is on the language of the *statute*. *E.g.*, *Dep't of Com.*, 588 U.S. at 772. Thus, "[t]he key to any determination of reviewability is *congressional* intent," *Ramah Navajo Sch. Bd., Inc. v. Babbitt*,

87 F.3d 1338, 1343 (D.C. Cir. 1996) (emphasis added), and "unless there is persuasive reason to believe that *Congress* intended to preclude judicial review," then APA review remains available. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 155–56 (2025) (emphasis added, internal quotation marks omitted). An agency's decision to give itself discretion does not supply the clear evidence of *congressional* intent to overcome the APA's presumption of reviewability. Were it otherwise, agencies could simply unilaterally opt out of APA review, which is not the law. *Foster v. Mabus*, 895 F. Supp. 2d 135, 145 (D.D.C. 2012).

When considering statutory language, Defendants' argument falls apart. Far from providing agencies with unfettered discretion to withhold evidence, the Housekeeping Statute expressly "does *not* authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301 (emphasis added). This language demonstrates an unmistakable Congressional intent *against* agency discretion in refusing to provide records. *See also* H.R. Rep No. 85-1461, at 3353 (1958) ("Executive officials have let every file clerk become a censor. The purpose of this bill is to correct that situation.").

Without any statutory language to support their unreviewability argument, Defendants contend that "courts have a duty to respect legitimate policy choices made by agencies." Def.'s Mot. 11 (citing *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 866 (1984)). But respect for legitimate policy choices does not mean agency actions are beyond judicial review. Such an argument "amount[s] to an attack on the very principles underlying the APA." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 602 (D.C. Cir. 2007) (rejecting, as "baseless," the argument that an agency's "managerial choice" is "one not susceptible to judicial review"). Indeed, every day, courts review agency actions that are driven by policy choices to ensure (among other things) that the agency gave a reasoned explanation that is not arbitrary or capricious. *E.g.*, *Dep't of Com.*,

588 U.S. at 772. And that same APA review is appropriate here. Defendants' arguments to the contrary in their motion to dismiss should be rejected.

## II. It Was Arbitrary and Capricious for DOJ and DHS to Bar Plaintiffs from Accessing Evidence

### A. Barring Plaintiffs from Evidence After the Shootings Was Arbitrary and Capricious

Almost immediately after each of the three shootings, Defendants made clear through their conduct and representations that they decided, categorically, to withhold all evidence from Plaintiffs. *See supra* 7-15. That decision was contrary to law, arbitrary and capricious, and an abuse of discretion because Defendants failed to examine relevant considerations, departed from prior policy without reasoned explanation, ignored serious reliance interests, and adopted a position with irrational consequences. *See State Farm*, 463 U.S. at 43; *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 28–33 (2020). Defendants do not attempt to argue otherwise in their motion to dismiss – and indeed do not address their denials at all.

*First*, Defendants based their categorical denial on an improper justification that the shootings were strictly a "federal" matter that should not concern the State. *See supra* 9. For example, the U.S. Attorney confirmed to the BCA Superintendent that there would be no joint investigation and no federal cooperation or evidence sharing regarding the shooting of Ms. Good because the shooting was a "federal" matter. Evans Decl. ¶ 15. And Defendants made almost identical statements following the shootings of Mr. Sosa-Celis and Mr. Pretti. *See* Ex. 11 to Freeny Decl.(DHS spokesperson stated that "[t]his is a federal issue, and it must be handled at the federal level"). This echoed Vice President Vance's statement that this was a purely federal matter in which federal officers were beyond the reach of state and local law enforcement. Freeny Decl ¶ 7. As discussed above, this Court may look beyond the administrative record here to review the real

basis for an agency's action, not embrace a "naiveté from which ordinary citizens are free" by ignoring evidence. *Dep't of Com.*, 588 U.S. at 785.

Notably, in their motion to dismiss, Defendants do not defend that rationale. And for good reason. "[A] State is generally 'entitled to the sovereignty and jurisdiction over all the territory within her limits,'" *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022) (quoting *Lessee of Pollard v. Hagan*, 3 How. 212, 228 (1845)), and "[o]f course an employee of the United States does not secure a general immunity from state law while acting in the course of his employment," *Johnson v. Maryland*, 254 U.S. 51, 56 (1920). There are particular circumstances when a federal officer may be immune from state prosecution, but that is ultimately a fact-bound question reserved for the judiciary, not for the Executive Branch to decide for itself. *See In re Neagle*, 135 U.S. 1, 75–76 (1890). The Executive may not seize and suppress the very evidence necessary for courts to resolve a potential future defense against prosecution. It is both unlawful and arbitrary and capricious for Defendants to categorically deny Plaintiffs evidence as a means to prevent the State from investigating the shooting incidents in the first place. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) ("Agency action that stands on a faulty legal premise and [lacks] adequate rationale is arbitrary and capricious." (internal quotations omitted)).

*Second* and relatedly, Defendants failed to properly consider Minnesota's sovereign interest in investigating these shootings. Minnesota has well-recognized sovereign interests in investigating crime within its territory, enforcing its criminal laws, protecting victims, and ensuring public confidence in impartial justice. *See Heath*, 474 U.S. at 93. The failure even to recognize or consider this state interest—instead, immediately labeling the matters as "federal" only—was arbitrary and capricious. *See Schroeder v. U.S. Dep't of Veterans Affs.*, 673 F. Supp. 3d 1204, 1227 (D. Kan. 2023) (invalidating *Touhy* denial where government "failed to consider an

important aspect of the problem—specifically, [the requestor's] need to procure the information").

*Third*, Defendants reversed longstanding practices related to intergovernmental sharing without meaningful explanation. For decades, federal and Minnesota authorities cooperated in overlapping criminal matters, including investigations involving federal-officer shootings. Evans Decl. ¶¶ 5-7. Defendants' abrupt reversal of a longstanding practice without explanation is a hallmark of arbitrary decisionmaking. *See Kirwa v. DOD*, 285 F. Supp. 3d 21, 38 (D.D.C. 2017).

*Fourth,* Defendants did not account for Plaintiffs' reliance interests upended by that reversal. Minnesota authorities reasonably relied on the historical norm of cooperation and on express initial assurances of cooperation from federal agents on scene at the Good and Sosa-Celis shootings to make on-scene decisions expecting federal evidence would be shared, only to have Defendants change course after Defendants removed evidence and took it into their exclusive control. Defendants were obligated to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33. They entirely failed to do so.

*Fifth*, Defendants failed to consider obvious alternatives to blanket withholding. Defendants could have given Plaintiffs copies of evidence or an opportunity to examine and photograph evidence if Defendants needed the evidence for their own investigations. And were legitimate law-enforcement privileges at stake—which Defendants do not contend—Defendants had a number of options, including protective orders, redactions, limited interviews, segregated productions, coordinated investigative protocols, or any number of targeted protections to address this concern. *See, e.g.*, Ex. 6 to Moriarty Decl. at 6 (offering to discuss "the practicalities of the transfer of evidence to preserve chain of custody"). Nor did they consider Plaintiffs' established capabilities in handling sensitive law enforcement information. *See, e.g.*, *id.* Defendants'

wholesale failure to explain why they did not choose available alternatives is arbitrary and capricious. *See Adaya LL v. DEA*, 826 F. Supp. 3d 115, 129 (D.D.C. 2026).

**B. DHS's March Letter Was Substantively Unlawful and Arbitrary and Capricious**

As discussed above at 18, DHS told Plaintiffs in a March letter that it was refusing to treat their February demand letter as "a *Touhy* demand as the regulations do not apply to disclosure of official information to federal, state or local law enforcement authorities related to criminal law enforcement investigations." ICE-AR 119. This was a reversal from the agency's earlier e-mail, which acknowledged the letter as a "DHS Touhy demand." *Id.* at 100. DHS instead indicated it would "consider[] your demand as a request for information under section (b)(7) of the Privacy Act of 1974," and "refer" it to DOJ, which was allegedly "leading the investigation into the subject matter of [the] demand." *Id.* at 119. This was contrary to law, in excess of DHS's statutory authority, and arbitrary and capricious.

*First*, DHS misconstrued its regulations, which provide that "[n]othing in this subpart *affects the disclosure* of official information to . . . federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings." 6 C.F.R. § 5.41(i) (emphasis added). By its own terms, that regulation does not—as DHS's denial claimed—provide that the agency's *Touhy* regulations "do not apply" to disclosure of the information Plaintiffs seek. Rather, by confirming that the provisions do not "affect" the disclosure of official information for that purpose, the regulations simply preserve the ability to make disclosures to law enforcement partners *without* requiring formal *Touhy* procedures. It is meant to *facilitate* sharing with law enforcement, not allow the agency to ignore every law enforcement request.

*Second*, DHS's denial is also arbitrary and capricious as it did not "reasonably consider[]

the relevant issues and reasonably explain[] its decision." *Prometheus Radio Project*, 592 U.S. at 423. DHS did not even purport to apply the regulatory factors that govern whether disclosure would be authorized because it mistakenly concluded that they did not apply. Therefore, there is no "rational connection between the facts . . . and the choice made" by the agency. *State Farm*, 463 U.S. at 43 (quotation marks omitted).

*Third*, DHS's reliance on the Privacy Act, 5 U.S.C. § 552a(b)(7) is wholly misplaced. The Privacy Act only creates a right or remedy for disclosures or failure to disclose information to "an individual," *i.e.*, "a citizen of the United States or an alien lawfully admitted for permanent residence," *id.* §§ (a)(2), (g)(1), and does not govern official requests by a state entity for official information for use in a criminal investigation.

*Fourth*, DHS's decision to "refer[]" the request to DOJ because "that agency is leading the investigation into the subject matter of [Plaintiffs'] demand" in the Good matter, ICE-AR 119, is arbitrary and capricious. Nothing in the regulations contemplates such a referral. And the fact that DOJ purportedly is investigating a similar subject matter is not a basis to deny Plaintiffs' properly submitted *Touhy* request wholesale or to refer it to another agency. Cooperation between federal and state agencies in use-of-force investigations is the norm, *see* Evans Decl. ¶¶ 5-7, and there is no reason that federal law enforcement cannot work with their state counterparts to carry out the type of joint investigation that regularly occurs. Indeed, DHS has never asserted investigatory or law enforcement concerns with sharing information with Plaintiffs.

Moreover, DHS's blanket refusal to process Plaintiffs' request or to produce *any* information is unreasonable because some of the requested material is plainly in DHS's custody and control. For instance, Plaintiffs seek to interview certain federal agents and officers who are DHS employees, and it falls to their employing agency—not DOJ—to authorize such interviews.

*See, e.g.*, Ex. 2 to Moriarty Decl., Att. A ¶ 8. Plaintiffs further requested agency personnel files, operational plans in place at the time of the incidents, the identities of federal officers present at the scenes, and agency use-of-force policies, all of which are in DHS's custody and control. *Id.* ¶¶ 6-7, 10, 12-13. DHS's March letter fails to recognize this, much less consider whether the agency should authorize production of certain materials.

*Fifth*, DHS's denial exceeds its lawful authority because the Federal Housekeeping Act—the source of authority for DHS's *Touhy* regulations—does not authorize withholding, absent an independent lawful basis. *See* 5 U.S.C. § 301 ("This section does not authorize withholding information from the public or limiting the availability of records to the public."). DHS identified no lawful basis for its refusal and did not invoke any of the regulatory factors that could purport to allow withholding under its own regulations. 6 C.F.R. § 5.48 (privilege, expenditure of time and resources). DHS's denial exceeds the authority granted to it by statute and should be set aside.

**C. DOJ's Subsequent Actions and Statements Confirm that the Denial of Access to Information was Arbitrary and Capricious**

Defendants' string of reversals and re-reversals, discussed above at 6-23, further show that their wholesale denials of access to information were arbitrary and capricious. After the DOJ had issued its June letters denying the *Touhy* requests, the United States Attorney's Office advised that it would share evidence as to all three shootings because "the best course for these investigations will be impartial and open sharing of information and evidence between the USAO and BCA." Ex. 17 to Moriarty Decl. at 2. The acknowledgement that the "best course" is "open sharing of information and evidence" contradicts the earlier conclusion to pursue secrecy and obstruction. And Defendants offered no reasoned explanation—other than "challenges with D.C."—why they instead departed from this "best course" to stonewall Plaintiffs.

This series of flip flops shows the arbitrariness of Defendants' earlier refusals, which are

"incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com.*, 588 U.S. at 785. The shifting justifications lay bare what was actually happening: Defendants trying on and discarding different explanations to justify the choice that they had already made to stonewall Plaintiffs based, according to Defendants' own leadership and others at the very highest levels of government, on Defendants' insistence that the shootings were a federal matter. This is not a situation in which "an agency may have both stated and unstated reasons for a decision," *id.* at 784, and this court is "not required to exhibit a naiveté from which ordinary citizens are free," *id.* at 785. Rather, "[a]ltogether, the evidence tells a story that does not match the explanation [Defendants] gave for [the] decision." *Id.* at 784.

## III. Defendants' June Letters Only Underscore the Arbitrariness of Their Decisionmaking

### A. DOJ's and DHS's June Letters Are Impermissible *Post Hoc* Rationalizations, and Defendants' Embrace of DHS's Belated Reasoning in Its Motion to Dismiss Fails for the Same Reasons

After this lawsuit was filed, DHS and DOJ suddenly arrived at new explanations for the decisions they made, months earlier, to block Plaintiffs from accessing evidence. Although DHS presented its new position as a "clarif[i]cation" of its March letter, it offered an entirely new explanation. The March letter emphasized that the regulations do not necessarily apply to requests from law enforcement, ICE-AR 119, but the June letter asserted that *Touhy* regulations only apply to requests submitted in connection with litigation. ICE-AR 135. Thus, the June letter contends that "[t]he information [sought] is not associated with an ongoing court action," ICE-AR 135, a position that CBP echoed, CBP-AR 22 ("is not a Touhy request"). DOJ's June letters offer a similar position with respect to DOJ's regulations. It is this latter position that Defendants now embrace in their motion to dismiss. They argue that Plaintiffs' February demand letters were not in fact *Touhy* demands because there was no litigation, so DOJ's and DHS's wholesale refusal to

share evidence did not violate the APA.

The Court can easily reject these explanations because "[a]n agency must defend its actions based on the reasons it gave when it acted." *Regents of the Univ. of California*, 591 U.S. at 24. This is a "foundational principle of administrative law." *Michigan v. EPA*, 576 U.S. 743, 758 (2015). That DHS tried to couch its new explanation as merely a supplement to its first is irrelevant, because "the two justifications are meaningfully distinct." *Regents of the Univ. of California*, 591 U.S. at 21-22. Both DHS's and DOJ's new June 2026 explanations, offered months after their first contrary explanations, instill no "confidence that the reasons given are not simply 'convenient litigating positions,'" and forced Plaintiffs "to chase a moving target" at great cost. *Id.* at 23. "If the grounds propounded by the agency for its decision 'are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.'" *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629 (2023) (quoting *SEC v. Chenery*, 332 U.S. 194, 196 (1947)). The Court should not consider the new rationales that Defendants manufactured well into this litigation and offer up again in their motion to dismiss.

### B. DOJ's and DHS's *Post Hoc* Assertion That Their *Touhy* Regulations Do Not Apply Is Meritless

Defendants' *post hoc* explanation that their regulations only apply to requests in connection with court proceedings fails on its own terms.

*First*, Defendants' position that only court proceedings trigger their *Touhy* regulations' procedures is contrary to the text. CBP's regulation, for example, applies "in all federal, state, local, and foreign proceedings when a[n] . . . order, or demand . . . of a court, *administrative agency, or other authority* is issued for such information." 19 C.F.R. § 103.21(a)(1) (emphasis added); 28 C.F.R. § 16.21(a)(2) (DOJ regulation) (applying procedures to disclosure of

information "[i]n all federal and state proceedings in which the United States is not a party . . . when a subpoena, order, or other demand . . . of a court *or other authority* is issued for such material or information" (emphasis added)). By referring to a demand coming from "a court, administrative agency, or other authority," the regulation clearly sweeps beyond the narrow, court-limited definition of "proceeding" offered by Defendants. *Cf.* Def.'s Mot. at 3 ("Proceeding is a word much used to express the business of done in courts." (quoting Edwin E. Bryant, The Law of Pleading Under the Codes of Civil Procedure, 3-4 (2d ed. 1899)). Similarly, DHS regulations explain that the procedures apply "in connection with federal or state litigation," *and* any "requests or demands of federal or state judicial or quasi-judicial or administrative authority . . . or in response to requests for depositions, affidavits, admissions, responses to interrogatories, document production, interviews, or other litigation-related matters." 6 C.F.R. § 5.41(a)(2); *see also id.* § 5.41(d) (defining litigation broadly to include "proceedings before courts, commissions, boards . . . , grand juries, or other judicial or quasi-judicial bodies or tribunals, whether criminal, civil, or administrative in nature," and includes "informal requests by attorneys or others in situations involving litigation"). Thus, the regulation applies not just to litigation but also to administrative requests and "litigation-*related* matters."

Plaintiffs' requests fit comfortably within the text of these regulations, which provide a framework for deciding whether and how an agency will respond to a demand for evidence. Outside of litigation, private parties have no legal authority to demand evidence from others; it is the litigation that supplies the relevant authority. For example, Defendants cite *Spence v. NCI Info. Sys., Inc.*, 530 F. Supp. 2d 739, 745 (D. Md. 2008), where a private employer was sued by a former employee for preventing the employee from getting a federal government job by providing damaging information during a background check. But, as the regulations recognize, governments

are different. They can investigate and gather evidence outside of formal court proceedings. Thus, the regulations speak to "other authorities"—like state and local law enforcement—which can present demands for evidence *without* needing a court proceeding.

Moreover, Defendants' interpretation that a court proceeding is required would lead to absurd results. The government's longstanding position is that a state court cannot enforce subpoenas or other compulsory processes against federal authorities at all, and at least one circuit has held that a "state court lacked jurisdiction to *issue* [a grand jury] subpoena." *In re Elko Cty. Grand Jury*, 109 F.3d 554, 555 (9th Cir. 1997) (emphasis added). Yet Defendants now insist that state officials go and secure exactly that sort of subpoena before Defendants will consider requests for information under their *Touhy* regulations. They cannot have it both ways. Adopting Defendants' view would significantly intrude on state criminal law processes because it would mean that state and local law enforcement could not use *Touhy* requests to obtain evidence for criminal investigations pre-charging and yet, in many circumstances, may never be able to charge without that evidence.

The permission for expedited law-enforcement information sharing contained in each regulation bolsters this interpretation. Each regulation provides that, notwithstanding the general control of information, its employees remain free to provide information to law enforcement agencies. *See, e.g.*, 6 C.F.R. § 5.41(i) (authorizing sharing of information to "prosecuting and law enforcement authorities in conjunction with criminal law enforcement *investigations*" (emphasis added)). If investigations were already outside of the regulation's processes because they are not "proceedings," then there would be no need to include this express authorization. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

*Second*, even if the *Touhy* demands here must relate to some form of judicial proceeding,

that requirement has been met. The investigations are all with an eye towards potential criminal proceedings before a court, should the facts support them. Notably, the regulations do not require that the evidentiary demand be issued or endorsed by a court; even "informal requests by attorneys or others" suffice. 6 C.F.R. § 5.41(d). Indeed, under Minnesota law, a grand jury indictment is only required for offenses punishable by life imprisonment. Minn. R. Crim. P. 17.01, subd. 1. Unlike federal procedure, in Minnesota, the vast majority of criminal cases are commenced by the filing of a complaint signed by a prosecutor, supported by an affidavit, and approved by a judge. Minn. R. Crim. P. 2. Crimes like assault, intentional murder, and manslaughter all proceed in Minnesota by complaint, not indictment. In this case, Plaintiff BCA Superintendent has determined, pursuant to Minn. Stat. § 299C.03, that investigations into the three federal officer-involved shootings are "necessary to secure evidence which may be essential to the apprehension and conviction of alleged violators of the criminal laws of the state." Likewise, Plaintiff HCAO has determined, pursuant to Minn. Stat. § 388.051, that an investigation is needed into these incidents to determine if a prosecutable felony has occurred. These facts clearly meet the threshold requirement of demand from state authorities for access to evidence. Therefore, even if there must be a nexus between Plaintiffs' demands and a judicial proceeding, that requirement has been met here.

*Third*, even if Defendants were right that these requests did not trigger the restrictive procedures spelled out in Defendants' regulations, then Defendants would have still identified *no* law that justifies their refusal to share evidence. Moreover, Defendants' refusal to share evidence must still be reasonable and reasonably explained. *See Citizens to Preserve Overton Park*, 401 U.S. at 416. It was not. Rather, Defendants took their view that the *Touhy* framework's requirements were not triggered and attempted to turn that, without explanation, into a substantive

basis for refusing to share evidence. That was error and, as discussed above in Part I(B), that error is reviewable. Defendants must, at a minimum, provide a reasoned explanation for why they did not provide the requested evidence to the Plaintiffs.

### C. Defendants' June Letters Were Arbitrary and Capricious Because They Unreasonably Rejected the Option to Share Information Pursuant to the Law Enforcement Sharing Provision in the *Touhy* Regulations

In addition to being contrary to law for the reasons discussed above, the June Letters were arbitrary and capricious because they cursorily dismissed the option to share information through the law enforcement exception. Tellingly, Defendants abandon this reasoning in their motion to dismiss. DHS, without basis, insisted that Plaintiffs did not have a "need to know" the information that they sought, ICE-AR 135, despite the paramount interest of the State in investigating crimes that happen in Minnesota, and the presence of ongoing, active criminal investigations.

DHS also ticked through a laundry list of other objections, without explanation: that the requests "*may* seek information protected from disclosure by statute or federal regulations" (emphasis added), that the requests seek "law-enforcement sensitive" information (without any attempt to invoke any law-enforcement privilege or make the showings necessary to sustain such a privilege as to any piece of withheld evidence, let alone all of it), and that responding to the request would "divert[] agency resources." *Id.* at 138-39. DHS did not provide any explanation for these conclusory statements.

DOJ's explanation was also threadbare. It stated only that "the federal government has an open investigation into the incident, and disclosure would improperly reveal investigatory records and/or interfere with federal law enforcement investigations," but provided no support for this assertion. DOJ-AR 32. Like DHS, it did not explain why these concerns required wholesale

withholding of evidence when the agencies have long shared evidence even when there are parallel proceedings.

This is precisely the type of unacknowledged and unexplained change in longstanding practice that is a hallmark of arbitrariness. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[T]he agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009)). And the failure to offer reasoned explanation and simply list boilerplate considerations was arbitrary and capricious. *Prometheus Radio Project*, 592 U.S. at 423; *State Farm*, 463 U.S. at 43. Moreover, it strongly suggests that Defendants have not offered "genuine justifications for important decisions," and "[a]ccepting [these] contrived reasons would defeat the purpose" of APA review. *Dep't of Com.*, 588 U.S. at 785.

## IV. The Federal Government's Decision to Block State and Local Criminal Investigations Violates the Tenth Amendment

Defendants' deliberate obstruction of Minnesota authorities' investigations into federal officers for potential violations of state law—including by exerting exclusive federal control over evidence seized from Minnesota's public streets—intrudes on the core sovereign police powers of the State. Defendants' attempt to justify this intrusion by relying on the Supremacy Clause fails because the laws they invoke do not justify withholding evidence and cannot override the State's interest in investigating violations of its laws. This provides another basis on which to invalidate Defendants' conduct here, under the APA, 5 U.S.C. § 706(2)(B), and is a basis for relief even if the APA did not apply, *e.g.*, *Armstrong*, 575 U.S. at 326-27.

The Tenth Amendment was enacted "to allay lingering concerns about the extent of the national power," *Alden v. Maine*, 527 U.S. 706, 713–14 (1999), and it affirmatively guarantees that the federal government cannot enlarge its authority at the expense of sovereign powers

retained by the States, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018) ("A healthy balance of power between the States and the Federal Government reduces the risk of tyranny and abuse from either front." (quotations and citations omitted)). And among other things, the Tenth Amendment means that the federal government cannot tell a state how to perform its sovereign functions. *Id.*

Chief among the powers reserved to the States is the police power—the authority to investigate, deter, and prosecute crimes committed within state borders. *Heath*, 474 U.S. at 93 ("Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code."). Indeed, there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *Morrison*, 529 U.S. at 618; *see Shinn v. Ramirez*, 596 U.S. 366, 376 (2022) ("The power to convict and punish criminals lies at the heart of the States' 'residuary and inviolable sovereignty.'" (quoting The Federalist No. 39)). The federal government intrudes on that power when it prevents a State from securing scenes, identifying actors, interviewing witnesses, examining physical evidence, and reconstructing events. The federal government may not block State agents from investigating crimes on the State's public streets or wield control over evidence or federal personnel as a means of obstructing a state's own criminal enforcement functions. The Constitution permits dual sovereignty, not federal nullification of state police power by Executive fiat.

Defendants' response to this is to invoke the Supremacy Clause, but the argument goes nowhere. The "Supremacy Clause is not the source of any federal rights," *Armstrong*, 575 U.S. at 324 (citation modified), and "'[t]here is no federal preemption *in vacuo*,' without a constitutional text, federal statute, or treaty made under the authority of the United States," *Kansas v. Garcia*,

589 U.S. 191, 202 (2020); *see also id.* at 212 ("The Supremacy Clause gives priority to 'the Laws of the United States,' not. . . preferences of federal officers."). And "particularly" "in a field which the States have traditionally occupied, [courts] start with the assumption that the historic police powers of the States" remain intact. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation modified).

Casting about, Defendants argue that the "Housekeeping statute, and Defendants' *Touhy* regulations, which emanate from that grant of power, preempt any Tenth Amendment claim asserted by the Plaintiffs." Def.'s Mot. 15. But neither the statute nor the regulations do any such thing. The Housekeeping Act could not be more explicit: It "does *not* authorize withholding information from the public or limiting the availability of records to the public." 5 U.S.C. § 301. Nor do the regulations authorize seizing and withholding evidence from state and local law enforcement. Again, they do the opposite. *See* 6 C.F.R. § 5.41(i) ("Nothing in this subpart affects the disclosure of official information . . . to federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings"); 28 C.F.R. § 16.21(c) (similar); 19 C.F.R. § 103.21(e) (similar). None of these authorities provide the clear statement that would be necessary to displace the State's historic sovereign interests in enforcement of criminal law within its territory.

The Defendants' argument fails for the additional reason that a federal authority that prohibits a State from taking an action constitutes invalid commandeering.[6] Thus, *Murphy* struck down a federal law that prevented states from repealing prohibitions on sports gambling because it commandeered the state legislative process and violated the Tenth Amendment. *Murphy*, 584 U.S. at 483. It was of no moment that, rather than affirmatively ordering states to do something,

[6] By contrast, a valid preemption law "regulat[es] the conduct of private actors." *Murphy*, 584 U.S. at 479. None of the authorities on which Defendants rely regulate the conduct of private actors, which underscores that the federal action here simply disarms the state of its sovereign power to investigate and prosecute crime.

the federal government had imposed a barrier to states' exercise of their sovereign power. The Court explained that "[a] more direct affront to state sovereignty is not easy to imagine" because it was "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id*. at 474.

The federal government's interference with Minnesota's sovereign power to investigate and prosecute crimes in Minnesota is unconstitutional for the same reason. As explained above, Defendants did not just decline to help Minnesota investigate. They actively obstructed the State's exercise of its sovereign powers. Across the three separate shootings, Defendants took exclusive possession of key evidence. They then refused to share that evidence, denied the State access to witnesses, and withheld the officers' identities. For example, when BCA investigators arrived at the scene of the fatal Pretti shooting, federal officers physically blocked the State from accessing its own public street. As a result, federal officers took critical evidence before the BCA could examine or photograph it. No principle of federal supremacy allows federal officials to physically prevent state investigators from accessing a local shooting scene, no matter who pulled the trigger. The power Defendants assert amounts to essentially the unilateral authority to determine whether, and under what conditions, a state criminal investigation can proceed. "A more direct affront to state sovereignty is not easy to imagine." *Id*. The Court should deny Defendants' motion to dismiss and grant Plaintiffs summary judgment on the Tenth Amendment claim.

## V. The Court Should Grant Plaintiffs' Requested Relief

If the Court concludes that Plaintiffs are entitled to summary judgment on their APA or Constitutional claims, the Court should direct the Defendants to immediately provide Plaintiffs with access to the requested evidence and issue a permanent injunction against further obstruction. Although the default rule in APA cases is to vacate and remand erroneous decisions back to the

agency, that default rule does not apply here for several reasons. First, Defendants' actions violate the Tenth Amendment, and the Court has the authority to issue appropriate injunctive relief to remedy that violation without awaiting further explanation from the agency. *See Trump v. CASA*, 606 U.S. 831, 851 (2025). Second, even just for the APA claims, when there is only one reasonable outcome, "the best course is for the reviewing court to simply apply the obvious result." *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 778 F.2d 850, 862 n.19 (D.C. Cir. 1985) (collecting cases). Here, even with multiple rounds of *post hoc* rationalizations, Defendants have identified no legal authority or rational basis justifying their obstruction of state criminal investigations. Defendants should not get yet another bite at the apple when they have already purported to re-explain their position, offered pretextual explanations, flip-flopped multiple times, and weaponized the administrative process to create delay that furthers their illegitimate obstruction. Finally, every day that Defendants are not ordered to provide Plaintiffs with the evidence increases the risk of spoliation and prevents Plaintiffs from carrying out their sovereign responsibilities. *Cf. Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (a state's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"). In the alternative, if the Court does not order Defendants to comply with Plaintiffs' requests, it should vacate the denials and, retaining jurisdiction, remand for Defendants to consider Plaintiffs' requests by a date certain. *See Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 12 (D.D.C. 2019) (subsequent history omitted).

## VI. The Court Should Deny Defendants' Request to Change Venue

Although Defendants concede that "venue in the District of Columbia is appropriate," Def.'s Mot. 15, they contend that the Court should transfer the case to the District of Minnesota under 28 U.S.C. § 1404. Plaintiffs' choice of forum is entitled to "significant deference" so long as there is a "substantial connection to their chosen venue." *Mich. Welfare Rights Organization v.*

*Trump*, 600 F. Supp. 3d 85, 113–14 (D.D.C. 2022) (Sullivan, J.). Defendants have not carried their burden to "show that 'considerations of convenience and the interest of justice weigh in favor of transfer.'" *Ctr. for Bio. Diversity v. Ross*, 310 F. Supp. 3d 119, 124 (D.D.C. 2018). On the interest of justice factor, Defendants offer only their speculation that Plaintiffs forum shopped. *Contra* Mot. 16–17. But it is not forum shopping to sue DOJ and DHS in the United States District Court for the District of Columbia. Defendants are headquartered in the District of Columbia, and key decisions being challenged were made here. *See supra* 21; *Nat'l Ass'n of Home Builders v. EPA*, 675 F. Supp. 2d 173, 179 (D.D.C. 2009) (denying transfer because APA claims arise where challenged decisionmaking largely occurs and plaintiffs were challenging federal agency decision). Moreover, this Court and the D.C. Circuit have an expertise in administrative law that makes them the logical choice for this administrative law case. John G. Roberts, Jr., *What Makes the D.C. Circuit Different? A Historical View*, 92 Va. L. Rev. 375, 389 (2006). Convenience also does not tip the scale. Defendants assert that "DHS officials with first-hand knowledge of the incidents giving rise to the case at hand" are in Minnesota, Mot. at 17, but Plaintiffs have alleged that the decision not to provide evidence was made by officials outside of the state. The request to change venue should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss and grant summary judgment to Plaintiffs.

Dated: October 13, 2026

KEITH ELLISON
Attorney General
State of Minnesota

/s/ Peter J. Farrell
PETER J. FARRELL
Deputy Solicitor General
JOSEPH RICHIE
Special Counsel
KIMBERLY SVENDSEN
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1010 (Voice)
Peter.Farrell@ag.state.mn.us
Joseph.Richie@ag.state.mn.us
kimberly.svendsen@ag.state.mn.us

*Attorneys for Plaintiffs State of Minnesota and the Minnesota Bureau of Criminal Apprehension*

Respectfully Submitted,

MARY F. MORIARTY
Hennepin County Attorney

/s/ Morgan D. Kunz
SARAH E. DAVIS
MORGAN D. KUNZ
CLARE A. DIEGEL
HENNEPIN COUNTY ATTORNEY'S OFFICE
300 S. 6th St.
Minneapolis, MN 55487
(612) 348-5550
Sarah.Davis@hennepin.us
Morgan.Kunz@hennepin.us
Clare.Diegel@hennepin.us

*/s/ Kyle R. Freeny*
KYLE R. FREENY (D.C. Bar No. 1684764)
NATHANIEL A.G. ZELINSKY (D.C. Bar No. 1724093)
JOSEPH MEAD (D.C. Bar No. 1740771)
FRANCIS SWANSON (D.C. Bar No. MD0197)
SARAH ARMSTRONG*
WASHINGTON LITIGATION GROUP
(202) 521-8750
1717 K Street NW
Washington, DC 20006
kfreeny@washingtonlitigationgroup.org

/s/ Rupa Bhattacharyya
MARY MCCORD (D.C. Bar No. 427563)
RUPA BHATTACHARYYA (D.C. Bar No. 1631262)
JULIA GEGENHEIMER (D.C. Bar No. 90034692)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
Georgetown University Law Center 600 New Jersey Ave. NW
Washington, D.C. 20001

*Attorneys for Plaintiff Mary Moriarty, in her official capacity as Hennepin County Attorney*

**Pro hac vice forthcoming; admitted only in Massachusetts; practicing under the supervision of D.C. Bar members*