**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF MINNESOTA, *by and through its Attorney General Keith Ellison*; MARY MORIARTY, *in her official capacity as the Hennepin County Attorney;* and DREW EVANS, *in his official capacity as Superintendent of the Minnesota Bureau of Criminal Apprehension*;

*Plaintiffs,*

v.

U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF HOMELAND SECURITY, TODD BLANCHE, *in his official capacity as Attorney General of the United States;* and MARKWAYNE MULLIN, *in his official capacity as Secretary of the U.S. Department of Homeland Security*;

*Defendants.*

No. 26 Civ. 1007 (EGS)

**DECLARATION OF DREW EVANS**

I, Drew Evans, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Superintendent of the Minnesota Bureau of Criminal Apprehension (BCA) and a Plaintiff in this lawsuit. This declaration is submitted in support of Plaintiffs' Motion for Summary Judgment. The statements made in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties as Superintendent of the BCA, including review of records and information prepared and/or gathered by BCA staff.

***I. Background***

2. I was named the Superintendent of the BCA in 2015. Prior to this role, I worked for the BCA Investigations Division: Homicide Unit as a special agent and senior special agent,

where I conducted and oversaw violent crime investigations throughout Minnesota. I most recently served as the BCA Assistant Superintendent from 2012 until my appointment as Superintendent. I also served as a police officer for the City of White Bear Lake, Minnesota, where I held a variety of roles, last as a detective, prior to joining the BCA. I am an adjunct professor at both St. Mary's University of Minnesota and Metropolitan State University in their criminal justice and law enforcement programs. I am a graduate of Metropolitan State University and received my Juris Doctor from William Mitchell College of Law. I am both a licensed peace officer and attorney in the State of Minnesota. I am an alumnus of the 257th Session of the FBI National Academy, have completed the International Association of Chiefs of Police (IACP) Leadership in Police Organizations Program, and am a graduate of the BCA Management Series. I serve on numerous boards and committees, including the Minnesota POST Board, the Minnesota Violent Crime Coordinating Council, the U.S. Attorney's Project Safe Neighborhoods Steering Committee, the Council on Crime and Justice Crime Trends Working Group, and the IACP Board of Directors and Firearms Committee. I serve as president of the Association of State Criminal Investigative Agencies (ASCIA) and of the North Central High Intensity Drug Trafficking Area (HIDTA). In 2023, I was appointed as the Governor's Homeland Security Advisor for the State of Minnesota.

3. The BCA is responsible for investigating potential violations of Minnesota's criminal laws, including use-of-deadly-force incidents. When a law enforcement officer uses force and a person dies or is seriously injured in the State of Minnesota, agents with the BCA's Force Investigations Unit investigate the officer's actions to determine the circumstances of the incident. The BCA initiates investigations at the request of the involved jurisdiction. The BCA has extensive experience investigating officer-involved use of force cases and maintains a team of

investigators specially trained to conduct such investigations.

4. After the BCA completes an investigation, the BCA submits a report, without any charging recommendation, to the County Attorney's Office with jurisdiction over the incident. It is the responsibility of the relevant County Attorney's Office to make any charging decisions—that is, to decide whether the evidence supports bringing charges and, if so, what charges to bring.

***II. The Longstanding Practice of Federal-State Evidence Sharing***

5. Cooperation and evidence sharing between federal law enforcement and state and local authorities has long been a routine and essential feature of criminal investigations in Minnesota, as in other states. Intergovernmental cooperation allows federal investigators to conduct their important work, while simultaneously allowing state and local investigators to do the work that the people of Minnesota require of them. I routinely work in cooperation with my counterparts at the Federal Bureau of Investigation (FBI), Homeland Security Investigations (HSI), and other federal agencies.

6. In particular, cooperation has long been the norm in investigations and prosecutions that implicate both state and federal interests. As one example, federal and state authorities cooperated after the murder and attempted murder of Minnesota state lawmakers in 2025. In that case, BCA and FBI agents conducted joint witness and subject interviews, shared physical evidence and other information, and met regularly and jointly with federal and state prosecutors. This collaboration led to ongoing state and federal prosecutions. As another example, federal and state investigators collaborated in the immediate aftermath of a mass shooting at the Church of the Annunciation in Minneapolis in August 2025. Minnesota authorities then completed the investigation with assistance from federal officers as needed.

7. Such cooperation also has been the historical practice in federal officer–involved

shootings. For example, in November 2019, after a Deputy U.S. Marshal shot a suspect at a gas station in St. Paul, the BCA led the investigation into federal agents' use of force, and state prosecutors handled related criminal cases against the suspect. Similarly, in June 2021, after two members of a U.S. Marshals' task force shot and killed a suspect in the Uptown neighborhood of Minneapolis, the BCA led the investigation into this shooting, with the support and cooperation of federal authorities.

8. Cooperation and evidence sharing is particularly important in the context of federal officer-involved violence occurring within Minnesota. To thoroughly investigate whether conduct violates Minnesota criminal law, state and local authorities must identify and interview witnesses, obtain relevant documents, and examine physical evidence. The State's ability to obtain such evidence, both by gathering it itself and obtaining evidence possessed by federal agencies, is an essential component of Minnesota's sovereign authority to investigate crimes and enforce its criminal laws. Until the incidents described below, it was essentially a given that Minnesota and federal law enforcement would work collaboratively on parallel investigations, including by sharing evidence.

9. The BCA is well-accustomed and well-equipped to handle any sensitive investigative materials shared by federal authorities. The FBI has never expressed a concern to me that sharing evidence with the BCA, as is routine practice, might compromise the FBI's sources or methods or otherwise compromise a parallel federal investigation. In joint federal and state investigations, we have always found mutually agreeable solutions for data sharing.

***III. The Fatal Shooting of Renee Good***

10. On the morning of January 7, 2026, the BCA responded to a Use of Deadly Force incident where a U.S. Immigration and Customs Enforcement (ICE) agent had shot and killed 37-

year-old U.S. citizen Renee Good in her car on a residential street in Minneapolis.

11. Following the shooting, the BCA promptly arrived at the scene and began investigating alongside federal investigators who were already present. Cooperation between the BCA and the FBI is standard practice in incidents such as this one. At the scene, the BCA and leadership in the FBI's Minneapolis Field Office agreed to conduct a joint investigation into the killing. The BCA was told that federal officials reached this decision after consulting with the Hennepin County Attorney's Office and the U.S. Attorney's Office for the District of Minnesota (USAO).

12. BCA investigators relied on federal officials' representations in making decisions about the course of their own investigation, including any actions they took at the scene. For example, BCA investigators trusted that important evidence gathered by federal investigators would be made available to them for inspection and analysis. Such evidence includes the vehicle in which Ms. Good was shot, shell casings discharged at the scene, and the shooter's firearm. Had BCA investigators known that federal authorities would thereafter refuse them access to critical evidence, they would have taken different measures to secure its availability. For example, the BCA would not have agreed to permit the FBI to process portions of the scene and take possession of Ms. Good's vehicle had the BCA known the federal officials would not make evidence available to the BCA as they had represented.

13. In the hours after the shooting death of Ms. Good, BCA agents went to the Whipple Federal Building to interview the federal officers involved. FBI agents told the BCA agents who arrived that they would be included in the interviews. Less than an hour later, however, BCA agents were told without explanation that the position of the federal government had changed and that Homeland Security Investigations (HSI) would not allow BCA agents to be present. The

BCA's requests for even the most basic information—such as the names of the federal officers involved—were ignored. And the point of contact given to the BCA agents, the Acting Director of the ICE St. Paul Field Office, did not respond to multiple outreach attempts.

14. The FBI informed the BCA that—despite the initial agreement earlier that day to jointly work the case and share files—the federal government would immediately cease any and all cooperation with State authorities. BCA investigators were excluded from interviews, prevented from following their standard investigative procedures, and blocked from accessing key physical evidence. When the BCA asked the FBI why they would no longer cooperate with State authorities, the FBI directed the BCA to the U.S. Attorney for the District of Minnesota.

15. On the evening of January 7, 2026, I spoke with the U.S. Attorney by telephone and he confirmed that there would be no joint investigation and no federal cooperation or evidence sharing with State officials. The only justification he provided was that the shooting was a "federal" matter.

16. The State of Minnesota is fulfilling its sovereign duty to conduct a thorough and fair investigation into Ms. Good's death. The BCA and the HCAO are leading the investigation, and the HCAO will be responsible for determining whether to bring any charges for violations of state law after it considers the available evidence.

17. The BCA has sought, and Minnesota courts have found probable cause to issue, search warrants for evidence related to the death of Ms. Good. Evidence covered by those warrants remains in the possession of the federal government and has never been examined by the BCA, including the cell phone of the agent who killed Ms. Good and Ms. Good's clothing.

18. I spoke with the FBI SAC on March 18, 2026, about the BCA's request for a return to the norm of cooperation and evidence-sharing. He informed me that DOJ and DHS leadership

had decided that they would not make available or release evidence related to Ms. Good's killing to the BCA. According to the FBI SAC, DOJ and DHS had directed the FBI to turn over the evidence related to Ms. Good's killing to DHS's Office of Inspector General only, not to BCA or other State officials.

***IV. The Shooting of Julio Cesar Sosa-Celis***

19. On the evening of January 14, 2026, a federal immigration agent shot and wounded Julio Cesar Sosa-Celis in Minneapolis. As with the Good shooting, federal agents initially led state investigators to believe that they would cooperate in parallel investigations, consistent with historical practice.

20. Local investigators again relied on those representations to make decisions about their investigation, including actions taken at the scene. For instance, in the hours immediately after the shooting, BCA and FBI agents initially paired into teams to begin witness interviews, to canvas the area, and to process the scene. The BCA would have insisted on taking the lead role in all interviews or conducted a parallel investigation had it known that federal authorities would not share evidence and collaborate with the BCA as they had represented.

21. This initial collaboration abruptly ended, however, when the FBI Assistant Special Agent in Charge gave directions that BCA agents would not be allowed to collaborate with the FBI in its investigation. In one instance, a BCA agent learned of this direction directly from the FBI agent he was paired with. The BCA agent had paired with an FBI agent to interview a key ICE agent witness. During the interview, the BCA agent could hear the cell phone of the FBI agent dinging with text message alerts. After the interview concluded, the FBI agent checked her phone, apologized to the BCA agent, and stated that the FBI could no longer work with state agents. As a result of this directive, BCA investigators were excluded from witness and subject

interviews going forward and no longer had access to the evidence FBI agents had collected.

22. After the FBI terminated the joint investigation, but before federal investigators left the scene of the shooting, BCA agents secured a judicial search warrant to obtain evidence at the scene. In executing that warrant, the BCA was able to obtain several pieces of physical evidence, but was unable to obtain the handgun used in the shooting or any other evidence that was in the possession of the federal agents involved.

23. The number of protestors at the scene began to grow. Local police and federal agents established a perimeter around the scene, but as the size of the crowd grew it became increasingly difficult to hold the scene. Federal officers began to leave the area, and BCA investigators made the decision to collect as much evidence as possible via the search warrant before departing.

24. BCA agents returned to the scene in subsequent days and obtained additional evidence that they could not gather on the night of the incident.

***V. The Fatal Shooting of Alex Pretti***

25. On January 24, 2026, federal immigration agents shot and killed U.S. citizen Alex Jeffrey Pretti on a public street in Minneapolis.

26. Shortly after the shooting, BCA agents responded to the scene to carry out their investigative responsibilities. A federal agent serving as the incident commander informed the BCA agents that he had been ordered not to allow the BCA access to the scene and to instead permit only the FBI to process the scene. When the BCA asked if its Crime Scene Team could assist with scene processing, the FBI refused. Federal authorities then blocked the BCA from even entering the area of the crime scene, even though it was a public street in Minneapolis that the BCA had a legal right and authority to access. The BCA sought and secured a warrant to access

the scene, but before BCA officers could arrive on scene with the warrant, federal authorities left the scene with key pieces of evidence in their possession.

27. As a result, federal investigators took exclusive possession and control of important evidence in the Pretti shooting before the BCA had any opportunity to examine, photograph, or document it. This evidence includes but is not limited to the firearms used by the involved officers, a firearm taken from Mr. Pretti before officers shot him, the cell phones of the involved officers, and other physical evidence, including projectiles and casings. All of this evidence was covered by the search warrant that the BCA obtained.

28. Federal agents also excluded the BCA from participating in witness interviews. That same day, BCA agents went to the Whipple Federal Building to interview the federal agents involved in the shooting. After waiting for hours, they were eventually told by the HSI Assistant Special Agent in Charge (ASAC) that HSI was leading the use-of-force investigation and the FBI would be assisting. The ASAC then informed the BCA that it would not be allowed to participate in any part of the investigation.

29. The federal officers responsible for the shooting and present during the incident were wearing masks that obscured their identities. In my experience, the nearly uniform masking of federal immigration officers deployed during Operation Metro Surge represented a break from longstanding law enforcement practice. It also made it significantly more difficult for BCA investigators to identify the federal agents involved in this and other shootings without federal cooperation.

30. Despite the foregoing, the BCA continued to press for a return to the well-established norm of cooperation in regard to the shooting of Mr. Pretti. On or about February 5, 2026, the USAO and the FBI contacted the BCA to indicate a desire to resume normal cooperation

that would include evidence sharing and the potential for a joint investigation into Mr. Pretti's killing. Senior DOJ officials dispatched an attorney from DOJ's Washington, D.C., headquarters to Minneapolis, who arrived on or about February 9, 2026. I had been told that I would meet with this senior DOJ official but no such meeting ever materialized. I remained optimistic, however, about the prospect of federal-state cooperation on the Pretti investigation, because federal officials had suggested to me that the plan for such cooperation had been approved by the Deputy Attorney General ("DAG").

31. On or about February 13, 2026, the FBI formally notified me by telephone that it would not provide the BCA with access to any information or evidence related to the death of Mr. Pretti and that DOJ had determined that evidence would only be shared in one direction. The DOJ expected the BCA to share evidence with the federal government but did not plan to share evidence with the BCA.

***VI. BCA's Requests for Collaboration***

32. On or about January 29, 2026, the BCA submitted a formal request to the HSI ASAC seeking all available case information, reports, evidence summaries, and investigative materials related to the three above-described shootings. A true and correct copy of this letter request is attached as Exhibit 1. HSI did not substantively respond to this request.

33. On February 17, 2026, the BCA and the HCAO jointly submitted formal *Touhy* demands to DHS and DOJ for evidence relevant to their investigation of the killing of Alex Pretti. BCA and HCAO requested initial responses from DHS and DOJ by March 5, 2026. I was also aware that the HCAO submitted *Touhy* demands to DHS and DOJ for evidence relevant to the investigation of the killing of Renee Good and shooting of Julio Cesar Sosa-Selis. DOJ and DHS declined to provide the requested evidence.

34. In addition to sending the DHS and DOJ demand letters to DHS's Office of General Counsel and the U.S. Attorney for the District of Minnesota, respectively, a courtesy copy of each letter was sent by email to officials within DOJ's Civil Division responsible for coordinating the federal government's response to *Touhy* demands to ensure prompt attention to the demands.

35. Despite acknowledging the March 3, 2026, deadline set forth in Plaintiffs' *Touhy* demand in the Pretti matter—and seeking an extension of the deadline to respond to HCAO's *Touhy* demand in the Good matter to match that deadline—DHS did not respond to the Pretti demand until June 4, 2026, months after this lawsuit was filed. I understand that true and correct copies of the Pretti *Touhy* demand and DHS's response are being submitted as exhibits to the Declaration of Mary Moriarty in this matter.

***VII. Temporary Collaboration and Sharing between BCA and Federal Government***

36. On June 2, 2026, I received an email from an Assistant U.S. Attorney for the District of Minnesota requesting that BCA provide the USAO with evidence the BCA had collected regarding the shooting of Julio Caesar Sosa-Celis.

37. I responded to that email by letter dated June 3, 2026. My letter affirmed that "the BCA is prepared to share evidence reciprocally and to collaborate with federal authorities in the investigation as we have always done." The letter suggested a "reciprocal exchange" of information, rather than the one-directional approach the USAO suggested. A true and correct copy of this letter is attached as Exhibit 2.

38. In late June 2026, the BCA and the USAO, through counsel, negotiated an agreement for each party to share information and collaborate on the investigation of the three shootings with the other. On June 26, 2026, the Chief of the Criminal Division for the USAO emailed me a letter memorializing this agreement. I responded indicating my agreement to the

terms stated in the letter. The letter agreement stated, among other things:

> [T]he USAO and BCA will each share with the other all information and evidence relating to the matters. The USAO will make available all non-grand jury material, such as reports, interview memos, media, physical evidence, and search warrant evidence. Likewise, the USAO prosecution team will have the same access to all evidence and information in the BCA's case file. The USAO will, within a reasonably prompt timeframe, move the federal court to disclose relevant grand jury material to the appropriate state prosecution office(s).

The USAO acknowledged "[t]his understanding does represent a change to this office's previous stance vis a vis the sharing of evidence and cooperation between our office and BCA in these investigations. We acknowledge that, ultimately, the best course for these investigations will be impartial and open sharing of information and evidence between the USAO and BCA." True and correct copies of the correspondence described above are attached as Exhibits 3–4.

39. After this agreement was formalized, both the BCA and USAO shared information with the other, as contemplated. Among other things, the FBI turned over possession of physical evidence to the BCA including Renee Good's vehicle and the gun used in the shooting of Ms. Good. The USAO provided the BCA with four deliveries of digital information concerning the Good shooting, three hard drives containing information concerning the Sosa-Celis shooting, and two hard drives containing information concerning the Pretti shooting. Those hard drives contained, for example, body-worn camera footage, officer statements, and other evidence. The BCA turned over evidence in its possession to the USAO. The BCA also participated in conversations amongst attorneys assigned to the investigation and prosecution in each matter.

40. On July 13, 2026, Hennepin County Attorney Mary Moriarty held a press conference in which she publicly announced that the U.S. Attorney's Office had shared this evidence.

41. Despite the letter agreement, the U.S. Attorney's Office ceased its cooperation and

evidence sharing following that press conference.

42. Important evidence remains in the possession of the federal government and has not been shared with the BCA, including the cell phone of the agent who killed Ms. Good, Ms. Good's clothing, recordings of interviews concerning the Good shooting, the firearms used by the officers who shot Mr. Pretti, a firearm taken from Mr. Pretti before officers shot him, the cell phones of the officers involved with the Pretti shooting, other physical evidence from the Pretti scene (including projectiles and casings), and the recording of a statement made by one of the officers who shot Mr. Pretti, and grand jury material regarding the shooting of Mr. Sosa-Selis. Examination of this evidence or examination of the documentation of the analysis of this evidence is critical to a complete and thorough investigation by the BCA of these matters.

* * *

43. At no point during the course of any of the BCA's efforts to secure federal evidence sharing and a return to normal cooperation did federal authorities assert that sharing evidence related to the above-described shootings would harm national security or impair the federal government's own criminal investigative efforts. I am aware of no other justification for the federal government's refusal to share evidence with the State in the above-referenced investigations other than a disagreement with the State's exercise of its prerogative to investigate these incidents.

I declare under penalty of perjury that the foregoing is true and correct.

| | |
|---|---|
| Executed this 13th day of October, 2026 | _s/ Drew Evans___ |
| Anoka County | Drew Evans |
| State of Minnesota | Superintendent |
| | Minnesota Bureau of Criminal Apprehension |