**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF MINNESOTA, MARY MORIARTY, and DREW EVANS,<br><br>*Plaintiffs,*<br>v.<br><br>U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF HOMELAND SECURITY, TODD BLANCHE, and MARKWAYNE MULLIN.<br><br>*Defendants.* | No. 26 Civ. 1007 (EGS) |

**DECLARATION OF MARY F. MORIARTY**

I, Mary F. Moriarty, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Hennepin County Attorney. This declaration is submitted in support of Plaintiffs' Motion for Summary Judgment. The statements made in this declaration are based upon my personal knowledge and information made available to me in the course of my official duties as the Hennepin County Attorney, including review of records and information prepared and/or gathered by Hennepin County Attorney's Office (HCAO) staff.

2. I earned a Bachelor of Arts degree from Macalester College and a Juris Doctor degree from the University of Minnesota Law School. After clerking for Hennepin County Judge Kevin Burke, I joined the Hennepin County Public Defender's Office. After 25 years at that office, I was selected as the Hennepin County Chief Public Defender and served in that role from 2014 to my retirement in 2020. I was elected Hennepin County Attorney in 2022 and have served in that role since January 2, 2023.

3. As Hennepin County Attorney, I am the chief executive of the HCAO, Minnesota's

largest public law office. Among other things, I am responsible for setting policies and priorities for prosecuting criminal cases and providing legal advice and representation to county government. I manage a staff of more than 500 people with an annual budget of approximately $95 million. As County Attorney, I am vested by Minnesota law with the power to prosecute felonies in Hennepin County. Minn. Stat. § 388.051, subd. 1.

***I. The Shooting of Renee Good***

4. On the morning of January 7, 2026, I learned that an ICE agent had shot and killed 37-year-old U.S. citizen Renee Good in her car on a residential street in Minneapolis, Hennepin County, Minnesota. At the time of her death, Ms. Good lived in Minneapolis with her young child and wife. When a person is shot and killed on a public street in Hennepin County, it is of vital importance that the circumstances of the death are thoroughly investigated. As such, I directed the staff of the HCAO to coordinate with state and local investigators to ensure a fair and independent investigation was completed. My staff immediately began working with state and local investigators.

5. In anticipation of the need for coordination with federal authorities, I reached out to the U.S. Attorney's Office for the District of Minnesota. In a telephone conversation that same morning, the First Assistant at the U.S. Attorney's Office confirmed to me that the Federal Bureau of Investigation (FBI) and the Minnesota Bureau of Criminal Apprehension (BCA) would collaborate on a joint investigation of the incident. Later, I learned that collaboration on a joint investigation lasted for only several hours, and that by the afternoon on January 7, 2026, the FBI had reversed course and was refusing to collaborate with, and was indeed actively blocking, state and local investigators from getting access to key evidence and witnesses.

***II. The Shooting of Julio Sosa-Celis***

6. On the evening of January 14, 2026, a federal immigration agent shot and wounded Julio Cesar Sosa-Celis in a residential neighborhood in Minneapolis. At the time he was shot, Mr. Sosa-Celis, a Venezuelan national, lived in Minneapolis with his wife and young child. I learned that Ms. Sosa-Celis was shot while inside his home and that the federal agent had fired the shot from outside the home, through a metal door, and into the house. I learned that multiple other Minneapolis residents, including several children, were present in the home at the time of the shooting. When residents of Minneapolis are shot at while inside their home, it is of vital importance that the circumstances of the shooting be thoroughly and fairly investigated. As such, I directed the staff of the HCAO to coordinate with state and local investigators to ensure a fair and independent investigation was completed.

7. The investigation began immediately and included staff from the HCAO, the BCA, and other state and local law enforcement agencies responding to the scene of the shooting. Initially, federal officials at the scene were willing to coordinate with the state and local law enforcement officials present. As with the Good incident, however, the coordination was short lived. All coordination stopped on the evening of January 14, after FBI agents at the scene were directed by their chain of command to stop collaborating with state investigators.

8. On May 18, 2026, the HCAO charged ICE officer Castro with four counts of second-degree assault and one count of falsely reporting a crime in connection with the above-described incident, based on the evidence gathered and investigation conducted by the BCA. Exhibit 1 to this Declaration. The HCAO was able to make a charging decision in this case because of the investigative work conducted by state and local investigators, and because key evidence was obtained during the short period of collaboration with federal officials at the scene of the shooting. While my office does have sufficient admissible evidence to prove the crimes

charged beyond reasonable doubt, additional evidence relevant to the case still remains in the exclusive control of federal officials, including certain witness statements, grand jury testimony, and physical evidence, including but not limited to the gun used by the federal agent during the incident.

### *III. The Shooting of Alex Pretti*

9. On the morning of January 24, 2026, federal immigration agents shot and killed U.S. citizen Alex Jeffrey Pretti on a public street in Minneapolis. Mr. Pretti was an ICU nurse, a long-time Minnesota resident, and a valued member of his community. Video of the incident showed that Mr. Pretti was shot in the back, that 10 shots were fired, and that many civilians and federal officials witnessed the shooting. When someone is shot on a public street, in a busy commercial area, in front of multiple witnesses, it is of vital importance that a full and complete investigation is conducted. As such, I directed the staff of the HCAO to coordinate with state and local investigators to ensure a fair and independent investigation was completed.

10. My team immediately began coordinating with the BCA to ensure a full state-level investigation would proceed. After BCA agents were physically blocked from the scene of the shooting by federal officers, we advised the BCA to obtain a warrant to search the scene. Over the coming weeks and months, my office continued to work closely with the BCA on investigating the shooting death of Alex Pretti. This work consisted of gathering any and all evidence that was accessible in Minnesota, including video, witness statements, and forensics related to the crime scene. Because of the federal obstruction on the day of the shooting, however, important evidence was taken by the federal government.

11. Accordingly, as the state investigation into the death of Mr. Prtti proceeded, my office had multiple conversations with officials from the United States Attorney's Office (USAO)

for the District of Minnesota to try to persuade them to reverse their decision not to share evidence and to return to traditional, cooperative investigations with respect to this incident. As is detailed more below, in late June 2026, the federal government reversed course and began to share information about all three shooting cases. That sharing, however, was short lived. By mid July 2026, all sharing stopped and it has not re-commenced.

### *IV. Plaintiffs' Formal Written* **Touhy** *Demands to DOJ and DHS*

12. As County Attorney, I submitted formal *Touhy* requests to DOJ and DHS seeking disclosure of investigative information and materials relating to all three Operation Metro Surge shootings. I took this step, notwithstanding federal authorities' demonstrated unwillingness to share evidence with the BCA and HCAO, to ensure that all avenues of redress were pursued.

13. First, on February 2, 2026, I submitted substantively identical, formal *Touhy* demands to DHS and DOJ for evidence relevant to the HCAO's investigation of the fatal shooting of Renee Good. Based on the urgency of the HCAO's need for the requested documents and testimony, as explained further below, and the fact that it appeared that federal authorities had already decided not to share evidence with State authorities, the HCAO requested initial responses from DHS and DOJ by February 17, 2026. True and correct copies of these letters are attached as Exhibits 2 and 3 to this Declaration.

14. On February 17, 2026, the HCAO and BCA jointly submitted substantively identical, formal *Touhy* demands to DHS and DOJ for evidence relevant to their investigation of the killing of Alex. Pretti. The HCAO requested initial responses from DHS and DOJ by March 3, 2026. True and correct copies of these letters are attached as Exhibits 4 and 5.

15. On February 19, 2026, I submitted substantively identical, formal *Touhy* demands to DHS and DOJ for evidence relevant to its investigation of the shooting of Julio Sosa-Celis. I

requested initial responses from DHS and DOJ by March 5, 2026. True and correct copies of these letters are attached as Exhibits 6 and 7.

16. In addition to sending the DHS and DOJ demand letters to DHS's Office of General Counsel and the U.S. Attorney for the District of Minnesota, respectively, a courtesy copy of each letter was sent by email to officials within DOJ's Civil Division responsible for coordinating the federal government's response to *Touhy* demands to ensure prompt attention to the demands.

### *V. Defendants' Initial Response to Plaintiffs' Touhy Requests*

17. On February 18, 2026—one day after the date by which the HCAO had requested a response from DHS on the *Touhy* requests in the Good matter—a senior attorney at ICE e-mailed the following to the HCAO:

> ICE is considering the attached DHS Touhy demand for records regarding the death of Ms. Renee Nicole Good and is formulating its response. We have also recently received the attached DHS Touhy demand for records regarding the death of Mr. Alex Pretti, which has a requested deadline for DOJ [sic] to respond by March 3, 2026. We kindly request an extension to March 3, 2026 as to the demand regarding Ms. Good. We will respond sooner if possible. Thank you in advance for your anticipated courtesy.

The HCAO agreed to the requested extension in light of the agency's commitment to respond no later than March 3, 2026, but reiterated its need for expedient disclosure of the evidence. A true and correct copy of this exchange is attached as Exhibit 8.

18. On March 3, 2026, the HCAO received a final written response from DHS related to the Good matter. A true and correct copy of DHS's first letter is attached as Exhibit 9.

19. Despite acknowledging the March 3, 2026, deadline set forth in Plaintiffs' *Touhy* demand in the Pretti matter—and seeking an extension of the deadline in the Good matter to match that deadline—DHS did not respond to the Pretti demand until June 4, 2026, months after this lawsuit was filed. See Paragraph 25, infra.

20. Unlike DHS, DOJ did not seek an extension of the deadlines set forth in the three *Touhy* demand letters submitted to it, nor did it provide any written response until after the initiation of this litigation.

### *VI. Filing of this Lawsuit and Subsequent Responses to Touhy Demands*

21. On March 24, 2026, I, along with my fellow Plaintiffs, filed this action in federal court seeking an order that DHS and DOJ comply with the requests made in Plaintiffs' *Touhy* demands.

22. On April 23, 2026, I was made aware that the U.S. Attorney's Office for the District of Minnesota asked if our office would be willing to collaborate and accept an agreement to share evidence only related to the Sosa-Celis matter. I declined and insisted that HCAO required evidence sharing and cooperation related to all three matters.

23. On June 4, 2026, more than 60 days after the filing of the *Touhy* lawsuit, the HCAO received a set of responses to the *Touhy* demands from DOJ and DHS.

24. The June 4, 2026 responses included a second written response from DHS relating to the Good matter. A true and correct copy of DHS's second letter related to the Good matter is attached as Exhibit 10.

25. The June 4, 2026 responses included a written response from U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP), two component agencies under DHS, relating to the Pretti matter. A true and correct copy of ICE and CBP letters related to the Pretti matter are attached as Exhibit 11 and Exhibit 12.

26. The June 4, 2026 responses also included a written response from DHS related to the Sosa-Celis matter. A true and correct copy of DHS's letter related to the Sosa-Celis matter is attached as Exhibit 13.

27. The June 4, 2026 responses also included three letters, signed by the U.S. Attorney for the District of Minnesota, denying each of the *Touhy* requests to the DOJ in the Good matter, the Sosa-Celis matter, and the Pretti matter. True and correct copies of these letters are attached as Exhibits 14, 15, and 16. Among other things, each of the three letters indicated that a law-enforcement-to-enforcement disclosure would "not be appropriate" because "the federal government has an open investigation into the incident, and disclosure would improperly reveal investigatory records and/or interfere with federal law enforcement investigations." The letters did not explain how these three cases differed from the vast run of parallel investigations in which evidence sharing is routine.

### *VII. Defendants' Reversal and Cooperation with Plaintiffs' Requests for Evidence*

28. On June 26, 2026, just a few weeks after I received the above-referenced *Touhy* denial letters from the Minnesota U.S. Attorney, Drew Evans, the Superintendent of the BCA, received a letter from the Chief of the Criminal Division of the U.S. Attorney's Office for the District of Minnesota. This letter stated that the federal government, through the U.S. Attorney's Office, "is prepared to share evidence and collaborate as appropriate in the investigative matters relating to the federal officer-involved shootings that occurred in Minnesota during Operation Metro Surge." The U.S. Attorney's Office acknowledged that their position "represent[ed] a change to this office's previous stance vis a vis the sharing of evidence and cooperation between our office and BCA in these investigations," as set forth in the June 4 denial letters. They went on to acknowledge that, "ultimately, the best course for these investigations will be impartial and open sharing of information and evidence between the USAO and BCA." A true and correct copy of this letter is attached as Exhibit 17.

29. After this agreement was formalized, the USAO began sharing evidence with the

HCAO and BCA, including providing multiple hard drives containing body-worn camera footage, officer statements, and other evidence, and participating in conversations amongst attorneys assigned to the investigations in Good and Pretti, and the prosecution in the Sosa-Celis matter.

30. The HCAO team assigned to these matters immediately began reviewing the material that was provided by the USAO. This material went through a filter process to ensure the integrity of the investigation and was only then provided to the attorneys in my office handling the investigations. It took several weeks before we had a full understanding of the scope of the USAO disclosure to us.

31. On July 13, 2026, I announced to the public that the federal government had shared evidence with the HCAO and the BCA, and I thanked the USAO for their cooperation. In that public announcement, I stated that we had received "all" the evidence from the USAO. I made that statement because complete information sharing is what was promised in the June 2026 letter from the USAO, and because multiple hard drives of information had been provided to the BCA and the HCAO. As the material from the USAO was cleared through filter review and then analyzed by my investigation team, it became clear that while we received a significant portion of the material we sought, some information had been withheld. Furthermore, it is clear that the federal government has obtained additional material since they last shared information with the State in early July 2026. This includes, but is not limited to, material obtained by grand jury processes and other witness statements.

***VIII. A Re-Reversal, and an Indefinite Pause on Sharing***

32. In the days and weeks following the July 13 announcement, however, the USAO stopped cooperating and sharing information and evidence with the HCAO and BCA.

33. Over the next two months, I repeatedly reached out to the U.S. Attorney to request

that his office restart sharing evidence with the BCA and HCAO. Throughout these conversations, the U.S. Attorney regularly confirmed that the collaboration agreed to in the June 26, 2026 letters was paused and stated that he was "optimistic" that he would be able to restart information sharing "soon." He did not provide a reason why the sharing stopped and stated he needed more time to navigate the situation.

34. On September 9, 2026, I directed several attorneys from my office to attend a meeting with the Chief of the Criminal Division at the USAO to discuss the state of information sharing. At that meeting, we clearly articulated to the USAO that we needed them to abide by the terms of the June 26 letter or to confirm that collaboration was stopped. The Chief of the Criminal Division agreed to consult with the U.S. Attorney and provide that answer.

35. The following day, on September 10, 2026, I spoke on the phone with the U.S. Attorney, who told me, in sum and substance, that evidence sharing from the USAO as agreed to in the June 26 letter would be on pause indefinitely "in light of challenges with D.C." I specifically asked the U.S. Attorney about access to the statement of a federal officer who was involved in the Pretti incident which had been inadvertently not included in their original production on that case. He indicated he was aware we did not have that specific statement and that it too was included in the pause, even though other statements from officers involved in that same case had been previously provided.

36. The U.S. Attorney could not provide a timeline for when he believed his office would be able to restart sharing evidence with the HCAO and BCA. I was left with the understanding that the USAO would not share any further evidence with the HCAO or the BCA, unless and until there was a change in policy on that sharing coming out of Washington D.C.

37. After my call with the U.S. Attorney on September 10, 2026, the HCAO Deputy

County Attorney spoke with the Chief of the Criminal Division of the USAO. In that conversation, the Chief of the Criminal Division confirmed what the U.S. Attorney had told me earlier that day; that the U.S Attorney's Office would not be sharing evidence with the HCAO and BCA in regard to the Good, Sosa-Celis, and Pretti matters. The Deputy County Attorney then asked the Criminal Division Chief whether HCAO attorneys could visit the U.S. Attorney's Office and, while sitting in those offices, watch video evidence that had not yet been shared with the HCAO and BCA. The Criminal Division Chief confirmed that even that level of cooperation was prohibited.

38. The Criminal Division Chief stated that in all other matters the U.S. Attorney's Office would continue to collaborate with the HCAO, and that the prohibition on collaboration only applied to the shootings of Ms. Good, Mr. Sosa-Celis, and Mr. Pretti.

39. Indeed, in all other matters including complex homicide cases, mass shootings, drug and gun cases, and many other types of cases, collaboration and information sharing with federal officials continues as normal. The pause on information sharing is unique to these matters.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of October, 2026.

*<u>/s/ Mary F. Moriarty</u>*
MARY F. MORIARTY
Hennepin County Attorney
Hennepin County Attorney's Office
300 S. 6th St.
Minneapolis, MN 55487
(612) 348-5550