UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF MINNESOTA, MARY MORIARTY, and DREW EVANS, Plaintiffs,
v.
U.S. DEPARTMENT OF JUSTICE, et al., Defendants.

No. 26-cv-1007 (EGS)

**INDEX OF EXHIBITS TO DECLARATION OF MARY F. MORIARTY**

Submitted in Support of Plaintiffs' Motion for Summary Judgment

| Exhibit | Description | Declaration ¶ |
|---|---|---|
| 1 | May 18, 2026 HCAO charges against ICE Officer Castro | 8 |
| 2 | February 2, 2026 Touhy demand concerning Renee Good (DHS) | 13 |
| 3 | February 2, 2026 Touhy demand concerning Renee Good (DOJ) | 13 |
| 4 | February 17, 2026 Touhy demand concerning Alex Pretti (DHS) | 14 |
| 5 | February 17, 2026 Touhy demand concerning Alex Pretti (DOJ) | 14 |
| 6 | February 19, 2026 Touhy demand concerning Julio Sosa-Celis (DHS) | 15 |
| 7 | February 19, 2026 Touhy demand concerning Julio Sosa-Celis (DOJ) | 15 |
| 8 | February 18, 2026 ICE email exchange regarding extension for Good demand | 17 |
| 9 | March 3, 2026 DHS response concerning Renee Good | 18 |
| 10 | June 4, 2026 second DHS response concerning Renee Good | 24 |
| 11 | June 4, 2026 ICE response concerning Alex Pretti | 25 |
| 12 | June 4, 2026 CBP response concerning Alex Pretti | 25 |
| 13 | June 4, 2026 DHS response concerning Julio Sosa-Celis | 26 |
| 14 | June 4, 2026 DOJ denial of Touhy demand concerning Renee Good | 27 |
| 15 | June 4, 2026 DOJ denial of Touhy demand concerning Alex Pretti | 27 |
| 16 | June 4, 2026 DOJ denial of Touhy demand concerning Julio Sosa-Celis | 27 |
| 17 | June 26, 2026 USAO letter to BCA regarding evidence sharing and collaboration | 28 |

# Exhibit 1

State of Minnesota
County of Hennepin

District Court
4th Judicial District

Prosecutor File No. 26A05307
Court File No. 27-CR-26-12537

---

**State of Minnesota,**

Plaintiff,

vs.

**CHRISTIAN J. CASTRO DOB: 12/26/1973**

MN

Defendant.

**COMPLAINT**

Warrant

---

The Complainant submits this complaint to the Court and states that there is probable cause to believe Defendant committed the following offense(s):

**COUNT I**

**Charge: Assault-2nd Degree-Dangerous Weapon**
Minnesota Statute: 609.222.1, with reference to: 609.222.1, 609.11.5(a)
Maximum Sentence: 7 YEARS AND/OR $4,200-$14,000
Offense Level: Felony

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro, assaulted Victim 1 while using a firearm.
Minimum Sentence: 3 YEARS

**COUNT II**

**Charge: Assault-2nd Degree-Dangerous Weapon**
Minnesota Statute: 609.222.1, with reference to: 609.222.1, 609.11.5(a)
Maximum Sentence: 7 YEARS AND/OR $4,200-$14,000
Offense Level: Felony

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro, assaulted Victim 2 while using a firearm.
Minimum Sentence: 3 YEARS

**COUNT III**

**Charge: Assault-2nd Degree-Dangerous Weapon**
Minnesota Statute: 609.222.1, with reference to: 609.222.1, 609.11.5(a)
Maximum Sentence: 7 YEARS AND/OR $4,200-$14,000

Offense Level: Felony

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro, assaulted Victim 3 while using a firearm.
Minimum Sentence: 3 YEARS

**COUNT IV**

**Charge: Assault-2nd Degree-Dangerous Weapon**
Minnesota Statute: 609.222.1, with reference to: 609.222.1, 609.11.5(a)
Maximum Sentence: 7 YEARS AND/OR $4,200-$14,000
Offense Level: Felony

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro, assaulted Victim 4 while using a firearm.
Minimum Sentence: 3 YEARS

**COUNT V**

**Charge: Falsely Reporting Crime**
Minnesota Statute: 609.505.1, with reference to: 609.505.1
Maximum Sentence: 90 DAYS AND/OR $1,000
Offense Level: Misdemeanor

Offense Date (on or about): 01/14/2026

Control #(ICR#): 26000126

Charge Description: That on or about January 14, 2026, in Minneapolis, Hennepin County, Minnesota, Christian J. Castro informed a law enforcement officer that a crime had been committed, or otherwise provided information to an on-duty peace officer regarding the conduct of others, knowing that such information was false and intended that the officer act in reliance upon it.

## STATEMENT OF PROBABLE CAUSE

Complainant has investigated the facts and circumstances of this offense and believes the following establishes probable cause:

On January 14, 2026, at approximately 6:43:49 PM, the Minneapolis Police Department ("MPD") received a report from a 911 dispatcher that U.S. Immigration and Customs Enforcement ("ICE") agents were engaged in a vehicle pursuit of a male traveling in a Ford Focus and that the male, later identified as Victim 2, was attempting to reach his home, which was identified as XXX 24th Ave. N. in Minneapolis, Hennepin County, Minnesota. At 6:45 PM, MPD officers took remote-control of a city camera located at the intersection of Lyndale Ave. and 24th Ave. and pointed it at the home. The camera captured a series of events that culminated in an ICE agent, later identified as Christian Castro (hereinafter "Defendant"), firing a gunshot into the home, knowing it was occupied by multiple individuals, and injuring a male, later identified as Victim 1.

Video of Incident

The shooting of Victim 1 led to an investigation conducted by the Minnesota Bureau of Criminal Apprehension ("BCA"). As part of its investigation, the BCA recovered footage from the city camera at Lyndale and 24th, which captured the following events:

At 6:47 PM, Victim 1 stepped onto the front lawn of the home holding a snow shovel. At 6:48:36 PM, two vehicles arrived in the area and abruptly stopped approximately 100 feet east of the home. At 6:48:45 PM, Victim 2 emerged from the first vehicle and ran toward the home. Defendant emerged from the second vehicle and pursued Victim 2 on foot. At 6:48:50 PM, Victim 1 tossed the shovel onto the ground, where it remained throughout the incident, and stepped back toward the front door of the home. At 6:48:52 PM, Victim 2 reached the front of the home but slipped on the ground before he could reach the front door. At 6:48:55 PM, Defendant caught up to Victim 2, jumped on top of Victim 2, and engaged in a brief struggle with Victim 2 on the ground in front of the home. At 6:48:57 PM, Defendant rolled off Victim 2 and onto the ground while Defendant continued efforts to grasp onto Victim 2. At 6:49:01 PM, Victim 1 approached Victim 2 and reached down, appearing to separate Victim 2 from Defendant and help Victim 2 off the ground. At 6:49:04 PM, Victim 1 and Victim 2 ran to the front door of the home, out of camera-view at 6:49:06 PM. At 6:49:08 PM, Defendant got off the ground and stood several feet from the front door of the home, just as additional ICE vehicles were arriving on 24th Ave. approximately 100 feet east of the home. At 6:49:09 PM, as Defendant faced the front door of the home, Defendant raised both of his arms straight out in front of him, pointing toward the front door. Defendant's movements between 6:49:09 PM and 6:49:10 PM are consistent with Defendant firing a gun at the front door of the home. Defendant then stepped back and spoke to an arriving ICE agent.

Reports of Shooting, Statement of Victim 3, and Immediate Scene Response

Immediately after this incident, MPD received multiple reports of a single gunshot occurring in front of XXX 24th Ave. N. One of those reports was from "ShotSpotter," an acoustic gunshot detection system which utilizes a network of sensors installed in the city of Minneapolis to detect, locate, and alert MPD to gunfire in real-time. ShotSpotter reported that a single round was fired in front of XXX 24th Ave. N. at precisely 6:49:09 PM.

A separate report of the shooting came from a 911 caller who was inside the home at XXX 24th Ave. N. at the time of the gunshot. This individual, identified as Victim 3, reported that there were four adults and two children inside the home when an ICE agent shot into it. The adults in the residence referenced by Victim 3

were identified as Victims 1, 2, 3, and 4. Victim 3 explained that Victim 2 was chased to the home by ICE, and that, once Victim 2 got into the home, ICE shot at them. Victim 3 emphasized that ICE shot at all of them and hit Victim 1 in the leg. Victim 3 further reported to the 911 dispatcher that ICE remained outside the home and was trying to gain entry.

At approximately 6:50 PM, MPD officers and paramedics began responding to the scene, where they encountered numerous ICE agents surrounding the home. ICE agents deployed tear gas, entered the home, and took Victims 1, 2, 3, and 4 into custody. Almost an hour later, at 7:48 PM, paramedics were allowed access to Victim 1 and transported him to North Memorial Hospital, where he was treated for a gunshot wound to the leg.

While on the scene, MPD contacted the BCA, reported that an ICE agent was involved in a shooting, and requested the BCA's assistance with the investigation. BCA investigators deployed to the scene and to North Memorial Hospital.

Interview of ICE Agent 1

At the scene, BCA investigators encountered Federal Bureau of Investigation ("FBI") agents who agreed to conduct a joint investigation into the shooting, and, at 8:36 PM, personnel from the two agencies conducted a joint video-recorded interview with an ICE agent (hereinafter "ICE Agent 1").

ICE Agent 1 stated that he, Defendant, and two other agents (hereinafter "ICE Agent 2" and "ICE Agent 3") pursued Victim 2 for 7-10 minutes on the highways and streets of Minneapolis to XXX 24th Ave. N. ICE Agent 1 stated that the pursuit began after ICE "ran a background information on somebody and . . . made sure that the person was apprehendable." ICE Agent 1 stated that Defendant was the initial pursuer of the vehicle and that Defendant arrived at the victims' home before ICE Agent 1 arrived. ICE Agent 1 stated that the shooting occurred just before ICE Agent 1 arrived. Upon arrival, ICE Agent 1 said that he had a verbal exchange with Defendant. ICE Agent 1 described the exchange: "[Defendant] had told us that the two individuals came outside with the shovel and the broom had smacked him with it, got him on the ground, hit him with it, and of course, [Defendant] shot one round. He wasn't sure if he hit anybody. They had already shut the doors on us." ICE Agent 1 explained that the occupants of the home refused to exit, so ICE breached the house. ICE Agent 1 provided the names and cellphone numbers of ten ICE agents who were part of his team, and the list included the names of Defendant, ICE Agent 1, ICE Agent 2, and ICE Agent 3. ICE Agent 1 unambiguously identified Defendant as the shooter.

Soon after conducting the interview of ICE Agent 1, FBI agents at the scene informed the BCA that they had been directed to cease working with the BCA and that no further interviews would be conducted at the scene. At that point, federal authorities stymied all further efforts by the BCA to interview additional ICE agents or Defendant himself. To date, federal authorities have prevented any further interviews of involved federal agents.

Statement of Victim 1 and Documentation of Victim 1's Gunshot Wound

At 8:26 PM on January 14, 2026, BCA investigators arrived at North Memorial Hospital, where they spoke to Victim 1. Victim 1 explained that he lived at XXX 24th Ave. N. with Victims 2, 3, and 4, and two young children. Prior to the shooting, Victim 1 was at home and received a call from Victim 2. Victim 1 stated that Victim 2 reported to him that, while Victim 2 was working for DoorDash, he encountered ICE agents, who began pursuing him in an unmarked pickup truck. Victim 1 stated that, out of fear, Victim 2 did not stop his vehicle and attempted to evade the agents and get back to his home. Victim 1 stated that, as Victim 2 approached the home, Victim 1 exited the home and witnessed Victim 2's arrival. Victim 1 saw Victim 2 exit his vehicle and run toward the home, followed by a single ICE agent. Victim 1 saw the ICE agent catch

Victim 2 and struggle with Victim 2. Victim 1 intervened by pulling Victim 2 away from the agent, and Victim 2 broke free. The agent attempted to grab Victim 2 again. Victim 1 offered that, at that point, Victim 1 swung a broom at the agent, but Victim 1 did not strike the agent. Victim 1 and Victim 2 then ran into the home. Victim 1 stated that, as he stood inside the home, behind the front door, and while attempting to close and lock the door, Victim 1 heard a loud gunshot and was shot in his right leg. Victim 1 and Victim 2 then fled upstairs and attempted to barricade themselves inside the home, at which point ICE agents broke windows, deployed pepper spray inside the home, and took him and the other occupants of the home into custody.

While speaking to Victim 1 at the hospital, BCA investigators photographed an acute gunshot wound to Victim 1's right leg and obtained Victim 1's medical records. They observed and documented with a ruler that, in a standing position, Victim 1's gunshot wound was 32 inches from the ground.

Statement of Victim 2

BCA investigators spoke to Victim 2, who explained that, prior to the shooting, Victim 2 was delivering meals for DoorDash and observed a vehicle pull up next to him. Based on the appearances of the occupants of the other vehicle, Victim 2 surmised that they were associated with ICE. Those occupants pointed at Victim 2 from inside their vehicle and maneuvered their vehicle to try to block him. Victim 2 explained that he feared for his life, so he drove away. The ICE agents pursued Victim 2 for what he estimated to be 25 minutes. During the pursuit, Victim 2 called Victim 1 and decided to drive home. Once Victim 2 arrived on 24th Ave., Victim 2 exited his car and ran toward his house. ICE agents stopped behind Victim 2's vehicle, and one agent ran after him. At that point, Victim 2 saw Victim 1, Victim 3, and Victim 4 standing in the foyer inside the front door of the home.

Victim 2 stated that he slipped on the ice in front of his home, and the ICE agent tackled Victim 2, causing them both to fall to the ground. Victim 2 stated that he did not punch or assault the agent and that Victim 2 was just trying to get away from him. Victim 2 was able to break free, stand up, and grab a broom. Victim 2 held the broom briefly like a baseball bat facing the agent, but Victim 2 did not swing it and threw it down on the ground. Victim 2 and Victim 1 then ran into the home. Once inside, Victim 2 observed Victims 3 and 4 begin to run up the stairs and saw Victim 1 standing behind the front door, locking the door. At that moment, Victim 2 heard a single gunshot coming from outside the home and observed that Victim 1 was shot in the leg. The four victims then ran upstairs and barricaded themselves in a room. Soon after, ICE agents threw tear gas into the home, entered, and took everyone into custody.

Statement of Victim 4

BCA investigators spoke to Victim 4, who explained that, prior to the shooting, Victim 2 called to explain to Victims 1, 3, and 4 that ICE was chasing him and that he was coming home. In response, they called 911 and went down to the front of their home to wait for Victim 2 to arrive. Victim 2 arrived and ran toward the home, chased by a single ICE agent. Victim 4 saw that the ICE agent grabbed Victim 2, and Victim 1 went out to separate Victim 2 from the ICE agent. Victim 2 was able to get away from the ICE agent, and Victim 1 and Victim 2 ran back inside the home. At that moment, Victim 3 and Victim 4 were standing on the staircase within sight of the front door. Victim 1 was in the process of closing and locking the door when Victim 4 heard one gunshot. They all ran upstairs, and Victim 4 observed that Victim 1 was shot in the right leg. The victims immediately called 911 again and remained in the house until ICE shot tear gas into the house, breached the door, and arrested everyone.

Statement of Defendant at Cambridge Medical Center

BCA investigators learned that, on the night of the shooting, Defendant traveled by private vehicle to the

Cambridge Medical Center in Cambridge, MN, where at 8:44 PM Defendant underwent a medical examination, which included radiographic imaging. At that time, Defendant claimed that, while in the process of trying to detain a suspect, “other persons” came and started hitting Defendant with a broom and a snow shovel. Defendant claimed that these people were trying to hit him in the head, and that Defendant was hit twice in the head with the shovel, but that he did a “good job” of blocking the blows by covering his head.

While Defendant’s account of events mirrored the account he provided to ICE Agent 1 at the scene, this account is not corroborated by the video of the incident or the accounts of Victims 1, 2, 3, or 4. Medical records document that Defendant suffered no demonstrable trauma to his body except for an abrasion to his left hand at the base of his thumb. The abrasion was cleaned off, and Defendant was discharged at 10:52 PM.

Collection and Review of Physical Evidence

Forensic scientists from the BCA responded to XXX 24th Ave. N to document the scene and collect physical evidence. They collected a shovel from the front yard, where the video from the city camera revealed Victim 1 had thrown it prior to Defendant arriving, a 9mm caliber discharged cartridge casing from the ground outside the front entrance of the home, a broom from the front step outside the entrance of the home, and another broom in the foyer. They observed a single bullet hole in the front door of the home. The hole was approximately 36.5 inches from the cement slab outside the residence and approximately 28 inches from the floor of the foyer inside the residence. Across the foyer from the front door, forensic scientists located additional defects in the residence that were consistent with a projectile passing through the front door, across the foyer, and then through the foyer wall, a closet, and a bedroom wall, where the projectile came to a rest. A single projectile was located inside the bedroom wall. The projectile was examined and determined to be consistent with being a jacketed hollow-point bullet fired by a 9mm caliber firearm. Utilizing physical and photographic evidence, forensic scientists conducted a trajectory analysis, finding that “the shot that fired the projectile originated outside of the duplex building, south of the front main door and traveled approximately south to north at a downward angle.”

Defendant’s Statement to FBI

BCA investigators learned that, following the incident, Defendant spoke to FBI agents about the incident. A summary of Defendant’s statement to the FBI was included in an affidavit signed by an FBI agent on January 16, 2026. In the affidavit, Defendant (identified as ERO #1 therein) reported that he was driving an unmarked vehicle with another agent in his passenger seat. They observed a Ford Focus, ran its license plate through ICE databases, and concluded that the registered owner of the vehicle was not a United States citizen. Defendant attempted a traffic stop, but the vehicle fled. Defendant stated that he engaged in a high-speed pursuit of the vehicle with his lights and sirens activated for 15-20 minutes until the pursuit concluded with the vehicle’s driver, Victim 2, coming to a stop on 24th Ave. N and running toward his home. Defendant stated that he exited his vehicle and chased Victim 2 on foot. Defendant stated that he saw a separate male, Victim 1, standing on the porch of the home and heard him yelling at Victim 2 to run faster. Victim 2 then slipped and fell on the ground, and Defendant grabbed Victim 2 to attempt to detain him.

According to the FBI affidavit, Defendant claimed to the FBI that, at that point, Victim 1 grabbed a broom and began striking him in the face and then a third male approached him with a snow shovel and began striking him with the shovel. Defendant claimed that, while being assaulted with a broom and a shovel by two assailants, he continued to tussle with Victim 2. According to the FBI affidavit, Defendant reported that he struggled with the three men “for about three minutes, was exhausted, alone, on the ground, and in fear of his safety.” Victim 2 then freed himself and, according to Defendant, gave him an “angry scowl.” Victim 1 then passed the broom to Victim 2, and, according to Defendant’s account in the FBI affidavit, Victim 2

struck Defendant repeatedly in the face or head with the broom while Defendant was lying on his back on the ground. Defendant claimed that he tried blocking the blows with his left hand while drawing his service pistol with his right hand. He then pulled out his service pistol and pointed it in the direction of the three assailants. According to the FBI affidavit, Defendant claimed that, once Defendant pointed his pistol at the three assailants, they began running toward the front door of the home. Before they could enter the home, Defendant claimed, he fired one shot at them, unsure of whether he struck anyone. According to Defendant, after he fired the shot, the assailants ran inside and closed the front door.

Defendant's account to the FBI resembles his account to ICE Agent 1 and his account at the Cambridge Hospital. However, his account is contradicted by the video of the incident, the accounts of Victims 1, 2, 3, and 4, and the physical evidence.

Initiation and Abandonment of Federal Prosecution of Victim 1 and Victim 2

On January 16, 2026, the United States Attorney's Office for the District of Minnesota filed the FBI affidavit which summarized Defendant's claims in the United States District Court for the District of Minnesota in support of federal felony assault charges against Victim 1 and Victim 2. Following several court appearances in the criminal proceedings against Victim 1 and Victim 2, on February 11, 2026, United States Attorney Daniel N. Rosen moved to dismiss all charges against Victim 1 and Victim 2, acknowledging that "[n]ewly discovered evidence is materially inconsistent with the allegations in the Complaint Affidavit," and stating that "dismissal with prejudice will serve the interests of justice." On February 13, 2026, District Court Judge Paul A. Magnuson dismissed those charges against Victim 1 and Victim 2.

Further investigation revealed that, at the time of the shooting, Victim 1 and Victim 2 were residing in Minnesota lawfully, having been granted "Temporary Protected Status" by the United States Department of Homeland Security.

Statements of Victims to FBI

BCA investigators are aware that FBI agents spoke to multiple other witnesses to the shooting on January 14, 2026, and conducted separate interviews with Victims 1, 2, 3, and 4. The aforementioned FBI affidavit, which was filed on January 16, 2026, included summaries of the victims' statements to the FBI. To the extent that the content of the victims' statements can be gleaned from the affidavit, Victims 1, 2, 3, and 4 separately provided statements to the FBI which report that all of the victims were at the threshold of their home when Defendant attempted to apprehend Victim 2 but that they were inside the home behind the front door when Defendant shot at them through the door. As to the particulars of their statements, despite repeated and standing requests from the BCA, the federal authorities have refused to provide the BCA access to any record or report of the interviews and to all other evidence exclusively in the possession of the federal government.

A warrant for Defendant's arrest is necessary because his whereabouts are unknown and there is a substantial likelihood that Defendant will not respond to a summons.

## SIGNATURES AND APPROVALS

Complainant requests that Defendant, subject to bail or conditions of release, be:
(1) arrested or that other lawful steps be taken to obtain Defendant's appearance in court; or
(2) detained, if already in custody, pending further proceedings; and that said Defendant otherwise be dealt with according to law.

Complainant declares under penalty of perjury that everything stated in this document is true and correct. Minn. Stat. § 358.116; Minn. R. Crim. P. 2.01, subds. 1, 2.

| | | |
|---|---|---|
| **Complainant** | Nicolai Lyfoung<br>Special Agent<br>1430 Maryland Avenue E<br>St. Paul, MN 55106<br>Badge: 1456 | Electronically Signed:<br>05/18/2026 12:04 PM<br>Ramsey County, Minnesota |

Being authorized to prosecute the offenses charged, I approve this complaint.

| | | |
|---|---|---|
| **Prosecuting Attorney** | Joshua Larson<br>300 S 6th St<br>Minneapolis, MN 55487<br>(612) 348-5550 | Electronically Signed:<br>05/18/2026 12:00 PM |

## FINDING OF PROBABLE CAUSE

From the above sworn facts, and any supporting affidavits or supplemental sworn testimony, I, the Issuing Officer, have determined that probable cause exists to support, subject to bail or conditions of release where applicable, Defendant's arrest or other lawful steps be taken to obtain Defendant's appearance in court, or Defendant's detention, if already in custody, pending further proceedings. Defendant is therefore charged with the above-stated offense(s).

## ☐ SUMMONS

THEREFORE YOU, THE DEFENDANT, ARE SUMMONED to appear as directed in the Notice of Hearing before the above-named court to answer this complaint.

IF YOU FAIL TO APPEAR in response to this SUMMONS, a WARRANT FOR YOUR ARREST shall be issued.

## ☒ WARRANT

To the Sheriff of the above-named county; or other person authorized to execute this warrant: I order, in the name of the State of Minnesota, that the Defendant be apprehended and arrested without delay and brought promptly before the court (if in session), and if not, before a Judge or Judicial Officer of such court without unnecessary delay, and in any event not later than 36 hours after the arrest or as soon as such Judge or Judicial Officer is available to be dealt with according to law.

☐ ***Execute in MN Only*** ☒ ***Execute Nationwide*** ☐ ***Execute in Border States***

## ☐ ORDER OF DETENTION

Since the Defendant is already in custody, I order, subject to bail or conditions of release, that the Defendant continue to be detained pending further proceedings.

Bail: $200,000.00
Conditions of Release: No Contact with Witnesses; No Possession of Weapons; Make All Appearances; Remain Law Abiding; Surrender Passport

This complaint, duly subscribed and sworn to or signed under penalty of perjury, is issued by the undersigned Judicial Officer as of the following date: May 18, 2026.

| | | |
|---|---|---|
| **Judicial Officer** | Paul R Scoggin<br>District Court Judge | Electronically Signed: 05/18/2026 12:17 PM |

Sworn testimony has been given before the Judicial Officer by the following witnesses:

---

**COUNTY OF HENNEPIN**
**STATE OF MINNESOTA**

**State of Minnesota**

Plaintiff

vs.

**Christian J. Castro**

Defendant

*LAW ENFORCEMENT OFFICER RETURN OF SERVICE*

*I hereby Certify and Return that I have served a copy of this Warrant upon the Defendant herein named.*

Signature of Authorized Service Agent:

# DEFENDANT FACT SHEET

| | |
|---|---|
| **Name:** | Christian J. Castro |
| **DOB:** | 12/26/1973 |
| **Address:** | MN |
| **Alias Names/DOB:** | |
| **SID:** | |
| **Height:** | |
| **Weight:** | |
| **Eye Color:** | |
| **Hair Color:** | |
| **Gender:** | MALE |
| **Race:** | Unknown |
| **Fingerprints Required per Statute:** | Yes |
| **Fingerprint match to Criminal History Record:** | No |
| **Driver's License #:** | |
| **SILS Person ID #:** | 974462 |
| **SILS Tracking No.** | 3525561 |
| **Case Scheduling Information:** | RUSH WARRANT |
| **Alcohol Concentration:** | |

# STATUTE AND OFFENSE GRID

| Cnt Nbr | Statute Type | Offense Date(s) | Statute Nbrs and Descriptions | Offense Level | MOC | GOC | Controlling Agencies | Case Numbers |
|---|---|---|---|---|---|---|---|---|
| 1 | Charge | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2323 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.11.5(a) Minimum Sentences of Imprisonment-Firearm Use or Possession | Felony | A2323 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2323 | | MNBCA0000 | 26000126 |
| 2 | Charge | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.11.5(a) Minimum Sentences of Imprisonment-Firearm Use or Possession | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| 3 | Charge | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.11.5(a) Minimum Sentences of Imprisonment-Firearm Use or Possession | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| 4 | Charge | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.11.5(a) Minimum Sentences of Imprisonment-Firearm Use or Possession | Felony | A2423 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.222.1 Assault-2nd Degree-Dangerous Weapon | Felony | A2423 | | MNBCA0000 | 26000126 |
| 5 | Charge | 1/14/2026 | 609.505.1 Falsely Reporting Crime | Misdemeanor | X3190 | | MNBCA0000 | 26000126 |
| | Penalty | 1/14/2026 | 609.505.1 Falsely Reporting Crime | Misdemeanor | X3190 | | MNBCA0000 | 26000126 |

# Exhibit 2

OFFICE OF THE HENNEPIN COUNTY ATTORNEY
MARY F. MORIARTY COUNTY ATTORNEY

February 2, 2026

**VIA CERTIFIED U.S. MAIL**
Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485

Re: Touhy Demand
Investigation into the January 7, 2026, Death of Renee Nicole Good

Dear Sir or Madam,

On January 7, 2026, a federal agent shot and killed Hennepin County resident Renee Nicole Good on a public street in downtown Minneapolis. That shooting was captured on video by bystanders for Minnesotans—indeed all Americans—to see.

As is standard practice in officer-involved shootings—including incidents involving federal officers—the Minnesota Bureau of Criminal Apprehension (BCA) arrived at the scene and began investigating the incident alongside federal investigators. But in the late afternoon on January 7, the BCA was informed that—despite the initial agreement to jointly work the case and share files—the federal government would immediately cease cooperating with State authorities.

This is unprecedented. To this day, despite repeated efforts to engage with federal agencies, the BCA has been unable to access critical information about Ms. Good's death that is in the exclusive custody of the federal government. Meanwhile, the federal government—at the highest levels—has publicly indicated that there will be no federal criminal investigation of this incident.

Minnesota is a sovereign State with the duty to investigate potential crimes committed within its borders. That duty is at its height in cases—like this one—involving the loss of life of one if its citizens within its borders. The Hennepin County Attorney's Office (the County) has jurisdiction to investigate and, if supported by the evidence, prosecute criminal matters related to this tragic incident. As a result, in furtherance of its duties to the citizens of the County, the County is currently conducting a criminal investigation into Ms. Good's death and the circumstances surrounding it, with support from the BCA and the Minnesota Attorney General's Office.

We write this letter pursuant to 6 CFR §§ 5.41 et seq. and 19 C.F.R. §103.21 et seq., to formally demand production of information, documents, and physical items.[1] We ask that the U.S. Department of Homeland Security (DHS), and all of its respective subcomponents, provide the material described in Attachment A to this letter for a state-level criminal investigation in regard to the death of Renee Nicole Good on January 7, 2026. We ask for a response to this request by February 17, 2026. Below, as required by Department regulations, we provide a summary of the evidence sought and its relevance to the proceeding. We also explain the core principles of federalism that vest the State and its instrumentalities with a constitutional interest in the requested evidence.

But at the outset, it bears emphasis: This demand should not even be necessary. The federal government's blanket refusal to cooperate with Minnesota law enforcement—after initially agreeing to jointly investigate this matter—is unmatched in recent memory. Indeed, under the applicable regulatory structure for DHS, "[n]othing in this subpart affects the disclosure of official information to … federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings … ." 6 C.F.R. §5.41(i). Likewise, the regulatory structure for Customs and Border Protection, states "[n]othing in this subpart is intended to impede the appropriate disclosure of information by CBP to federal, state, local, and foreign law enforcement." 19 C.F.R. §103.21(e). We trust that the government will reverse course and promptly respond to this demand.

**Background On Investigation Into the Death of Renee Nicole Good**

A federal agent shot and killed Renee Nicole Good on January 7, 2026, in Minneapolis, Hennepin County, Minnesota. Public statements by U.S. Department of Justice and other federal officials indicate that there is not, and will not be, any federal investigation into the shooting. That choice is the prerogative of the federal government. But the State of Minnesota, together with its agencies and divisions, has an independent sovereign prerogative and responsibility to investigate possible violations of its criminal laws.

Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the death of Ms. Good on a Minneapolis public street. The state offenses under investigation include, but are not limited to, murder, manslaughter, and failure to render aid. The investigation is led by the Hennepin County Attorney's Office, which has jurisdiction pursuant to Minn. Stats. § 388.051 to prosecute felonies that occur within Hennepin County. This office has reached no conclusion as to whether a violation of law has occurred and is committed to ensuring that a full and fair investigation is conducted at a local level based on all available evidence, whether inculpatory or exculpatory. Indeed, it is worth noting that Minnesota courts have already found probable cause to issue search warrants for evidence related to the death of Ms. Good.

[1] We have sent a similar demand letter to the Department of Justice for evidence in their possession, custody, and control. Setting forth our requests for evidence in a letter-demand comports with 6 CFR §§ 5.41 et seq. and 19 C.F.R. §103.21 et seq., and with state and local procedure, which does not utilize grand juries with the same regularity as in the federal system as a means to obtain documentary and physical evidence.

In Minnesota, the law requires an independent investigation for any Minnesota Peace officer-involved death. Minn. Stats. § 626.5534. An independent investigation is also authorized for deaths involving federal officers who were not designated as Minnesota Peace officers. See Minn. Stats. § 299C.03; Minn. Stats § 390.11. Public transparency is vitally important in these cases—not just for the people of Hennepin County and Minnesota, but for the public nationwide. The only way to achieve transparency is thorough investigation conducted at a local level, and for the County Attorney in Hennepin County to review all the evidence—including evidence currently in possession of federal authorities—and determine if a crime was committed.

**Reliance on Federal Assurance that Access Would Be Permitted**

The manner in which the scene was handled—and the fact that state officials were ultimately sidelined—has necessitated our current demand for evidence. In the minutes and hours after the use of force, federal officials informed the local investigators that there would be a joint investigation into the incident. This has been standard operating procedure in Minnesota for years—collaboration and evidence-sharing between federal and local officials when there are overlapping interests in investigating incidents of violence.

Indeed, two high-profile examples of this collaboration have occurred in Hennepin County within the last 12 months—namely, the murder and attempted murder of Minnesota lawmakers and their family members, and a mass shooting at a church service. Following both of those incidents, state and federal officials worked together to ensure that a thorough investigation occurred. Concurrent state and federal investigations have also been the widespread historical practice in federal officer-involved shootings. This method of joint investigation allows the federal investigators to conduct their important work, while at the same time allowing the local investigators and County Attorney to do the work that the people of Minnesota require of them.

On the morning of January 7, 2026, local investigators were told by federal officials that this longstanding practice of joint investigations would be followed in this case. Local investigators relied on these representations in decisions they made about the course of the investigation, including actions taken at the scene. For example, local investigators trusted that important evidence that was gathered by federal investigators would be made available for local analysis. This includes the vehicle in which Ms. Good was shot, shell casings discharged at the scene, and the shooter's gun. In the initial hours after the shooting, federal officials continued to lead local investigators to believe that this would be a joint investigation. In reliance on this settled expectation and de facto standard operating procedures, local investigators prioritized other investigative steps. Had local investigators known that federal authorities would thereafter refuse them access to physical and other evidence taken at the scene into exclusive federal custody, they would have taken different measures to secure the availability of evidence.

In the afternoon on January 7, 2026, the position of the federal government abruptly changed. Local investigators were excluded from interviews, prevented from following standard investigative procedures, and blocked from access to key physical evidence. It was eventually made clear through public statements from high-ranking DHS and DOJ officials that there would be no federal cooperation with the local investigation. At that point, however, key pieces of evidence were already within the possession and control of federal investigators.

**The State's Core Sovereign Interest**

This request for evidence for use in a state criminal investigation is supported by the State's core sovereign interest in exercising its police powers and in investigating possible violations of state law, as enshrined in the Tenth Amendment of the U.S. Constitution and long-standing principles of federalism going back to our Founding. This interest is particularly acute here, where local law enforcement acted in reliance on federal recognition of its right to access evidence, to its later detriment. This core sovereign interest creates a compelling need for the evidence sought herein. Conversely, federal withholding of the requested evidence, in an apparent effort to shield one or more federal officers from scrutiny following the death of a Minnesota citizen, flatly contravenes core principles of federalism.

All of the information set forth in Attachment A bears on the County's pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. For example, physical evidence from the scene, including the firearm used in the shooting and the vehicle operated by Ms. Good, will assist in reconstructing the incident. Audiovisual evidence (including contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist in establishing the sequence of events and shed light on the officer's state of mind. And operations plans and employment and training records are relevant to discerning the officer's preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed his state of mind on January 7, 2026, as well as to assessing the objective reasonableness of the use of force.

At the same time, there is no risk that releasing this information will cause harm to the federal government, witnesses, or others. The federal government has already repeatedly stated that it does not intend to investigate the shooting death of Ms. Good, having apparently already concluded (without investigation) no crime was committed. Accordingly, compliance with our request would not impair any federal investigation. And in any event, as always, we stand willing to work with federal authorities to protect any sensitive investigative techniques or procedures that our requests may inadvertently implicate. Moreover, to the extent that our requests do implicate information protected by the law enforcement privilege, this is a case where the administration of justice requires disclosure, in light of compelling state interests in investigating this matter and the seriousness of the potential offenses at stake.

Moreover, local investigators conduct secure and appropriate investigations into serious incidents every day. They maintain appropriate protections, follow procedures for chain of custody, and otherwise preserve evidence for later use. In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as non-public. Minn. Stats. § 13.82, Subd. 7. This Act also creates procedures to protect witnesses who have legitimate fear for their safety and other protections that will ensure no negative result for the federal government in turning over the information requested in this letter.

This matter has attracted significant ongoing public attention. The public—not just in Minnesota but nationwide—deserves a prompt resolution to our pending investigation, in the interests of the orderly and impartial administration of justice and in ensuring public faith in the same. This prompt resolution depends on the Department's prompt compliance with our demand for evidence. Such

compliance will not in any way hamper the performance of the Department's mission, as there is no conflict between the state's exercise of its lawful authority to investigate homicide deaths within its borders and the faithful enforcement of federal immigration and criminal laws.

**Request for Expedited Consideration**

This request is extraordinarily time-sensitive. The materials sought are needed to support investigative steps that are presently underway, and delay in obtaining them may materially affect the direction, scope, and timing of the investigation. It is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. This is in part because the passage of time can result in dissipation and deterioration of evidence. Most obviously, witness memories fade. Prompt access to federal law enforcement witnesses is essential to ensuring that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

Prompt access to documentary and physical evidence is equally important for the same reason. Investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed interviews of other witnesses, including non-federal witnesses. Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost. Delays in access to such evidence thus compound the risk of evidentiary dissipation by impairing the effectiveness of witness interviews as well as the preservation of documentary and physical proof.

The physical evidence sought is also subject to the risk of deterioration, amplifying our need for swift access. For example, if not stored properly, biological evidence and other forensic evidence will deteriorate beyond testing capabilities. This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in this and other recent ICE-involved shooting incidents. For example, federal authorities removed Ms. Good's vehicle from the scene before local investigators were able to respond and complete their normal processing. Local investigators would have completed 3D scans of the entire incident scene, conducted detailed analysis of trajectory, and obtained precise measurements of the location of key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators conducted a rushed analysis of the incident scene and then removed key physical evidence before local investigators could conduct their normal work. As another example, based on images posted by DHS on social media, a gun alleged to belong to the subject of different fatal ICE-involved shooting in Minneapolis was not handled according to normal law enforcement processes governing the securing of evidence, creating issues with forensic testing and chain of custody.

Prompt disclosure of the requested evidence is also important to ensure compliance with United States and Minnesota law. These include the rights of the accused to due process under the Fifth Amendment of the United States Constitution and to be charged within three years for most relevant felonies, other than those resulting in death, under Minnesota law; as well as the rights of crime victims under Minnesota law to notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. Ann. §§ 611A.01, 611A.02, 611A.033.

For that reason, we respectfully request expedited processing of this demand for evidence and information in federal custody. We are prepared to work with your office to prioritize categories of information, if helpful, to facilitate prompt processing, and to discuss the practicalities of the transfer of evidence to preserve chain of custody. But at minimum, given the government's changing posture, we need an initial response to this demand for information by no later than **February 17, 2026**, to allow us to pursue other legal remedies, if necessary.

* * *

On January 7, 2026, a woman was shot and killed in Hennepin County. My office must conduct a full and transparent investigation into this death. We ask that the federal government provide the information necessary for us to complete this important investigation.

Thank you,



Mary F. Moriarty
Hennepin County Attorney

**CC (with attachment) via Electronic Mail to:**

- Office of the General Counsel, U.S. Department of Homeland Security, OGC@hq.dhs.gov
- Brett Shumate, U.S. Attorney's Office, Civil Division
- Alex Haas, U.S. Attorney's Office, Federal Programs Branch Director
- Jacqueline Snead, U.S. Attorney's Office, Federal Programs Branch Assistant Director
- Eric J. Hamilton, Assistant Director, Federal Programs Branch Deputy Assistant Attorney General

**CC (with attachment) via Certified Mail**:

General Counsel
Immigration, Customs, and Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

General Counsel
Homeland Security Investigations
Minnesota Field Office
1 Federal Drive, Suite 1340
Fort Snelling, MN 55111

Chief Counsel
U.S. Customs and Border Protection
Minnesota Field Office
5600 W American Blvd. Suite 760
Bloomington, MN 55437

U.S. Attorney for the District of Minnesota
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

OFFICE OF THE HENNEPIN COUNTY ATTORNEY
MARY F. MORIARTY COUNTY ATTORNEY

**Attachment A**

1. Any and all physical evidence relevant to the January 7, 2026, shooting of Renee Good on Portland Avenue near 34th Street in Minneapolis, Hennepin County, Minnesota (the "January 7 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting, such as: discharged cartridge casings; any and all firearms; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; motor vehicles and the contents thereof; and any other item(s) collected on the scene. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting or who were present on the scene at or near Ms. Good's vehicle. We also request a chain of custody for any and all such evidence.

2. Any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle, on the day of the shooting. We also request a chain of custody for any and all such evidence.

3. Any and all photographs, videos, measurements, and other imaging relevant to the January 7 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, analysts, and investigators. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4. Any and all radio communications from 8:00 a.m. through 8:00 pm Central time on January 7, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5. Any and all immigration and federal law-enforcement reports related to the January 7 shooting, including but not limited to: incident reports; use-of-force reports; injury reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; weapons discharge logs for weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; investigative assessments, openings, or closing and related communications; and after-action reports and memoranda.

6. Any and all personnel and assignment logs listing the federal agents and officers on duty on January 7, 2026, in Minneapolis Hennepin County, Minnesota, who were involved in the January 7 shooting, or were at the scene of the shooting at any point on January 7. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7. Access to interview federal agents and officers on duty on January 7, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 7 shooting, or were at the scene of the shooting at any point that day.

8. Any and all communications from witnesses pertaining to the January 7 shooting and to the circumstances surrounding that shooting, including, but not limited to: statements from federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; communications to, from, or among federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; and statements to or from civilian witnesses. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

9. Any and all operation plans in effect or in use on January 7, 2026, applicable to and/or provided to any of the federal agents or officers present at the scene of the shooting.

10. Any and all policies, regulations, procedures, and briefings in place on January 7, 2026, that pertain to: use of force and tactics; use of force and tactics regarding moving vehicles; firearms and other weapons use; de-escalation and risk mitigation; incident and use-of-force reporting; securing a crime scene and processing evidence; and any duty to or procedures for securing or providing medical assistance or treatment.

11. Any and all training materials for federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle, including but not limited to: records related to classroom instruction, hands-on training, and scenario training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

12. The following material from the personnel files for the federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

13. Any and all documentation related to a June 2025 vehicle encounter involving U.S. Immigration and Customs Enforcement Agent Jonathan Ross in Bloomington, Minnesota,

including, but not limited to, incident reports, use-of-force reports, weapons discharge reports, injury reports and medical records, affidavits and other statements related to the incident by Agent Ross or any other federal agent or officer involved in or who responded to the incident.

14. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle.

15. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 7 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

# Exhibit 3

OFFICE OF THE HENNEPIN COUNTY ATTORNEY
MARY F. MORIARTY COUNTY ATTORNEY

February 2, 2026

**VIA CERTIFIED U.S. MAIL**
U.S. Attorney for the District of Minnesota
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

Re: Touhy Demand
Investigation into the January 7, 2026, Death of Renee Nicole Good

Dear Sir or Madam,

On January 7, 2026, a federal agent shot and killed Hennepin County resident Renee Nicole Good on a public street in downtown Minneapolis. That shooting was captured on video by bystanders for Minnesotans—indeed all Americans—to see.

As is standard practice in officer-involved shootings—including incidents involving federal officers—the Minnesota Bureau of Criminal Apprehension (BCA) arrived at the scene and began investigating the incident alongside federal investigators. But in the late afternoon on January 7, the BCA was informed that—despite the initial agreement to jointly work the case and share files—the federal government would immediately cease cooperating with State authorities.

This is unprecedented. To this day, despite repeated efforts to engage with federal agencies, the BCA has been unable to access critical information about Ms. Good's death that is in the exclusive custody of the federal government. Meanwhile, the federal government—at the highest levels—has publicly indicated that there will be no federal criminal investigation of this incident.

Minnesota is a sovereign State with the duty to investigate potential crimes committed within its borders. That duty is at its height in cases—like this one—involving the loss of life of one if its citizens within its borders. The Hennepin County Attorney's Office (the County) has jurisdiction to investigate and, if supported by the evidence, prosecute criminal matters related to this tragic incident. As a result, in furtherance of its duties to the citizens of the County, the County is currently conducting a criminal investigation into Ms. Good's death and the circumstances surrounding it, with support from the BCA and the Minnesota Attorney General's Office.

We write this letter pursuant to 28 C.F.R. §16.21 et seq. to formally demand production of information, documents, and physical items.[1] We ask that the U.S. Department of Justice (DOJ), and all of its respective subcomponents, provide the material described in Attachment A to this letter for a state-level criminal investigation in regard to the death of Renee Nicole Good on January 7, 2026. We ask for a response to this request by February 17, 2026. Below, as required by Department regulations, we provide a summary of the evidence sought and its relevance to the proceeding. We also explain the core principles of federalism that vest the State and its instrumentalities with a constitutional interest in the requested evidence.

But at the outset, it bears emphasis: This demand should not even be necessary. The federal government's blanket refusal to cooperate with Minnesota law enforcement—after initially agreeing to jointly investigate this matter—is unmatched in recent memory. Indeed, under the applicable regulatory structure for DOJ, "[n]othing in this subpart is intended to impede the appropriate disclosure, in the absence of a demand, of information by Department law enforcement agencies to federal, state, local and foreign law enforcement, prosecutive, or regulatory agencies." 28 CFR §§ 16.21(c). We trust that the government will reverse course and promptly respond to this demand.

**Background On Investigation Into the Death of Renee Nicole Good**

A federal agent shot and killed Renee Nicole Good on January 7, 2026, in Minneapolis, Hennepin County, Minnesota. Public statements by U.S. Department of Justice and other federal officials indicate that there is not, and will not be, any federal investigation into the shooting. That choice is the prerogative of the federal government. But the State of Minnesota, together with its agencies and divisions, has an independent sovereign prerogative and responsibility to investigate possible violations of its criminal laws.

Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the death of Ms. Good on a Minneapolis public street. The state offenses under investigation include, but are not limited to, murder, manslaughter, and failure to render aid. The investigation is led by the Hennepin County Attorney's Office, which has jurisdiction pursuant to Minn. Stats. § 388.051 to prosecute felonies that occur within Hennepin County. This office has reached no conclusion as to whether a violation of law has occurred and is committed to ensuring that a full and fair investigation is conducted at a local level based on all available evidence, whether inculpatory or exculpatory. Indeed, it is worth noting that Minnesota courts have already found probable cause to issue search warrants for evidence related to the death of Ms. Good.

In Minnesota, the law requires an independent investigation for any Minnesota Peace officer-involved death. Minn. Stats. § 626.5534. An independent investigation is also authorized for deaths involving federal officers who were not designated as Minnesota Peace officers. See Minn.

---

[1] We have sent a similar demand letter to the Department of Homeland Security for evidence in their possession, custody, and control. Setting forth our requests for evidence in a letter-demand comports with 28 CFR §§ 16.21 et seq. and with state and local procedure, which does not utilize grand juries with the same regularity as in the federal system as a means to obtain documentary and physical evidence.

Stats. § 299C.03; Minn. Stats § 390.11. Public transparency is vitally important in these cases—not just for the people of Hennepin County and Minnesota, but for the public nationwide. The only way to achieve transparency is thorough investigation conducted at a local level, and for the County Attorney in Hennepin County to review all the evidence—including evidence currently in possession of federal authorities—and determine if a crime was committed.

**Reliance on Federal Assurance that Access Would Be Permitted**

The manner in which the scene was handled—and the fact that state officials were ultimately sidelined—has necessitated our current demand for evidence. In the minutes and hours after the use of force, federal officials informed the local investigators that there would be a joint investigation into the incident. This has been standard operating procedure in Minnesota for years—collaboration and evidence-sharing between federal and local officials when there are overlapping interests in investigating incidents of violence.

Indeed, two high-profile examples of this collaboration have occurred in Hennepin County within the last 12 months—namely, the murder and attempted murder of Minnesota lawmakers and their family members, and a mass shooting at a church service. Following both of those incidents, state and federal officials worked together to ensure that a thorough investigation occurred. Concurrent state and federal investigations have also been the widespread historical practice in federal officer-involved shootings. This method of joint investigation allows the federal investigators to conduct their important work, while at the same time allowing the local investigators and County Attorney to do the work that the people of Minnesota require of them.

On the morning of January 7, 2026, local investigators were told by federal officials that this longstanding practice of joint investigations would be followed in this case. Local investigators relied on these representations in decisions they made about the course of the investigation, including actions taken at the scene. For example, local investigators trusted that important evidence that was gathered by federal investigators would be made available for local analysis. This includes the vehicle in which Ms. Good was shot, shell casings discharged at the scene, and the shooter's gun. In the initial hours after the shooting, federal officials continued to lead local investigators to believe that this would be a joint investigation. In reliance on this settled expectation and de facto standard operating procedures, local investigators prioritized other investigative steps. Had local investigators known that federal authorities would thereafter refuse them access to physical and other evidence taken at the scene into exclusive federal custody, they would have taken different measures to secure the availability of evidence.

In the afternoon on January 7, 2026, the position of the federal government abruptly changed. Local investigators were excluded from interviews, prevented from following standard investigative procedures, and blocked from access to key physical evidence. It was eventually made clear through public statements from high-ranking DHS and DOJ officials that there would be no federal cooperation with the local investigation. At that point, however, key pieces of evidence were already within the possession and control of federal investigators.

**The State's Core Sovereign Interest**

This request for evidence for use in a state criminal investigation is supported by the State's core sovereign interest in exercising its police powers and in investigating possible violations of state law, as enshrined in the Tenth Amendment of the U.S. Constitution and long-standing principles of federalism going back to our Founding. This interest is particularly acute here, where local law enforcement acted in reliance on federal recognition of its right to access evidence, to its later detriment. This core sovereign interest creates a compelling need for the evidence sought herein. Conversely, federal withholding of the requested evidence, in an apparent effort to shield one or more federal officers from scrutiny following the death of a Minnesota citizen, flatly contravenes core principles of federalism.

All of the information set forth in Attachment A bears on the County's pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. For example, physical evidence from the scene, including the firearm used in the shooting and the vehicle operated by Ms. Good, will assist in reconstructing the incident. Audiovisual evidence (including contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist in establishing the sequence of events and shed light on the officer's state of mind. And operations plans and employment and training records are relevant to discerning the officer's preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed his state of mind on January 7, 2026, as well as to assessing the objective reasonableness of the use of force.

At the same time, there is no risk that releasing this information will cause harm to the federal government, witnesses, or others. The federal government has already repeatedly stated that it does not intend to investigate the shooting death of Ms. Good, having apparently already concluded (without investigation) no crime was committed. Accordingly, compliance with our request would not impair any federal investigation. And in any event, as always, we stand willing to work with federal authorities to protect any sensitive investigative techniques or procedures that our requests may inadvertently implicate. Moreover, to the extent that our requests do implicate information protected by the law enforcement privilege, this is a case where the administration of justice requires disclosure, in light of compelling state interests in investigating this matter and the seriousness of the potential offenses at stake.

Moreover, local investigators conduct secure and appropriate investigations into serious incidents every day. They maintain appropriate protections, follow procedures for chain of custody, and otherwise preserve evidence for later use. In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as non-public. Minn. Stats. § 13.82, Subd. 7. This Act also creates procedures to protect witnesses who have legitimate fear for their safety and other protections that will ensure no negative result for the federal government in turning over the information requested in this letter.

This matter has attracted significant ongoing public attention. The public—not just in Minnesota but nationwide—deserves a prompt resolution to our pending investigation, in the interests of the orderly and impartial administration of justice and in ensuring public faith in the same. This prompt resolution depends on the Department's prompt compliance with our demand for evidence. Such

compliance will not in any way hamper the performance of the Department's mission, as there is no conflict between the state's exercise of its lawful authority to investigate homicide deaths within its borders and the faithful enforcement of federal immigration and criminal laws.

**Request for Expedited Consideration**

This request is extraordinarily time-sensitive. The materials sought are needed to support investigative steps that are presently underway, and delay in obtaining them may materially affect the direction, scope, and timing of the investigation. It is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. This is in part because the passage of time can result in dissipation and deterioration of evidence. Most obviously, witness memories fade. Prompt access to federal law enforcement witnesses is essential to ensuring that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

Prompt access to documentary and physical evidence is equally important for the same reason. Investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed interviews of other witnesses, including non-federal witnesses. Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost. Delays in access to such evidence thus compound the risk of evidentiary dissipation by impairing the effectiveness of witness interviews as well as the preservation of documentary and physical proof.

The physical evidence sought is also subject to the risk of deterioration, amplifying our need for swift access. For example, if not stored properly, biological evidence and other forensic evidence will deteriorate beyond testing capabilities. This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in this and other recent ICE-involved shooting incidents. For example, federal authorities removed Ms. Good's vehicle from the scene before local investigators were able to respond and complete their normal processing. Local investigators would have completed 3D scans of the entire incident scene, conducted detailed analysis of trajectory, and obtained precise measurements of the location of key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators conducted a rushed analysis of the incident scene and then removed key physical evidence before local investigators could conduct their normal work. As another example, based on images posted by DHS on social media, a gun alleged to belong to the subject of different fatal ICE-involved shooting in Minneapolis was not handled according to normal law enforcement processes governing the securing of evidence, creating issues with forensic testing and chain of custody.

Prompt disclosure of the requested evidence is also important to ensure compliance with United States and Minnesota law. These include the rights of the accused to due process under the Fifth Amendment of the United States Constitution and to be charged within three years for most relevant felonies, other than those resulting in death, under Minnesota law; as well as the rights of crime victims under Minnesota law to notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. Ann. §§ 611A.01, 611A.02, 611A.033.

For that reason, we respectfully request expedited processing of this demand for evidence and information in federal custody. We are prepared to work with your office to prioritize categories of information, if helpful, to facilitate prompt processing, and to discuss the practicalities of the transfer of evidence to preserve chain of custody. But at minimum, given the government's changing posture, we need an initial response to this demand for information by no later than **February 17, 2026**, to allow us to pursue other legal remedies, if necessary.

* * *

On January 7, 2026, a woman was shot and killed in Hennepin County. My office must conduct a full and transparent investigation into this death. We ask that the federal government provide the information necessary for us to complete this important investigation.

Thank you,



Mary F. Moriarty
Hennepin County Attorney

**CC (with enclosure) via Electronic Mail to:**

- Brett Shumate, U.S. Attorney's Office, Civil Division
- Alex Haas, U.S. Attorney's Office, Federal Programs Branch Director
- Jacqueline Snead, U.S. Attorney's Office, Federal Programs Branch Assistant Director
- Eric J. Hamilton, Assistant Director, Federal Programs Branch Deputy Assistant Attorney General
- Sam Ramer, Federal Bureau of Investigation Office of the General Counsel

**CC (with attachment) via Certified Mail**:
Office of General Counsel
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

Office of General Counsel
Federal Bureau of Investigation
1501 Freeway Blvd
Brooklyn Center, MN 55430

**OFFICE OF THE HENNEPIN COUNTY ATTORNEY**
**MARY F. MORIARTY** COUNTY ATTORNEY

**Attachment A**

1. Any and all physical evidence relevant to the January 7, 2026, shooting of Renee Good on Portland Avenue near 34th Street in Minneapolis, Hennepin County, Minnesota (the "January 7 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting, such as: discharged cartridge casings; any and all firearms; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; motor vehicles and the contents thereof; and any other item(s) collected on the scene. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting or who were present on the scene at or near Ms. Good's vehicle. We also request a chain of custody for any and all such evidence.

2. Any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle, on the day of the shooting. We also request a chain of custody for any and all such evidence.

3. Any and all photographs, videos, measurements, and other imaging relevant to the January 7 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, analysts, and investigators. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4. Any and all radio communications from 8:00 a.m. through 8:00 pm Central time on January 7, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5. Any and all immigration and federal law-enforcement reports related to the January 7 shooting, including but not limited to: incident reports; use-of-force reports; injury reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; weapons discharge logs for weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; investigative assessments, openings, or closing and related communications; and after-action reports and memoranda.

6. Any and all personnel and assignment logs listing the federal agents and officers on duty on January 7, 2026, in Minneapolis Hennepin County, Minnesota, who were involved in the January 7 shooting, or were at the scene of the shooting at any point on January 7. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7. Access to interview federal agents and officers on duty on January 7, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 7 shooting, or were at the scene of the shooting at any point that day.

8. Any and all communications from witnesses pertaining to the January 7 shooting and to the circumstances surrounding that shooting, including, but not limited to: statements from federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; communications to, from, or among federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; and statements to or from civilian witnesses. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

9. Any and all operation plans in effect or in use on January 7, 2026, applicable to and/or provided to any of the federal agents or officers present at the scene of the shooting.

10. Any and all policies, regulations, procedures, and briefings in place on January 7, 2026, that pertain to: use of force and tactics; use of force and tactics regarding moving vehicles; firearms and other weapons use; de-escalation and risk mitigation; incident and use-of-force reporting; securing a crime scene and processing evidence; and any duty to or procedures for securing or providing medical assistance or treatment.

11. Any and all training materials for federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle, including but not limited to: records related to classroom instruction, hands-on training, and scenario training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

12. The following material from the personnel files for the federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

13. Any and all documentation related to a June 2025 vehicle encounter involving U.S. Immigration and Customs Enforcement Agent Jonathan Ross in Bloomington, Minnesota,

including, but not limited to, incident reports, use-of-force reports, weapons discharge reports, injury reports and medical records, affidavits and other statements related to the incident by Agent Ross or any other federal agent or officer involved in or who responded to the incident.

14. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle.

15. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 7 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

# Exhibit 4

February 17, 2026

**VIA CERTIFIED U.S. MAIL**
Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485

Re: *Touhy* Demand
Investigation into the January 24, 2026, Death of Alex Jeffrey Pretti

Dear Sir or Madam,

On January 24, 2026, Customs and Border Patrol agents shot and killed Hennepin County resident Alex Jeffrey Pretti on a public street in downtown Minneapolis. Mr. Pretti's killing occurred only 17 days after federal agents shot and killed Hennepin County resident Renee Good in her car. And like the Good shooting, Mr. Pretti's shooting was captured on video by multiple bystanders for Minnesotans—indeed all Americans—to see.

As is standard practice in officer-involved shootings—including incidents involving federal officers—the Minnesota Bureau of Criminal Apprehension (BCA) arrived promptly at the scene and attempted to investigate the incident alongside federal investigators. But federal agents blocked them from accessing the scene, gathering evidence, or interviewing witnesses, forcing the BCA to swiftly seek and secure a search warrant signed by a Hennepin County District Court Judge. Even after BCA agents returned to the scene of Mr. Pretti's killing and presented federal agents with the signed search warrant, they still were blocked from accessing the scene (despite it being a public street within the County) or from gathering any evidence or conducting routine investigatory actions. This is unprecedented. To this day, despite repeated efforts to engage with federal agencies, the BCA has been unable to access critical information about Mr. Pretti's death that is in the exclusive custody of the federal government.

Minnesota is a sovereign State with the duty to investigate potential crimes committed within its borders. That duty is at its height in cases—like this one—involving the loss of life of one if its citizens within its borders. Here, the BCA is generally responsible for conducting officer-involved death investigations in Minnesota. Similarly, the Hennepin County Attorney's Office (the County) has jurisdiction to investigate and, if supported by the evidence, prosecute criminal matters related to this tragic incident. As a result, in furtherance of its duties to the citizens of the County, the County is currently conducting a criminal investigation into Mr. Pretti's death and the circumstances surrounding it, with support from the BCA and the Minnesota Attorney General's Office.

We write this letter pursuant to 6 CFR §§ 5.41 et seq. and 19 C.F.R. §103.21 et seq., to formally demand production of information, documents, and physical items.[1] We ask that the U.S. Department of Homeland Security (DHS), and all of its respective subcomponents, provide the material described in Attachment A to this letter for a state-level criminal investigation in regard to the death of Alex Jeffrey Pretti on January 24, 2026. We ask for a response to this request by March 3, 2026. Below, as required by Department regulations, we provide a summary of the evidence sought and its relevance to the proceeding. We also explain the core principles of federalism that vest the State and its instrumentalities with a constitutional interest in the requested evidence.

But at the outset, it bears emphasis: This demand should not even be necessary. The federal government's blanket refusal to cooperate with Minnesota law enforcement is unmatched in our entire history working with the federal government. Indeed, under the applicable regulatory structure for DHS, "[n]othing in this subpart affects the disclosure of official information to … federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings … ." 6 C.F.R. §5.41(i). Likewise, the regulatory structure for Customs and Border Protection, states "[n]othing in this subpart is intended to impede the appropriate disclosure of information by CBP to federal, state, local, and foreign law enforcement." 19 C.F.R. §103.21(e). We trust that the government will reverse course and promptly respond to this demand.

**Background On Investigation Into the Death of Alex Jeffrey Pretti**

Federal agents shot and killed Alex Jeffrey Pretti on January 24, 2026, in Minneapolis, Hennepin County, Minnesota. The U.S. Department of Justice has indicated that it has opened a federal civil rights investigation into the incident. But the State of Minnesota, together with its agencies and divisions, has an independent sovereign prerogative and responsibility to investigate possible violations of its criminal laws within its territory. The investigation of the death of a citizen is typically conducted by state and local authorities and only occasionally by the federal government.

Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the death of Mr. Pretti on a Minneapolis public street. The BCA's investigation is impartial and includes no recommendation as to a charging decision. The County's investigation is likewise impartial, and the HCAO has reached no conclusion as to whether a violation of law has occurred. The HCAO will review the full investigation once it is complete and will consider all possible offenses, including but are not limited to, murder, manslaughter, and failure to render aid. The BCA and the County are committed to ensuring that a full and fair investigation is conducted at a local level based on all available evidence, whether inculpatory or exculpatory. Indeed, it is worth

[1] We have sent a similar demand letter to the U.S. Department of Justice for evidence in their possession, custody, and control. Setting forth our requests for evidence in a letter-demand comports with 6 CFR §§ 5.41 et seq. and 19 C.F.R. §103.21 et seq., and with state and local procedure, which does not utilize grand juries with the same regularity as in the federal system as a means to obtain documentary and physical evidence.

noting that a Minnesota court already has found probable cause to issue a search warrant for evidence at the scene of Mr. Pretti's death.

The BCA and the County are discharging their responsibilities under Minnesota law. For instance, Minnesota law requires an independent investigation for any Minnesota Peace officer-involved death. Minn. Stat. § 626.5534. An independent investigation is also authorized for deaths involving federal officers who were not designated as Minnesota Peace officers. *See* Minn. Stat. § 299C.03; Minn. Stat § 390.11. Public transparency is vitally important in these cases—not just for the people of Hennepin County and Minnesota, but for the public nationwide. The only way to achieve transparency is thorough investigation conducted at a local level, and for the BCA and the County to review all the evidence—including evidence currently in possession of federal authorities. The County can then exercise its authority to determine if a crime was committed.

**Unexplained and Unjustified Deviation From Longstanding Practice of Joint Investigations**

The manner in which the scene was handled—and the fact that state officials were barred from entering, even after obtaining a judicially signed search warrant—has necessitated our current demand for evidence. Joint federal and state investigations of incidents of this type have been standard operating procedure in Minnesota for years—collaboration and evidence-sharing between federal and local officials when there are overlapping interests in investigating incidents of violence.

Indeed, two high-profile examples of this collaboration have occurred in Hennepin County within the last 12 months—namely, the murder and attempted murder of Minnesota lawmakers and their family members and a mass shooting at a church service. Following both of those incidents, state and federal officials worked together to ensure that a thorough investigation occurred. Concurrent state and federal investigations have also been the widespread historical practice in federal officer-involved shootings. This method of joint investigation allows the federal investigators to conduct their important work, while at the same time allowing the BCA and the County to do the work that the people of Minnesota require of them.

On the morning of January 24, 2026, BCA investigators arrived at the scene of a federal-officer-involved shooting reasonably expecting that this longstanding practice of joint investigations would be followed in this case. Rather than working in cooperation with their federal counterparts, as they typically would, BCA investigators were rebuffed and wholly denied access to a Hennepin County public street where they enjoyed a lawful right to be present. As a result, important pieces of evidence were taken into the exclusive possession and control of federal investigators before the BCA had any opportunity even to examine and photograph them. The BCA was excluded from interviews, prevented from following standard investigative procedures, and blocked from access to important physical evidence.

Despite these challenges, the BCA continued to press for a return to the well-established norm of cooperation. Approximately ten days ago, your office and the FBI reached out to the BCA to indicate an intent to resume normal cooperation, including evidence-sharing and the potential for a joint investigation. That progress unraveled when the Department of Justice dispatched a representative from Main Justice to Minneapolis, after which the contemplated cooperation did

not materialize. On Friday, February 13, 2026, the FBI formally notified the BCA that it will not provide the BCA with access to any information or evidence related to the death of Mr. Pretti.

**The State's Core Sovereign Interest**

This request for evidence for use in a state criminal investigation is supported by the State's core sovereign interest in exercising its police powers and in investigating possible violations of state law, as enshrined in the Tenth Amendment of the U.S. Constitution and longstanding principles of federalism going back to our Founding. This interest is particularly acute here, where state law enforcement was thwarted in its attempt to swiftly gather evidence in a public setting according to standard investigatory protocols by the federal government, which prevented state investigators from accessing the scene of an officer-involved shooting. This core sovereign interest creates a compelling need for the evidence sought herein. Conversely, federal withholding of the requested evidence, in an apparent effort to shield one or more federal officers from scrutiny following the death of a Minnesota citizen, flatly contravenes core principles of federalism.

All of the information set forth in Attachment A bears on the pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. For example, physical evidence from the scene, including the firearms used in the shooting, will assist in reconstructing the incident. Audiovisual evidence (including contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist in establishing the sequence of events and shed light on the officers' states of mind. And operations plans and employment and training records are relevant to discerning the officers' preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed their states of mind on January 24, 2026, as well as to assessing the objective reasonableness of the use of force.

At the same time, releasing this information will not cause harm to the federal government, witnesses, or others. As explained above, federal/state cooperation is the norm—even in complex, high-profile, and sensitive cases, and Minnesota's law enforcement generally, and the BCA specifically, has always maintained a productive and cooperative working relationship with our federal counterparts. And as always, we stand willing to work with federal authorities to protect any sensitive investigative techniques or procedures that our requests may inadvertently implicate. Moreover, to the extent that our requests do implicate information protected by the law enforcement privilege, this is a case where the administration of justice requires disclosure, in light of compelling state interests in investigating this matter and the seriousness of the potential offenses at stake.

Moreover, state and local investigators conduct secure and appropriate investigations into serious incidents every day. They maintain appropriate protections, follow procedures for chain of custody, and otherwise preserve evidence for later use. In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as non-public. Minn. Stat. § 13.82, Subd. 7. This Act also creates procedures to protect witnesses who have legitimate fear for their safety and other protections that will ensure no negative result for the federal government in turning over the information requested in this letter.

This matter has attracted significant ongoing public attention. The public—not just in Minnesota but nationwide—deserves a prompt resolution to our pending investigation, in the interests of the orderly and impartial administration of justice and in ensuring public faith in the same. This prompt resolution depends on the Department's prompt compliance with our demand for evidence. Such compliance will not in any way hamper the performance of the Department's mission, as there is no conflict between the state's exercise of its lawful authority to investigate homicide deaths within its borders and the faithful enforcement of federal immigration and criminal laws.

**Request for Expedited Consideration**

This request is extraordinarily time sensitive. The materials sought are needed to support investigative steps that are presently underway, and delay in obtaining them may materially affect the direction, scope, and timing of the investigation. It is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. This is in part because the passage of time can result in dissipation and deterioration of evidence. Most obviously, witness memories fade. Prompt access to federal law enforcement witnesses is essential to ensuring that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

Prompt access to documentary and physical evidence is equally important for the same reason. Investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed interviews of other witnesses, including non-federal witnesses. Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost. Delays in access to such evidence thus compound the risk of evidentiary dissipation by impairing the effectiveness of witness interviews as well as the preservation of documentary and physical proof.

The physical evidence sought is also subject to the risk of deterioration, amplifying our need for swift access. For example, if not stored properly, biological evidence and other forensic evidence will deteriorate beyond testing capabilities. This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in this and other recent ICE-involved shooting incidents. For example, it appears from publicly available sources that federal authorities handled Mr. Pretti's firearm in a manner that substantially deviated from normal evidentiary protocols, creating issues with forensic testing and chain of custody. State investigators would have completed 3D scans of the entire incident scene, conducted detailed analysis of trajectory, and obtained precise measurements of the location of key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators conducted a rushed analysis of the incident scene and then removed key physical evidence before local investigators could conduct their normal work.

Prompt disclosure of the requested evidence is also important to ensure compliance with United States and Minnesota law. These include the rights of the accused to due process under the Fifth Amendment of the United States Constitution and to be charged within three years for most relevant felonies, other than those resulting in death, under Minnesota law; as well as the rights of

crime victims under Minnesota law to notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. §§ 611A.01, 611A.02, 611A.033.

We acknowledge the federal government's prior denial of BCA's request for evidence in this matter, which we understand to have been final. We nonetheless submit this demand to ensure all avenues are explored. Should the government wish to reverse its prior determination, we remain available to engage immediately on prioritizing categories of information, if helpful, to facilitate prompt processing, and to discuss the practicalities of the transfer of evidence to preserve chain of custody.

But at minimum, given the exigencies of the situation, we request a response by **March 3, 2026,** indicating whether the government will reverse its previous denial. If we don't hear from the government by that date, we will have no other choice but to consider all avenues for legal relief.

* * *

On January 24, 2026, a man was shot and killed in Hennepin County. Minnesota officials must conduct a full and transparent investigation into this death. We ask that the federal government provide the information necessary for us to complete this important investigation.

Thank you,

/s/ Mary Moriarty

Mary F. Moriarty
Hennepin County Attorney

/s/ Drew Evans

Drew Evans
BCA Superintendent

**CC (with enclosure) via Electronic Mail to:**

- Office of the General Counsel, U.S. Department of Homeland Security, OGC@hq.dhs.gov
- Brett Shumate, U.S. Department of Justice, Civil Division, Assistant Attorney General
- Eric J. Hamilton, U.S. Department of Justice, Civil Division, Deputy Assistant Attorney General
- Alex Haas, Civil Division, Federal Programs Branch, Director
- Jacqueline Snead, Civil Division, Federal Programs Branch, Assistant Director

**CC (with attachment) via Certified Mail**:
General Counsel
Immigration, Customs, and Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

General Counsel
Homeland Security Investigations
Minnesota Field Office
1 Federal Drive, Suite 1340
Fort Snelling, MN 55111

Chief Counsel
U.S. Customs and Border Protection
Minnesota Field Office
5600 W American Blvd. Suite 760
Bloomington, MN 55437

Daniel Rosen
U.S. Attorney for the District of Minnesota
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

HENNEPIN COUNTY ATTORNEY'S OFFICE

Minnesota BCA Bureau of Criminal Apprehension

**Attachment A**

1. Any and all physical evidence relevant to the January 24, 2026, shooting of Alex Jeffrey Pretti on Nicolett Avenue in Minneapolis, Minnesota (the "January 24 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting, such as: discharged cartridge casings; any and all firearms; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; and any other item collected on the scene. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting, who interacted with Mr. Pretti, or who were present on the scene at any time on January 24, 2026. We also request a chain of custody for any and all such evidence.

2. Any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 24 shooting, who interacted with Mr. Pretti, or who were present on the scene at any time on January 24, 2026. We also request a chain of custody for any and all such evidence.

3. Any and all photographs, videos, measurements, and other imaging relevant to the January 24 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, and investigators; and material recorded by members of the public that was obtained by any federal agent, officer, or investigator. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4. Any and all radio communications from 8:00 a.m. through 5:00 p.m. Central time on January 24, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5. Any and all immigration and federal law-enforcement reports related to the January 24 shooting, including but not limited to: incident reports; use-of-force reports, including those concerning individuals at the scene of the shooting other than Mr. Pretti; injury reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers at the scene; weapons discharge reports, including for firearms and chemical weapons, for weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; investigative assessments, openings, or closing and related communications; after-action reports and memoranda; and any and all reports concerning the detention, questioning,

or arrest of individuals who were at or near the scene of the January 24 shooting, including documentation of the purpose and legal basis for transporting any individual away from the scene and information about the location to which they were transferred.

6. Any and all personnel and assignment logs listing the federal agents and officers on duty on January 24, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 24 shooting, or were at the scene of the shooting at any point. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7. Any and all travel and assignment logs showing the subsequent assignment or reassignment of any federal agents and officers involved in the January 24 shooting, including, but not limited to, documentation of any assignments to locations outside Hennepin County, Minnesota, following the January 24 shooting.

8. Access to interview federal agents and officers on duty on January 24, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 24 shooting, or were at the scene of the shooting at any point that day.

9. Any and all communications from witnesses pertaining to the January 24 shooting and to the circumstances surrounding that shooting, including, but not limited to: statements to, from, or among federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; and statements to or from civilian witnesses. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

10. Any and all operation plans that cover or pertain to January 24, 2026, in Minneapolis, Hennepin County, Minnesota, or that relate to any and all federal agents and officers who interacted with Mr. Pretti on January 24, 2026, or who were involved in the January 24 shooting.

11. Any and all policies, regulations, procedures, and briefings in place on January 24, 2026, that pertain to: use of force and tactics; firearms, chemical weapons, and other weapons use; de-escalation and risk mitigation; responding to protests or civil disobedience; incident and use-of-force reporting; evidence handling and processing; and any duty to or procedures for securing or providing medical assistance or treatment.

12. Any and all training materials for federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting at any time that day, or who interacted with Mr. Pretti on January 24, 2026. These materials should include, but are not limited to: records related to classroom instruction, hands-on training, and scenario-based training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

13. The following material from the personnel files for the federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting at any point that day, or who interacted with Mr. Pretti on January 24, 2026: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

14. Any and all documentation related to any interaction between Mr. Pretti and federal agents and officers that occurred at any time prior to the January 24 shooting, including any interaction on January 13, 2026. These materials should include, but are not limited to, reports, logs, video recordings, audio recordings, photographs, notes, communications in any format, and radio traffic.

15. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting, or who interacted with Mr. Pretti on January 24, 2026.

16. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any civilian or any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 24 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

# Exhibit 5

HENNEPIN COUNTY ATTORNEY'S OFFICE

Minnesota BCA Bureau of Criminal Apprehension

February 17, 2026

**VIA CERTIFIED U.S. MAIL**
Daniel Rosen
U.S. Attorney for the District of Minnesota
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

Re: *Touhy* Demand
Investigation into the January 24, 2026, Death of Alex Jeffrey Pretti

Dear Mr. Rosen:

On January 24, 2026, Customs and Border Patrol agents shot and killed Hennepin County resident Alex Jeffrey Pretti on a public street in downtown Minneapolis. Mr. Pretti's killing occurred only 17 days after federal agents shot and killed Hennepin County resident Renee Good in her car. And like the Good shooting, Mr. Pretti's shooting was captured on video by multiple bystanders for Minnesotans—indeed all Americans—to see.

As is standard practice in officer-involved shootings—including incidents involving federal officers—the Minnesota Bureau of Criminal Apprehension (BCA) arrived promptly at the scene and attempted to investigate the incident alongside federal investigators. But federal agents blocked them from accessing the scene, gathering evidence, or interviewing witnesses, forcing the BCA to swiftly seek and secure a search warrant signed by a Hennepin County District Court Judge. Even after BCA agents returned to the scene of Mr. Pretti's killing and presented federal agents with the signed search warrant, they still were blocked from accessing the scene (despite it being a public street within the County) or from gathering any evidence or conducting routine investigatory actions. This is unprecedented. To this day, despite repeated efforts to engage with federal agencies, the BCA has been unable to access critical information about Mr. Pretti's death that is in the exclusive custody of the federal government.

Minnesota is a sovereign State with the duty to investigate potential crimes committed within its borders. That duty is at its height in cases—like this one—involving the loss of life of one if its citizens within its borders. Here, the BCA is generally responsible for conducting officer-involved death investigations in Minnesota. Similarly, the Hennepin County Attorney's Office (the County) has jurisdiction to investigate and, if supported by the evidence, prosecute criminal matters related to this tragic incident. As a result, in furtherance of its duties to the citizens of the County, the County is currently conducting a criminal investigation into Mr. Pretti's death and the

circumstances surrounding it, with support from the BCA and the Minnesota Attorney General's Office.

We write this letter pursuant to 28 C.F.R. §16.21 *et seq*. to formally demand production of information, documents, and physical items.[1] We ask that the U.S. Department of Justice (DOJ), and all of its respective subcomponents, provide the material described in Attachment A to this letter for a state-level criminal investigation in regard to the death of Alex Jeffrey Pretti on January 24, 2026. We ask for a response to this request by March 3, 2026. Below, as required by Department regulations, we provide a summary of the evidence sought and its relevance to the proceeding. We also explain the core principles of federalism that vest the State and its instrumentalities with a constitutional interest in the requested evidence.

But at the outset, it bears emphasis: This demand should not even be necessary. The federal government's blanket refusal to cooperate with Minnesota law enforcement is unmatched in our entire history working with the federal government. Indeed, under the applicable regulatory structure for DOJ, "[n]othing in this subpart is intended to impede the appropriate disclosure, in the absence of a demand, of information by Department law enforcement agencies to federal, state, local and foreign law enforcement, prosecutive, or regulatory agencies." 28 C.F.R. § 16.21(c). We trust that the government will reverse course and promptly respond to this demand.

**Background On Investigation Into the Death of Alex Jeffrey Pretti**

Federal agents shot and killed Alex Jeffrey Pretti on January 24, 2026, in Minneapolis, Hennepin County, Minnesota. DOJ has indicated that it has opened a federal civil rights investigation into the incident. But the State of Minnesota, together with its agencies and divisions, has an independent sovereign prerogative and responsibility to investigate possible violations of its criminal laws within its territory. The investigation of the death of a citizen is typically conducted by state and local authorities and only occasionally by the federal government.

Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the death of Mr. Pretti on a Minneapolis public street. The BCA's investigation is impartial and includes no recommendation as to a charging decision. The County's investigation is likewise impartial, and the HCAO has reached no conclusion as to whether a violation of law has occurred. The HCAO will review the full investigation once it is complete and will consider all possible offenses, including but are not limited to, murder, manslaughter, and failure to render aid. The BCA and the County are committed to ensuring that a full and fair investigation is conducted at a local level based on all available evidence, whether inculpatory or exculpatory. Indeed, it is worth noting that a Minnesota court already has found probable cause to issue a search warrant for evidence at the scene of Mr. Pretti's death.

[1] We have sent a similar demand letter to the Department of Homeland Security for evidence in its possession, custody, and control. Setting forth our requests for evidence in a letter-demand comports with 28 CFR §§ 16.21 *et seq*. and with state and local procedure, which does not utilize grand juries with the same regularity as in the federal system as a means to obtain documentary and physical evidence.

The BCA and the County are discharging their responsibilities under Minnesota law. For instance, Minnesota law requires an independent investigation for any Minnesota Peace officer-involved death. Minn. Stat. § 626.5534. An independent investigation is also authorized for deaths involving federal officers who were not designated as Minnesota Peace officers. *See* Minn. Stat. § 299C.03; Minn. Stat § 390.11. Public transparency is vitally important in these cases—not just for the people of Hennepin County and Minnesota, but for the public nationwide. The only way to achieve transparency is thorough investigation conducted at a local level, and for the BCA and the County to review all the evidence—including evidence currently in possession of federal authorities. The County can then exercise its authority to determine if a crime was committed.

**Unexplained and Unjustified Deviation From Longstanding Practice of Joint Investigations**

The manner in which the scene was handled—and the fact that state officials were barred from entering, even after obtaining a judicially signed search warrant—has necessitated our current demand for evidence. Joint federal and state investigations of incidents of this type have been standard operating procedure in Minnesota for years—collaboration and evidence-sharing between federal and local officials when there are overlapping interests in investigating incidents of violence.

Indeed, two high-profile examples of this collaboration have occurred in Hennepin County within the last 12 months—namely, the murder and attempted murder of Minnesota lawmakers and their family members and a mass shooting at a church service. Following both of those incidents, state and federal officials worked together to ensure that a thorough investigation occurred. Concurrent state and federal investigations have also been the widespread historical practice in federal officer-involved shootings. This method of joint investigation allows the federal investigators to conduct their important work, while at the same time allowing the BCA and the County to do the work that the people of Minnesota require of them.

On the morning of January 24, 2026, BCA investigators arrived at the scene of a federal-officer-involved shooting reasonably expecting that this longstanding practice of joint investigations would be followed in this case. Rather than working in cooperation with their federal counterparts, as they typically would, BCA investigators were rebuffed and wholly denied access to a Hennepin County public street where they enjoyed a lawful right to be present. As a result, important pieces of evidence were taken into the exclusive possession and control of federal investigators before the BCA had any opportunity even to examine and photograph them. The BCA was excluded from interviews, prevented from following standard investigative procedures, and blocked from access to important physical evidence.

Despite these challenges, the BCA continued to press for a return to the well-established norm of cooperation. Approximately ten days ago, your office and the FBI reached out to the BCA to indicate an intent to resume normal cooperation, including evidence-sharing and the potential for a joint investigation. That progress unraveled when the Department of Justice dispatched a representative from Main Justice to Minneapolis, after which the contemplated cooperation did not materialize. On Friday, February 13, 2026, the FBI formally notified the BCA that it will not provide the BCA with access to any information or evidence related to the death of Mr. Pretti.

**The State's Core Sovereign Interest**

This request for evidence for use in a state criminal investigation is supported by the State's core sovereign interest in exercising its police powers and in investigating possible violations of state law, as enshrined in the Tenth Amendment of the U.S. Constitution and longstanding principles of federalism going back to our Founding. This interest is particularly acute here, where state law enforcement was thwarted in its attempt to swiftly gather evidence in a public setting according to standard investigatory protocols by the federal government, which prevented state investigators from accessing the scene of an officer-involved shooting. This core sovereign interest creates a compelling need for the evidence sought herein. Conversely, federal withholding of the requested evidence, in an apparent effort to shield one or more federal officers from scrutiny following the death of a Minnesota citizen, flatly contravenes core principles of federalism.

All of the information set forth in Attachment A bears on the pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. For example, physical evidence from the scene, including the firearms used in the shooting, will assist in reconstructing the incident. Audiovisual evidence (including contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist in establishing the sequence of events and shed light on the officers' states of mind. And operations plans and employment and training records are relevant to discerning the officers' preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed their states of mind on January 24, 2026, as well as to assessing the objective reasonableness of the use of force.

At the same time, releasing this information will not cause harm to the federal government, witnesses, or others. As explained above, federal/state cooperation is the norm—even in complex, high-profile, and sensitive cases, and Minnesota's law enforcement generally, and the BCA specifically, has always maintained a productive and cooperative working relationship with our federal counterparts. And as always, we stand willing to work with federal authorities to protect any sensitive investigative techniques or procedures that our requests may inadvertently implicate. Moreover, to the extent that our requests do implicate information protected by the law enforcement privilege, this is a case where the administration of justice requires disclosure, in light of compelling state interests in investigating this matter and the seriousness of the potential offenses at stake.

Moreover, state and local investigators conduct secure and appropriate investigations into serious incidents every day. They maintain appropriate protections, follow procedures for chain of custody, and otherwise preserve evidence for later use. In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as non-public. Minn. Stat. § 13.82, Subd. 7. This Act also creates procedures to protect witnesses who have legitimate fear for their safety and other protections that will ensure no negative result for the federal government in turning over the information requested in this letter.

This matter has attracted significant ongoing public attention. The public—not just in Minnesota but nationwide—deserves a prompt resolution to our pending investigation, in the interests of the orderly and impartial administration of justice and in ensuring public faith in the same. This prompt

resolution depends on the Department's prompt compliance with our demand for evidence. Such compliance will not in any way hamper the performance of the Department's mission, as there is no conflict between the state's exercise of its lawful authority to investigate homicide deaths within its borders and the faithful enforcement of federal immigration and criminal laws.

**Request for Expedited Consideration**

This request is extraordinarily time sensitive. The materials sought are needed to support investigative steps that are presently underway, and delay in obtaining them may materially affect the direction, scope, and timing of the investigation. It is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. This is in part because the passage of time can result in dissipation and deterioration of evidence. Most obviously, witness memories fade. Prompt access to federal law enforcement witnesses is essential to ensuring that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

Prompt access to documentary and physical evidence is equally important for the same reason. Investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed interviews of other witnesses, including non-federal witnesses. Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost. Delays in access to such evidence thus compound the risk of evidentiary dissipation by impairing the effectiveness of witness interviews as well as the preservation of documentary and physical proof.

The physical evidence sought is also subject to the risk of deterioration, amplifying our need for swift access. For example, if not stored properly, biological evidence and other forensic evidence will deteriorate beyond testing capabilities. This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in this and other recent ICE-involved shooting incidents. For example, it appears from publicly available sources that federal authorities handled Mr. Pretti's firearm in a manner that substantially deviated from normal evidentiary protocols, creating issues with forensic testing and chain of custody. State investigators would have completed 3D scans of the entire incident scene, conducted detailed analysis of trajectory, and obtained precise measurements of the location of key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators conducted a rushed analysis of the incident scene and then removed key physical evidence before local investigators could conduct their normal work.

Prompt disclosure of the requested evidence is also important to ensure compliance with United States and Minnesota law. These include the rights of the accused to due process under the Fifth Amendment of the United States Constitution and to be charged within three years for most relevant felonies, other than those resulting in death, under Minnesota law; as well as the rights of crime victims under Minnesota law to notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. §§ 611A.01, 611A.02, 611A.033.

We acknowledge the federal government's prior denial of BCA's request for evidence in this matter, which we understand to have been final. We nonetheless submit this demand to ensure all avenues are explored. Should the government wish to reverse its prior determination, we remain available to engage immediately on prioritizing categories of information, if helpful, to facilitate prompt processing, and to discuss the practicalities of the transfer of evidence to preserve chain of custody.

But at minimum, given the exigencies of the situation, we request a response by **March 3, 2026,** indicating whether the government will reverse its previous denial. If we don't hear from the government by that date, we will have no other choice but to consider all avenues for legal relief.

* * *

On January 24, 2026, a man was shot and killed in Hennepin County. Minnesota officials must conduct a full and transparent investigation into this death. We ask that the federal government provide the information necessary for us to complete this important investigation.

Thank you,

/s/ Mary Moriarty

Mary F. Moriarty
Hennepin County Attorney

/s/ Drew Evans

Drew Evans
BCA Superintendent

**CC (with enclosure) via Electronic Mail to:**

- Brett Shumate, U.S. Department of Justice, Civil Division, Assistant Attorney General
- Eric J. Hamilton, U.S. Department of Justice, Civil Division, Deputy Assistant Attorney General
- Alex Haas, Civil Division, Federal Programs Branch, Director
- Jacqueline Snead, Civil Division, Federal Programs Branch, Assistant Director
- Sam Ramer, Federal Bureau of Investigation Office of the General Counsel

**CC (with attachment) via Certified Mail**:
Office of General Counsel
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

Office of General Counsel
Federal Bureau of Investigation
1501 Freeway Blvd
Brooklyn Center, MN 55430

HENNEPIN COUNTY ATTORNEY'S OFFICE

Minnesota BCA Bureau of Criminal Apprehension

**Attachment A**

1. Any and all physical evidence relevant to the January 24, 2026, shooting of Alex Jeffrey Pretti on Nicolett Avenue in Minneapolis, Minnesota (the "January 24 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting, such as: discharged cartridge casings; any and all firearms; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; and any other item collected on the scene. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting, who interacted with Mr. Pretti, or who were present on the scene at any time on January 24, 2026. We also request a chain of custody for any and all such evidence.

2. Any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 24 shooting, who interacted with Mr. Pretti, or who were present on the scene at any time on January 24, 2026. We also request a chain of custody for any and all such evidence.

3. Any and all photographs, videos, measurements, and other imaging relevant to the January 24 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, and investigators; and material recorded by members of the public that was obtained by any federal agent, officer, or investigator. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4. Any and all radio communications from 8:00 a.m. through 5:00 p.m. Central time on January 24, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5. Any and all immigration and federal law-enforcement reports related to the January 24 shooting, including but not limited to: incident reports; use-of-force reports, including those concerning individuals at the scene of the shooting other than Mr. Pretti; injury reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers at the scene; weapons discharge reports, including for firearms and chemical weapons, for weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; investigative assessments, openings, or closing and related communications; after-action reports and memoranda; and any and all reports concerning the detention, questioning,

or arrest of individuals who were at or near the scene of the January 24 shooting, including documentation of the purpose and legal basis for transporting any individual away from the scene and information about the location to which they were transferred.

6. Any and all personnel and assignment logs listing the federal agents and officers on duty on January 24, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 24 shooting, or were at the scene of the shooting at any point. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7. Any and all travel and assignment logs showing the subsequent assignment or reassignment of any federal agents and officers involved in the January 24 shooting, including, but not limited to, documentation of any assignments to locations outside Hennepin County, Minnesota, following the January 24 shooting.

8. Access to interview federal agents and officers on duty on January 24, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 24 shooting, or were at the scene of the shooting at any point that day.

9. Any and all communications from witnesses pertaining to the January 24 shooting and to the circumstances surrounding that shooting, including, but not limited to: statements to, from, or among federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; and statements to or from civilian witnesses. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

10. Any and all operation plans that cover or pertain to January 24, 2026, in Minneapolis, Hennepin County, Minnesota, or that relate to any and all federal agents and officers who interacted with Mr. Pretti on January 24, 2026, or who were involved in the January 24 shooting.

11. Any and all policies, regulations, procedures, and briefings in place on January 24, 2026, that pertain to: use of force and tactics; firearms, chemical weapons, and other weapons use; de-escalation and risk mitigation; responding to protests or civil disobedience; incident and use-of-force reporting; evidence handling and processing; and any duty to or procedures for securing or providing medical assistance or treatment.

12. Any and all training materials for federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting at any time that day, or who interacted with Mr. Pretti on January 24, 2026. These materials should include, but are not limited to: records related to classroom instruction, hands-on training, and scenario-based training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

13. The following material from the personnel files for the federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting at any point that day, or who interacted with Mr. Pretti on January 24, 2026: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

14. Any and all documentation related to any interaction between Mr. Pretti and federal agents and officers that occurred at any time prior to the January 24 shooting, including any interaction on January 13, 2026. These materials should include, but are not limited to, reports, logs, video recordings, audio recordings, photographs, notes, communications in any format, and radio traffic.

15. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting, or who interacted with Mr. Pretti on January 24, 2026.

16. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any civilian or any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 24 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

# Exhibit 6

OFFICE OF THE HENNEPIN COUNTY ATTORNEY
MARY F. MORIARTY COUNTY ATTORNEY

February 19, 2026

**VIA CERTIFIED U.S. MAIL**
Office of the General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr. Ave SE
Washington, DC 20528-0485

Re: *Touhy* Demand
Investigation into the January 14, 2026, shooting of Julio Cesar Sosa-Celis

Dear Sir or Madam,

On January 14, 2026, a federal agent shot Hennepin County resident Julio Cesar Sosa-Celis outside of his home in North Minneapolis. This shooting occurred just 7 days after federal agents shot and killed Renee Good, and 10 days before federal agents shot and killed Alex Pretti. Like the Good and Pretti cases, the people of Minnesota—indeed all Americans—demand a transparent and independent investigation into what occurred.

As is standard practice in officer-involved shootings—including incidents involving federal officers—the Minnesota Bureau of Criminal Apprehension (BCA) arrived promptly at the scene and began to investigate the incident. When the BCA arrived, a team of Immigration and Customs Enforcement (ICE) officers had established a perimeter and were preventing a growing crowd of onlookers from accessing the scene. Officers with the Minneapolis Police Department were also present, working to hold the scene for the BCA investigation. BCA agents arrived at about the same time as Federal Bureau of Investigation (FBI) agents. Following standard operating procedures that date back years, BCA and FBI agents began to collaborate on the investigation. The agents split into pairs to conduct joint investigation efforts and began to plan the investigative steps that needed to occur.

This initial collaboration quickly evaporated, however, after FBI agents at the scene received orders to stop collaborating with their BCA counterparts. FBI agents began to exclude the BCA agents from witness interviews and otherwise stopped collaborating. Indeed, FBI agents began preparing to seize evidence at the crime scene before the BCA had a chance to fully process the scene. The BCA was able to prevent the seizure of this evidence only by confronting the FBI about their lack of a search warrant for the premises at issue. The BCA had followed normal law enforcement procedures and obtained a search warrant, which they executed and obtained several pieces of evidence.

At around this same time that the BCA was executing the warrant, the FBI decided to leave the area. They notified the ICE team that was holding the crime scene perimeter that they were leaving, and the ICE team followed the FBI's lead and began to depart. Minneapolis Police Officers who were present on the scene attempted to take over for the departing ICE officers, with the goal of holding the scene so the BCA could continue to process it. The lack of coordination by the departing federal officers and the growing crowd made it unsafe for the number of BCA officers on scene to hold the perimeter, leading them to depart the area without completing a full investigation

To this day, despite repeated efforts to engage with federal agencies, the BCA has been unable to access critical information relevant to the shooting of Mr. Sosa-Celis that is in the exclusive custody of the federal government.

Minnesota is a sovereign State with the duty to investigate potential crimes committed within its borders. The Hennepin County Attorney's Office (the County) has jurisdiction to investigate and, if supported by the evidence, prosecute criminal matters related to this shooting. As a result, in furtherance of its duties to the citizens of the County, the County is currently conducting a criminal investigation into the shooting of Mr. Sosa-Celis and the circumstances surrounding it, with support from the BCA.

We write this letter pursuant to 6 CFR §§ 5.41 et seq. and 19 C.F.R. §103.21 et seq., to formally demand production of information, documents, and physical items.[1] We ask that the Department of Homeland Security (DHS), and all of its respective subcomponents, provide the material described in Attachment A to this letter for a state-level criminal investigation in regard to the shooting of Mr. Sosa-Celis on January 14, 2026. We ask for a response to this request by March 5, 2026. Below, as required by Department regulations, we provide a summary of the evidence sought and its relevance to the proceeding. We also explain the core principles of federalism that vest the State and its instrumentalities with a constitutional interest in the requested evidence.

But at the outset, it bears emphasis: This demand should not even be necessary. The federal government's blanket refusal to cooperate with Minnesota law enforcement is unmatched in our entire history working with the federal government. Indeed, under the applicable regulatory structure for DHS, "[n]othing in this subpart affects the disclosure of official information to … federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings … ." 6 C.F.R. §5.41(i). Likewise, the regulatory structure for Customs and Border Protection, states "[n]othing in this subpart is intended to impede the appropriate disclosure of information by CBP to federal, state, local, and foreign law enforcement." 19 C.F.R. §103.21(e). We trust that the government will reverse course and promptly respond to this demand.

---

[1] We have sent a similar demand letter to the U.S. Department of Justice for evidence in their possession, custody, and control. Setting forth our requests for evidence in a letter-demand comports with 6 CFR §§ 5.41 et seq. and 19 C.F.R. §103.21 et seq., and with state and local procedure, which does not utilize grand juries with the same regularity as in the federal system as a means to obtain documentary and physical evidence.

**Background On Investigation Into the Shooting Of Julio Cesar Sosa-Celis**

A federal agent shot Julio Cesar Sosa-Celis on January 14, 2026, in Minneapolis, Hennepin County, Minnesota. Rather than investigating the circumstances under which Mr. Sosa-Celis was shot, the federal government initially charged him with allegedly attacking the federal agent who shot him. The United States recently dismissed that criminal, however, because the federal government learned of evidence that was materially inconsistent with claims it made in the charging document. Only after dismissing the criminal case did federal officials announce an investigation into the Sosa-Celis matter, but it is still unclear if there is a federal civil rights investigation into the incident.

This lack of transparency evidences the need for Minnesota to conduct a full and fair investigation into the incident. The State of Minnesota, together with its agencies and divisions, has an independent sovereign prerogative and responsibility to investigate possible violations of its criminal laws within its territory. The investigation of the shooting of a citizen is typically conducted by state and local authorities and only occasionally by the federal government.

Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the shooting of Mr. Sosa-Celis. The state offenses under investigation include, but are not limited to, assault in second degree and reckless discharge of a firearm. The investigation is led by the Hennepin County Attorney's Office, which has jurisdiction pursuant to Minn. Stats. § 388.051 to prosecute felonies that occur within Hennepin County. This office has reached no conclusion as to whether a violation of law has occurred and is committed to ensuring that a full and fair investigation is conducted at a local level based on all available evidence, whether inculpatory or exculpatory. Indeed, it is worth noting that Minnesota courts have already found probable cause to issue search warrants for evidence related to the shooting to Mr. Sosa-Celis.

In Minnesota, the law requires an independent investigation for any Minnesota Peace officer-involved death. Minn. Stats. § 626.5534. An independent investigation is also authorized for non-fatal shootings, and for incidents involving federal officers who are not licensed as Minnesota Peace officers. See Minn. Stats. § 299C.03. Public transparency is vitally important in these cases—not just for the people of Hennepin County and Minnesota, but for the public nationwide. The only way to achieve transparency is thorough investigation conducted at a local level, and for the County Attorney in Hennepin County to review all the evidence—including evidence currently in the possession of federal authorities—and determine if a crime was committed.

**Reliance on Federal Cooperation Before Unexplained and Unjustified Deviation From Longstanding Practice of Joint Investigations**

The manner in which the scene was handled—and the fact that state officials were ultimately sidelined—has necessitated our current demand for evidence. In the initial response after the use of force, federal and local officials began to collaborate as they have in the past. BCA and FBI agents split into teams and began a joint investigation into what occurred. This has been standard operating procedure in Minnesota for years—collaboration and evidence-sharing between federal and local officials when there are overlapping interests in investigating incidents of violence.

Indeed, two high-profile examples of this collaboration have occurred in Hennepin County within the last 12 months—namely, the murder and attempted murder of Minnesota lawmakers and their family members, and a mass shooting at a church service. Following both of those incidents, state and federal officials worked together to ensure that a thorough investigation occurred. Concurrent state and federal investigations have also been the widespread historical practice in federal officer-involved shootings. This method of joint investigation allows the federal investigators to conduct their important work, while at the same time allowing the local investigators and County Attorney to do the work that the people of Minnesota require of them.

On the evening of January 14, 2026, the initial indication was that this longstanding practice of joint investigations would be followed in this case. Local investigators relied on these representations in decisions they made about the course of the investigation, including actions taken at the scene. This included partnering with federal agents to conduct interviews and relying on the federal team that was securing the crime scene. Then, without explanation or notice, the federal agents received orders to stop collaborating and the BCA investigators were excluded from interviews and prevented from completing a full investigation.

Despite these challenges, the BCA continued to press for a return to the well-established norm of cooperation in all three of the federal officer involved shooting cases – Good, Sosa-Celis, and Pretti. Indeed, in early February, federal officials reached out to the BCA to indicate an intent to resume normal cooperation in the Pretti matter, including evidence-sharing and the potential for a joint investigation. That progress unraveled when the Department of Justice dispatched a representative from Main Justice to Minneapolis, after which the contemplated cooperation did not materialize. On Friday, February 13, 2026, the FBI formally notified the BCA that it will not provide the BCA with access to any information or evidence related to the Pretti case. That refusal to cooperate or coordinate has, unfortunately, permeated the federal government's response to this matter as well.

**The State's Core Sovereign Interest**

This request for evidence for use in a state criminal investigation is supported by the State's core sovereign interest in exercising its police powers and in investigating possible violations of state law, as enshrined in the Tenth Amendment of the U.S. Constitution and longstanding principles of federalism going back to our Founding. This interest is particularly acute here, where local law enforcement acted in reliance on federal recognition of its right to access evidence, to its later detriment. This core sovereign interest creates a compelling need for the evidence sought herein. Conversely, federal withholding of the requested evidence, in an apparent effort to shield one or more federal officers from scrutiny following the shooting of a Minnesota resident, flatly contravenes core principles of federalism.

All of the information set forth in Attachment A bears on the County's pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. For example, physical evidence from the scene, including the firearm used in the shooting, will assist in reconstructing the incident. Audiovisual evidence (including contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist in establishing the sequence of events and shed light on the officer's

state of mind. And operations plans and employment and training records are relevant to discerning the officer's preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed his state of mind on January 14, 2026, as well as to assessing the objective reasonableness of the use of force.

At the same time, there is no risk that releasing this information will cause harm to the federal government, witnesses, or others. As explained above, federal/state cooperation is the norm—even in complex, high-profile, and sensitive cases, and Minnesota's law enforcement generally, and the BCA specifically, has always maintained a productive and cooperative working relationship with our federal counterparts. And as always, we stand willing to work with federal authorities to protect any sensitive investigative techniques or procedures that our requests may inadvertently implicate. Moreover, to the extent that our requests do implicate information protected by the law enforcement privilege, this is a case where the administration of justice requires disclosure, in light of compelling state interests in investigating this matter and the seriousness of the potential offenses at stake.

Moreover, local investigators conduct secure and appropriate investigations into serious incidents every day. They maintain appropriate protections, follow procedures for chain of custody, and otherwise preserve evidence for later use. In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as non-public. Minn. Stats. § 13.82, Subd. 7. This Act also creates procedures to protect witnesses who have legitimate fear for their safety and other protections that will ensure no negative result for the federal government in turning over the information requested in this letter.

This matter has attracted significant ongoing public attention. The public—not just in Minnesota but nationwide—deserves a prompt resolution to our pending investigation, in the interests of the orderly and impartial administration of justice and in ensuring public faith in the same. This prompt resolution depends on the Department's prompt compliance with our demand for evidence. Such compliance will not in any way hamper the performance of the Department's mission, as there is no conflict between the state's exercise of its lawful authority to shootings within its borders and the faithful enforcement of federal immigration and criminal laws.

**Request for Expedited Consideration**

This request is extraordinarily time-sensitive. The materials sought are needed to support investigative steps that are presently underway, and delay in obtaining them may materially affect the direction, scope, and timing of the investigation. It is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. This is in part because the passage of time can result in dissipation and deterioration of evidence. Most obviously, witness memories fade. Prompt access to federal law enforcement witnesses is essential to ensuring that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

Prompt access to documentary and physical evidence is equally important for the same reason. Investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed interviews of other witnesses, including non-federal witnesses.

Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost. Delays in access to such evidence thus compound the risk of evidentiary dissipation by impairing the effectiveness of witness interviews as well as the preservation of documentary and physical proof.

The physical evidence sought is also subject to the risk of deterioration, amplifying our need for swift access. For example, if not stored properly, biological evidence and other forensic evidence will deteriorate beyond testing capabilities. This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in other recent ICE-involved shooting incidents. For example, federal authorities removed Ms. Good's vehicle from the scene before local investigators were able to respond and complete their normal processing. Local investigators would have completed 3D scans of the entire incident scene, conducted detailed analysis of trajectory, and obtained precise measurements of the location of key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators conducted a rushed analysis of the incident scene and then removed key physical evidence before local investigators could conduct their normal work. As another example, based on images posted by DHS on social media, a gun alleged to belong to Mr. Pretti, who was killed in a different ICE-involved shooting in Minneapolis, was not handled according to normal law enforcement processes governing the securing of evidence, creating issues with forensic testing and chain of custody.

Prompt disclosure of the requested evidence is also important to ensure compliance with United States and Minnesota law. These include the rights of the accused to due process under the Fifth Amendment of the United States Constitution and to be charged within three years for most relevant felonies, other than those resulting in death, under Minnesota law; as well as the rights of crime victims under Minnesota law to notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. Ann. §§ 611A.01, 611A.02, 611A.033.

For that reason, we respectfully request expedited processing of this demand for evidence and information in federal custody. We are prepared to work with your office to prioritize categories of information, if helpful, to facilitate prompt processing, and to discuss the practicalities of the transfer of evidence to preserve chain of custody. But at minimum, given the government's changing posture, we need an initial response to this demand for information by no later than **March 5, 2026**, to allow us to pursue other legal remedies, if necessary.

* * *

On January 14, 2026, a man was shot in Hennepin County. My office must conduct a full and transparent investigation this incident. We ask that the federal government provide the information necessary for us to complete this important investigation.

Thank you,

Mary F. Moriarty, Hennepin County Attorney

**CC (with enclosure) via Electronic Mail to:**

- Office of the General Counsel, U.S. Department of Homeland Security, OGC@hq.dhs.gov
- Brett Shumate, U.S. Department of Justice, Civil Division, Assistant Attorney General
- Eric J. Hamilton, U.S. Department of Justice, Civil Division, Deputy Assistant Attorney General
- Alex Haas, Civil Division, Federal Programs Branch, Director
- Jacqueline Snead, Civil Division, Federal Programs Branch, Assistant Director

**CC (with attachment) via Certified Mail**:
General Counsel
Immigration, Customs, and Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

General Counsel
Homeland Security Investigations
Minnesota Field Office
1 Federal Drive, Suite 1340
Fort Snelling, MN 55111

Chief Counsel
U.S. Customs and Border Protection
Minnesota Field Office
5600 W American Blvd. Suite 760
Bloomington, MN 55437

Daniel Rosen
U.S. Attorney for the District of Minnesota
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

OFFICE OF THE HENNEPIN COUNTY ATTORNEY
MARY F. MORIARTY COUNTY ATTORNEY

**Attachment A**

1. We request any and all physical evidence relevant to the January 14, 2026, shooting of Julio Cesar Sosa-Celis in Minneapolis, Minnesota (the "January 14 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting or the pursuit leading up to the shooting, such as: discharged cartridge casings; any and all firearms; any physical objects used by any individuals involved in the incident; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; motor vehicles and the contents thereof, including any GPS technologies; any other item collected on the scene; and any item related to the January 14 shooting collected pursuant to a search warrant. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting or traffic stop and pursuit leading to the shooting, who interacted with Mr. Sosa-Celis, Alfredo Alejandro Aljorna, or Gabriel Alejandro Hernandez-Ledezma, or who were present on the scene of the shooting at any time on January 14, 2026. We also request a chain of custody for any and all such evidence.

2. We request any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 14 shooting or the traffic stop and pursuit leading to the shooting; who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026; or who were present on the scene of the shooting at any time on January 14, 2026. We also request a chain of custody for any and all such evidence.

3. We request any and all photographs, videos, measurements, and other imaging relevant to the January 14 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, and investigators; and material recorded by members of the public that was obtained by any federal agent, officer, or investigator. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4. We request any and all radio communications from 4:00 p.m. Central time on January 14, 2026, through 1:00 a.m. Central time on January 15, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5. We request any and all immigration and federal law-enforcement reports related to the January 14 shooting, including but not limited to: incident reports; use-of-force reports, including those concerning Mr. Sosa-Celis, Mr. Aljorna, Mr. Hernandez-Ledezma, or any other individual at the scene of the January 14 shooting; injury reports; arrest reports; property damage reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers involved in or at the scene of the January 14 shooting or the pursuit leading to the shooting; weapons discharge reports for weapons assigned to or used by any and all federal agents and officers involved in or at the scene of the January 14 shooting or the pursuit leading to the shooting; investigative assessments, openings, or closing and related communications; administrative warrants; maps, measurements, and diagrams of the January 14 shooting scene and any area related to any pursuit leading to the scene; affidavits drafted in connection with the January 14 shooting incident; judicial search warrants sought and/or executed related to the January 14 shooting incident, including any affidavits and search warrant return documents; after-action reports and memoranda; any and all reports concerning the detention, questioning, or arrest of individuals who were at or near the scene of the January 14 shooting; and any and all reports concerning the arrest and detention of Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma.

6. We request any and all personnel and assignment logs listing the federal agents and officers on duty on January 14, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 14 shooting, were at the scene of the shooting at any point, or were involved in any traffic stop or pursuit leading up to the shooting. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7. We request any and all travel and assignment logs showing the subsequent assignment or reassignment of any federal agents and officers involved in the January 14 shooting and any traffic stop or pursuit leading up to the shooting, including, but not limited to, documentation of any assignments to locations outside Hennepin County, Minnesota, following the January 14 shooting.

8. We request any and all communications from witnesses pertaining to the January 14 shooting and to the circumstances leading up to and surrounding that shooting, including, but not limited to: statements to, from, or among federal agents and officers regarding the shooting, the circumstances leading up to and surrounding the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; statements to or from civilian witnesses; and any statements by Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

9. We request any and all operation plans that cover or pertain to January 14, 2026, in Minneapolis, Hennepin County, Minnesota, including any plans involving traffic stops and any plans that relate to federal agents and officers involved in the January 14 shooting or who

interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026.

10. We request any and all policies, regulations, procedures, and briefings in place on January 14, 2026, that pertain to: use of force and tactics; firearms, chemical weapons, and other weapons use; traffic stops; pursuits; legal authority and tactical guidance for entry of homes or other private places; de-escalation and risk mitigation; incident and use-of-force reporting; evidence handling and processing; and any duty to or procedures for securing or providing medical assistance or treatment.

11. We request any and all training materials for federal agents and officers involved in the January 14 shooting or the pursuit leading up to the shooting, who were present on the scene of the January 14 shooting at any time that day, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026. These materials should include, but are not limited to: records related to classroom instruction, hands-on training, and scenario training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

12. We request the following material from the personnel files for the federal agents and officers involved in the January 14 shooting or the traffic stop or pursuit leading up to the shooting, who were present on the scene of the January 14 shooting at any point that day, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

13. We request any and all documentation related to any interaction between Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma and federal agents and officers at any time prior to the January 24 shooting. These materials should include, but are not limited to, reports, logs, video recordings, audio recordings, photographs, notes, communications in any format, and radio traffic.

14. We request any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 14 shooting or the pursuit leading up to the shooting, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026.

15. We request any and all reports of medical assessment, diagnosis, and treatment for any person, including any civilian or any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 14 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

# Exhibit 7

OFFICE OF THE HENNEPIN COUNTY ATTORNEY
MARY F. MORIARTY COUNTY ATTORNEY

February 19, 2026

**VIA CERTIFIED U.S. MAIL**
Daniel Rosen
U.S. Attorney for the District of Minnesota
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

Re: *Touhy* Demand
Investigation into the January 14, 2026, shooting of Julio Cesar Sosa-Celis

Dear Mr. Rosen,

On January 14, 2026, a federal agent shot Hennepin County resident Julio Cesar Sosa-Celis outside of his home in North Minneapolis. This shooting occurred just 7 days after federal agents shot and killed Renee Good, and 10 days before federal agents shot and killed Alex Pretti. Like the Good and Pretti cases, the people of Minnesota—indeed all Americans—demand a transparent and independent investigation into what occurred.

As is standard practice in officer-involved shootings—including incidents involving federal officers—the Minnesota Bureau of Criminal Apprehension (BCA) arrived promptly at the scene and began to investigate the incident. When the BCA arrived, a team of Immigration and Customs Enforcement (ICE) officers had established a perimeter and were preventing a growing crowd of onlookers from accessing the scene. Officers with the Minneapolis Police Department were also present, working to hold the scene for the BCA investigation. BCA agents arrived at about the same time as Federal Bureau of Investigation (FBI) agents. Following standard operating procedures that date back years, BCA and FBI agents began to collaborate on the investigation. The agents split into pairs to conduct joint investigation efforts and began to plan the investigative steps that needed to occur.

This initial collaboration quickly evaporated, however, after FBI agents at the scene received orders to stop collaborating with their BCA counterparts. FBI agents began to exclude the BCA agents from witness interviews and otherwise stopped collaborating. Indeed, FBI agents began preparing to seize evidence at the crime scene before the BCA had a chance to fully process the scene. The BCA was able to prevent the seizure of this evidence only by confronting the FBI about their lack of a search warrant for the premises at issue. The BCA had followed normal law enforcement procedures and obtained a search warrant, which they executed and obtained several pieces of evidence.

At around this same time that the BCA was executing the warrant, the FBI decided to leave the area. They notified the ICE team that was holding the crime scene perimeter that they were leaving, and the ICE team followed the FBI's lead and began to depart. Minneapolis Police Officers who were present on the scene attempted to take over for the departing ICE officers, with the goal of holding the scene so the BCA could continue to process it. The lack of coordination by the departing federal officers and the growing crowd made it unsafe for the number of BCA officers on scene to hold the perimeter, leading them to depart the area without completing a full investigation

To this day, despite repeated efforts to engage with federal agencies, the BCA has been unable to access critical information relevant to the shooting of Mr. Sosa-Celis that is in the exclusive custody of the federal government.

Minnesota is a sovereign State with the duty to investigate potential crimes committed within its borders. The Hennepin County Attorney's Office (the County) has jurisdiction to investigate and, if supported by the evidence, prosecute criminal matters related to this shooting. As a result, in furtherance of its duties to the citizens of the County, the County is currently conducting a criminal investigation into the shooting of Mr. Sosa-Celis and the circumstances surrounding it, with support from the BCA.

We write this letter pursuant to 28 C.F.R. §16.21 et seq. to formally demand production of information, documents, and physical items.[1] We ask that the U.S. Department of Justice (DOJ), and all of its respective subcomponents, provide the material described in Attachment A to this letter for a state-level criminal investigation in regard to the shooting of Mr. Sosa-Celis on January 14, 2026. We ask for a response to this request by March 5, 2026. Below, as required by Department regulations, we provide a summary of the evidence sought and its relevance to the proceeding. We also explain the core principles of federalism that vest the State and its instrumentalities with a constitutional interest in the requested evidence.

But at the outset, it bears emphasis: This demand should not even be necessary. The federal government's blanket refusal to cooperate with Minnesota law enforcement—after initial steps toward a joint investigation—is unmatched in recent memory. Indeed, under the applicable regulatory structure for DOJ, "[n]othing in this subpart is intended to impede the appropriate disclosure, in the absence of a demand, of information by Department law enforcement agencies to federal, state, local and foreign law enforcement, prosecutive, or regulatory agencies." 28 CFR §§ 16.21(c). We trust that the government will reverse course and promptly respond to this demand.

[1] We have sent a similar demand letter to the Department of Homeland Security for evidence in its possession, custody, and control. Setting forth our requests for evidence in a letter-demand comports with 28 CFR §§ 16.21 et seq., and with state and local procedure, which does not utilize grand juries with the same regularity as in the federal system as a means to obtain documentary and physical evidence.

**Background On Investigation Into the Shooting Of Julio Cesar Sosa-Celis**

A federal agent shot Julio Cesar Sosa-Celis on January 14, 2026, in Minneapolis, Hennepin County, Minnesota. Rather than investigating the circumstances under which Mr. Sosa-Celis was shot, the federal government initially charged him with allegedly attacking the federal agent who shot him. The United States recently dismissed that criminal, however, because the federal government learned of evidence that was materially inconsistent with claims it made in the charging document. Only after dismissing the criminal case did federal officials announce an investigation into the Sosa-Celis matter, but it is still unclear if there is a federal civil rights investigation into the incident.

This lack of transparency evidences the need for Minnesota to conduct a full and fair investigation into the incident. The State of Minnesota, together with its agencies and divisions, has an independent sovereign prerogative and responsibility to investigate possible violations of its criminal laws within its territory. The investigation of the shooting of a citizen is typically conducted by state and local authorities and only occasionally by the federal government.

Consistent with that sovereign responsibility, Minnesota officials are conducting an investigation into the shooting of Mr. Sosa-Celis. The state offenses under investigation include, but are not limited to, assault in second degree and reckless discharge of a firearm. The investigation is led by the Hennepin County Attorney's Office, which has jurisdiction pursuant to Minn. Stats. § 388.051 to prosecute felonies that occur within Hennepin County. This office has reached no conclusion as to whether a violation of law has occurred and is committed to ensuring that a full and fair investigation is conducted at a local level based on all available evidence, whether inculpatory or exculpatory. Indeed, it is worth noting that Minnesota courts have already found probable cause to issue search warrants for evidence related to the shooting to Mr. Sosa-Celis.

In Minnesota, the law requires an independent investigation for any Minnesota Peace officer-involved death. Minn. Stats. § 626.5534. An independent investigation is also authorized for non-fatal shootings, and for incidents involving federal officers who are not licensed as Minnesota Peace officers. See Minn. Stats. § 299C.03. Public transparency is vitally important in these cases—not just for the people of Hennepin County and Minnesota, but for the public nationwide. The only way to achieve transparency is thorough investigation conducted at a local level, and for the County Attorney in Hennepin County to review all the evidence—including evidence currently in the possession of federal authorities—and determine if a crime was committed.

**Reliance on Federal Cooperation Before Unexplained and Unjustified Deviation From Longstanding Practice of Joint Investigations**

The manner in which the scene was handled—and the fact that state officials were ultimately sidelined—has necessitated our current demand for evidence. In the initial response after the use of force, federal and local officials began to collaborate as they have in the past. BCA and FBI agents split into teams and began a joint investigation into what occurred. This has been standard operating procedure in Minnesota for years—collaboration and evidence-sharing between federal and local officials when there are overlapping interests in investigating incidents of violence.

Indeed, two high-profile examples of this collaboration have occurred in Hennepin County within the last 12 months—namely, the murder and attempted murder of Minnesota lawmakers and their family members, and a mass shooting at a church service. Following both of those incidents, state and federal officials worked together to ensure that a thorough investigation occurred. Concurrent state and federal investigations have also been the widespread historical practice in federal officer-involved shootings. This method of joint investigation allows the federal investigators to conduct their important work, while at the same time allowing the local investigators and County Attorney to do the work that the people of Minnesota require of them.

On the evening of January 14, 2026, the initial indication was that this longstanding practice of joint investigations would be followed in this case. Local investigators relied on these representations in decisions they made about the course of the investigation, including actions taken at the scene. This included partnering with federal agents to conduct interviews and relying on the federal team that was securing the crime scene. Then, without explanation or notice, the federal agents received orders to stop collaborating and the BCA investigators were excluded from interviews and prevented from completing a full investigation.

Despite these challenges, the BCA continued to press for a return to the well-established norm of cooperation in all three of the federal officer involved shooting cases – Good, Sosa-Celis, and Pretti. Indeed, in early February, federal officials reached out to the BCA to indicate an intent to resume normal cooperation in the Pretti matter, including evidence-sharing and the potential for a joint investigation. That progress unraveled when the Department of Justice dispatched a representative from Main Justice to Minneapolis, after which the contemplated cooperation did not materialize. On Friday, February 13, 2026, the FBI formally notified the BCA that it will not provide the BCA with access to any information or evidence related to the Pretti case. That refusal to cooperate or coordinate has, unfortunately, permeated the federal government's response to this matter as well.

**The State's Core Sovereign Interest**

This request for evidence for use in a state criminal investigation is supported by the State's core sovereign interest in exercising its police powers and in investigating possible violations of state law, as enshrined in the Tenth Amendment of the U.S. Constitution and longstanding principles of federalism going back to our Founding. This interest is particularly acute here, where local law enforcement acted in reliance on federal recognition of its right to access evidence, to its later detriment. This core sovereign interest creates a compelling need for the evidence sought herein. Conversely, federal withholding of the requested evidence, in an apparent effort to shield one or more federal officers from scrutiny following the shooting of a Minnesota resident, flatly contravenes core principles of federalism.

All of the information set forth in Attachment A bears on the County's pending investigation and will directly assist us in completing a comprehensive review, regardless of the outcome. For example, physical evidence from the scene, including the firearm used in the shooting, will assist in reconstructing the incident. Audiovisual evidence (including contemporaneous statements by the involved federal officers), government reports, witness accounts and communications, and medical reports will assist in establishing the sequence of events and shed light on the officer's

state of mind. And operations plans and employment and training records are relevant to discerning the officer's preparation, knowledge of use-of-force policies, and any prior performance or disciplinary history that may have informed his state of mind on January 14, 2026, as well as to assessing the objective reasonableness of the use of force.

At the same time, there is no risk that releasing this information will cause harm to the federal government, witnesses, or others. As explained above, federal/state cooperation is the norm—even in complex, high-profile, and sensitive cases, and Minnesota's law enforcement generally, and the BCA specifically, has always maintained a productive and cooperative working relationship with our federal counterparts. And as always, we stand willing to work with federal authorities to protect any sensitive investigative techniques or procedures that our requests may inadvertently implicate. Moreover, to the extent that our requests do implicate information protected by the law enforcement privilege, this is a case where the administration of justice requires disclosure, in light of compelling state interests in investigating this matter and the seriousness of the potential offenses at stake.

Moreover, local investigators conduct secure and appropriate investigations into serious incidents every day. They maintain appropriate protections, follow procedures for chain of custody, and otherwise preserve evidence for later use. In addition, the Minnesota Government Data Practices Act classifies data related to open investigations as non-public. Minn. Stats. § 13.82, Subd. 7. This Act also creates procedures to protect witnesses who have legitimate fear for their safety and other protections that will ensure no negative result for the federal government in turning over the information requested in this letter.

This matter has attracted significant ongoing public attention. The public—not just in Minnesota but nationwide—deserves a prompt resolution to our pending investigation, in the interests of the orderly and impartial administration of justice and in ensuring public faith in the same. This prompt resolution depends on the Department's prompt compliance with our demand for evidence. Such compliance will not in any way hamper the performance of the Department's mission, as there is no conflict between the state's exercise of its lawful authority to shootings within its borders and the faithful enforcement of federal immigration and criminal laws.

**Request for Expedited Consideration**

This request is extraordinarily time-sensitive. The materials sought are needed to support investigative steps that are presently underway, and delay in obtaining them may materially affect the direction, scope, and timing of the investigation. It is the policy and practice of the BCA, wherever feasible, to complete use-of-force investigations within 60 days. This is in part because the passage of time can result in dissipation and deterioration of evidence. Most obviously, witness memories fade. Prompt access to federal law enforcement witnesses is essential to ensuring that evidence is not lost due to the effects of fading memories, external factors influencing recollection, or witnesses becoming unavailable.

Prompt access to documentary and physical evidence is equally important for the same reason. Investigators must be able to review contemporaneous records and tangible materials in order to conduct thorough and informed interviews of other witnesses, including non-federal witnesses.

Without access to those materials, investigators may be unable to ask complete or properly contextualized questions while memories remain fresh, increasing the risk that relevant information will be overlooked or irretrievably lost. Delays in access to such evidence thus compound the risk of evidentiary dissipation by impairing the effectiveness of witness interviews as well as the preservation of documentary and physical proof.

The physical evidence sought is also subject to the risk of deterioration, amplifying our need for swift access. For example, if not stored properly, biological evidence and other forensic evidence will deteriorate beyond testing capabilities. This risk is exacerbated by the manner in which federal authorities have been collecting and maintaining evidence in other recent ICE-involved shooting incidents. For example, federal authorities removed Ms. Good's vehicle from the scene before local investigators were able to respond and complete their normal processing. Local investigators would have completed 3D scans of the entire incident scene, conducted detailed analysis of trajectory, and obtained precise measurements of the location of key evidence (such as discharged cartridge casings and vehicles). Instead, federal investigators conducted a rushed analysis of the incident scene and then removed key physical evidence before local investigators could conduct their normal work. As another example, based on images posted by DHS on social media, a gun alleged to belong to Mr. Pretti, who was killed in a different ICE-involved shooting in Minneapolis, was not handled according to normal law enforcement processes governing the securing of evidence, creating issues with forensic testing and chain of custody.

Prompt disclosure of the requested evidence is also important to ensure compliance with United States and Minnesota law. These include the rights of the accused to due process under the Fifth Amendment of the United States Constitution and to be charged within three years for most relevant felonies, other than those resulting in death, under Minnesota law; as well as the rights of crime victims under Minnesota law to notice, participation, a speedy trial, and restitution should a prosecution result. Minn. Stat. Ann. §§ 611A.01, 611A.02, 611A.033.

For that reason, we respectfully request expedited processing of this demand for evidence and information in federal custody. We are prepared to work with your office to prioritize categories of information, if helpful, to facilitate prompt processing, and to discuss the practicalities of the transfer of evidence to preserve chain of custody. But at minimum, given the government's changing posture, we need an initial response to this demand for information by no later than **March 5, 2026**, to allow us to pursue other legal remedies, if necessary.

* * *

On January 14, 2026, a man was shot in Hennepin County. My office must conduct a full and transparent investigation this incident. We ask that the federal government provide the information necessary for us to complete this important investigation.

Thank you,

Mary F. Moriarty, Hennepin County Attorney

**CC (with enclosure) via Electronic Mail to:**

- Brett Shumate, U.S. Department of Justice, Civil Division, Assistant Attorney General
- Eric J. Hamilton, U.S. Department of Justice, Civil Division, Deputy Assistant Attorney General
- Alex Haas, Civil Division, Federal Programs Branch, Director
- Jacqueline Snead, Civil Division, Federal Programs Branch, Assistant Director
- Sam Ramer, Federal Bureau of Investigation Office of the General Counsel

**CC (with attachment) via Certified Mail**:
Office of General Counsel
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

Office of General Counsel
Federal Bureau of Investigation
1501 Freeway Blvd
Brooklyn Center, MN 55430

OFFICE OF THE HENNEPIN COUNTY ATTORNEY
MARY F. MORIARTY COUNTY ATTORNEY

**Attachment A**

1. We request any and all physical evidence relevant to the January 14, 2026, shooting of Julio Cesar Sosa-Celis in Minneapolis, Minnesota (the "January 14 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting or the pursuit leading up to the shooting, such as: discharged cartridge casings; any and all firearms; any physical objects used by any individuals involved in the incident; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; motor vehicles and the contents thereof, including any GPS technologies; any other item collected on the scene; and any item related to the January 14 shooting collected pursuant to a search warrant. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting or traffic stop and pursuit leading to the shooting, who interacted with Mr. Sosa-Celis, Alfredo Alejandro Aljorna, or Gabriel Alejandro Hernandez-Ledezma, or who were present on the scene of the shooting at any time on January 14, 2026. We also request a chain of custody for any and all such evidence.

2. We request any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 14 shooting or the traffic stop and pursuit leading to the shooting; who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026; or who were present on the scene of the shooting at any time on January 14, 2026. We also request a chain of custody for any and all such evidence.

3. We request any and all photographs, videos, measurements, and other imaging relevant to the January 14 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, and investigators; and material recorded by members of the public that was obtained by any federal agent, officer, or investigator. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4. We request any and all radio communications from 4:00 p.m. Central time on January 14, 2026, through 1:00 a.m. Central time on January 15, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5. We request any and all immigration and federal law-enforcement reports related to the January 14 shooting, including but not limited to: incident reports; use-of-force reports, including those concerning Mr. Sosa-Celis, Mr. Aljorna, Mr. Hernandez-Ledezma, or any other individual at the scene of the January 14 shooting; injury reports; arrest reports; property damage reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers involved in or at the scene of the January 14 shooting or the pursuit leading to the shooting; weapons discharge reports for weapons assigned to or used by any and all federal agents and officers involved in or at the scene of the January 14 shooting or the pursuit leading to the shooting; investigative assessments, openings, or closing and related communications; administrative warrants; maps, measurements, and diagrams of the January 14 shooting scene and any area related to any pursuit leading to the scene; affidavits drafted in connection with the January 14 shooting incident; judicial search warrants sought and/or executed related to the January 14 shooting incident, including any affidavits and search warrant return documents; after-action reports and memoranda; any and all reports concerning the detention, questioning, or arrest of individuals who were at or near the scene of the January 14 shooting; and any and all reports concerning the arrest and detention of Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma.

6. We request any and all personnel and assignment logs listing the federal agents and officers on duty on January 14, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 14 shooting, were at the scene of the shooting at any point, or were involved in any traffic stop or pursuit leading up to the shooting. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7. We request any and all travel and assignment logs showing the subsequent assignment or reassignment of any federal agents and officers involved in the January 14 shooting and any traffic stop or pursuit leading up to the shooting, including, but not limited to, documentation of any assignments to locations outside Hennepin County, Minnesota, following the January 14 shooting.

8. We request any and all communications from witnesses pertaining to the January 14 shooting and to the circumstances leading up to and surrounding that shooting, including, but not limited to: statements to, from, or among federal agents and officers regarding the shooting, the circumstances leading up to and surrounding the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; statements to or from civilian witnesses; and any statements by Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

9. We request any and all operation plans that cover or pertain to January 14, 2026, in Minneapolis, Hennepin County, Minnesota, including any plans involving traffic stops and any plans that relate to federal agents and officers involved in the January 14 shooting or who

interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026.

10. We request any and all policies, regulations, procedures, and briefings in place on January 14, 2026, that pertain to: use of force and tactics; firearms, chemical weapons, and other weapons use; traffic stops; pursuits; legal authority and tactical guidance for entry of homes or other private places; de-escalation and risk mitigation; incident and use-of-force reporting; evidence handling and processing; and any duty to or procedures for securing or providing medical assistance or treatment.

11. We request any and all training materials for federal agents and officers involved in the January 14 shooting or the pursuit leading up to the shooting, who were present on the scene of the January 14 shooting at any time that day, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026. These materials should include, but are not limited to: records related to classroom instruction, hands-on training, and scenario training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

12. We request the following material from the personnel files for the federal agents and officers involved in the January 14 shooting or the traffic stop or pursuit leading up to the shooting, who were present on the scene of the January 14 shooting at any point that day, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

13. We request any and all documentation related to any interaction between Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma and federal agents and officers at any time prior to the January 24 shooting. These materials should include, but are not limited to, reports, logs, video recordings, audio recordings, photographs, notes, communications in any format, and radio traffic.

14. We request any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 14 shooting or the pursuit leading up to the shooting, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026.

15. We request any and all reports of medical assessment, diagnosis, and treatment for any person, including any civilian or any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 14 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

# Exhibit 8

| | |
|---|---|
| **From:** | Morgan D Kunz |
| **To:** | "Fiorentino-Rios, Angela M"; Mary F Moriarty |
| **Cc:** | OGC; Jazayeri, Sara |
| **Subject:** | RE: [External] RE: DHS Touhy Demand re investigation into shooting death of Renee Nicole Good - ICE Extension Request |
| **Date:** | Wednesday, February 18, 2026 5:43:00 PM |
| **Attachments:** | image001.png |

Good Evening,

Thank you for reaching out. As detailed in our letter, it is imperative that our investigation proceeds expediently, and this information is needed promptly to allow for a thorough investigation. We appreciate your commitment to responding as soon as possible, and no later than March 3, 2026.

-mk

Morgan D. Kunz
Criminal Division Director
Hennepin County Attorney's Office
He/him
w: 612.348.0817 | c: 612.235.1489
Morgan.Kunz@hennepin.us

**From:** Fiorentino-Rios, Angela M <Angela.M.Fiorentino-Rios@ice.dhs.gov>
**Sent:** Wednesday, February 18, 2026 1:07 PM
**To:** Morgan D Kunz <Morgan.Kunz@hennepin.us>; Mary F Moriarty <Mary.Moriarty@hennepin.us>
**Cc:** OGC <ogc@HQ.DHS.GOV>; Jazayeri, Sara <Sara.Jazayeri@ice.dhs.gov>
**Subject:** [External] RE: DHS Touhy Demand re investigation into shooting death of Renee Nicole Good - ICE Extension Request

**CAUTION:** This email was sent from outside of Hennepin County. Unless you recognize the sender and know the content, do not click links or open attachments.

Greetings, I've corrected the message below to refer to DHS, not DOJ. Thank you.

**From:** Fiorentino-Rios, Angela M
**Sent:** Wednesday, February 18, 2026 12:47 PM
**To:** 'Morgan.Kunz@hennepin.us' <Morgan.Kunz@hennepin.us>; 'Mary.Moriarty@hennepin.us' <Mary.Moriarty@hennepin.us>

**Cc:** OGC <ogc@HQ.DHS.GOV>; Jazayeri, Sara <Sara.Jazayeri@ice.dhs.gov>
**Subject:** DHS Touhy Demand re investigation into shooting death of Renee Nicole Good - ICE Extension Request

Good afternoon, Counsels,

ICE is considering the attached DHS Touhy demand for records regarding the death of Ms. Renee Nicole Good and is formulating its response. We have also recently received the attached DHS Touhy demand for records regarding the death of Mr. Alex Pretti, which has a requested deadline for DHS to respond by March 3, 2026. We kindly request an extension to March 3, 2026 as to the demand regarding Ms. Good. We will respond sooner if possible. Thank you in advance for your anticipated courtesy.

Angela M. Fiorentino-Rios
Senior Attorney
Government Information Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement
Cell: (202) 740-4113
Angela.M.Fiorentino-Rios@ice.dhs.gov

# Exhibit 9

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

U.S. Immigration and Customs Enforcement

March 3, 2026

**Via Email Only**
Mary F. Moriarty, Hennepin County Attorney
Morgan D. Kunz, Criminal Division Director
Hennepin County Attorney's Office, Adult Prosecution Division
A-1600 Government Center, 300 South Sixth Street
Minneapolis, MN 55487
Mary.Moriarty@hennepin.us
Morgan.Kunz@hennepin.us

Re: Touhy Demand
Investigation into the January 7, 2026, Death of Renee Nicole Good

Dear Ms. Moriarty and Mr. Kunz,

This is in response to your February 2, 2026 letter described as a *Touhy* Demand pursuant to the U.S. Department of Homeland Security (DHS) *Touhy* regulations at 6 C.F.R. §§5.41 et seq. and 19 C.F.R. §§ 103.21 et seq. demanding production of information, documents, and physical items from DHS components, including Immigration and Customs Enforcement (ICE), for a state criminal investigation in regard to the death of Rene Nicole Good on January 7, 2026.

We have considered your demand as a request for information under section (b)(7) of the Privacy Act of 1974 (5 U.S.C. § 552a(b)(7), rather than a *Touhy* demand as the regulations do not apply to disclosure of official information to federal, state or local law enforcement authorities related to criminal law enforcement investigations (*see* 6 C.F.R. § 5.41). The U.S. Department of Justice (DOJ), Federal Bureau of Investigations (FBI) is leading the investigation into the subject matter of your demand and, accordingly, ICE respectfully refers your office to DOJ. We have copied the DHS Office of General Counsel and the DOJ attorneys that you copied on your letter.

Thank you.

/s/ *Angela M. Fiorentino-Rios*
Senior Attorney
Government Information Law Division
ICE Office of the Principal Legal Advisor
U.S. Department of Homeland Security

CC: Office of the General Counsel, U.S. Department of Homeland Security
OGC@hq.dhs.gov
Brett Shumate, U.S.A.O., Civil Division
Brett.Shumate@usdoj.gov
Alex Haas, U.S.A.O., Federal Programs Branch Director
Alex.Haas@usdoj.gov
Jacqueline Snead, U.S.A.O., Federal Programs Branch Assistant Director
Jacqueline.Snead@usdoj.gov
Eric J. Hamilton, U.S.A.O., Federal Programs Branch Deputy Assistant Director
Eric.J.Hamilton@usdoj.gov

# Exhibit 10

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
425 I Street, NW, Room 6100
Washington, DC 20536

U.S. Immigration and Customs Enforcement

June 4, 2026

Mary F. Moriarty
Hennepin County Attorney
A-1600 Government Center
300 South Sixth Street
Minneapolis, MN 55487

Re: Letter Request for Information Concerning Investigation into the January 7, 2026 Death of Renee Nicole Good

Dear Ms. Moriarty:

A copy of your request dated February 2, 2026, to the U.S. Department of Homeland Security (DHS), of which Immigration and Customs Enforcement (ICE) is a component, seeking records pertaining to your investigation of the January 7, 2026 death of Renee Nicole Good was previously forwarded to ICE for a response. On March 3, 2026, ICE provided a response to your request, declining to process your request pursuant to the DHS Touhy regulations at 6 C.F.R. §§5.41 et seq., instead, treating your request as a request for law enforcement to law enforcement sharing. ICE now provides this supplemental response, further clarifying ICE's prior decision.

The information you seek is not associated with an ongoing court action, so the DHS *Touhy* regulations, 6 C.F.R. §§5.41 et seq., do not apply.[1] Instead, ICE processed your request as a discrete request for information shared between law enforcement agencies.[2]

As you know, law enforcement sharing requests are routine. Such requests may be made to ICE informally through established law enforcement sharing channels, pursuant to written information sharing and access agreements, pursuant to written requests for Privacy Act information in support of civil or criminal law enforcement activity under (b)(7) of the Privacy Act of 1974 (5 U.S.C. § 552a(b)(7)),[3] and pursuant to a routine use under (b)(3) of the Privacy Act of 1974 (5 U.S.C. §

---

[1] The scope of the DHS *Touhy* regulations covers requests that are "in connection with federal or state litigation," and "the term 'litigation' encompasses all pre-trial, trial, and post-trial stages…before courts, commissions, boards…grand juries, or other judicial or quasi-judicial bodies or tribunals." *See generally* 6 C.F.R. § 5.41.

[2] Section 5.41(i) provides that "[n]othing in this subpart affects the disclosure of official information …to federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings, e.g., extradition, deportation." 6 C.F.R. § 5.41(i).

[3] Privacy Act-protected information may be disclosed to a domestic agency conducting a civil or criminal law enforcement investigation or activity authorized by law pursuant to section (b)(7) of the Privacy Act (5 U.S.C. § 552a(b)(7)). U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7. ICE employees have the authority to disclose the information but are not required to make such disclosures. U.S. Immigration and Customs Enforcement Privacy Guidance, *Requests for Information Under Section (b)(7) of the Privacy Act* (August 13, 2010).

552a(b)(3)).[4] Barring any applicable legal authorities, binding agreements, or any other mechanism that compels ICE to share information (none of which are present here), ICE maintains discretion whether to decline a request for information.[5]

ICE evaluates each request individually and assesses whether it can provide responsive materials based on the specific information requested. ICE may decline law enforcement sharing requests that seek personal or sensitive information that may compromise officer safety or the integrity of an investigation.[6]

Specifically, you requested:

1. Any and all physical evidence relevant to the January 7, 2026, shooting of Renee Good on Portland Avenue near 34th Street in Minneapolis, Hennepin County, Minnesota (the "January 7 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting, such as: discharged cartridge casings; any and all firearms; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; motor vehicles and the contents thereof; and any other item(s) collected on the scene. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting or who were present on the scene at or near Ms. Good's vehicle. Further, you requested a chain of custody for any and all such evidence;

2. Any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle, on the day of the shooting. Further, you requested a chain of custody for any and all such evidence;

3. Any and all photographs, videos, measurements, and other imaging relevant to the January 7 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, analysts, and investigators. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard

---

[4] ICE employees may disclose information outside of DHS if authority exists from subsection (b) of the Privacy Act pursuant to written permission from the individual to whom the record pertains, as authorized by the Privacy Act itself in subsection (b), or pursuant to one of the Privacy Act "Routine Uses" in applicable Privacy Act System or Records Notices (SORN(s)). When disclosures are authorized by the Privacy Act, these disclosures are discretionary. *See*, U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7. *See also*, *generally*, DHS Privacy Policy Directive No. 047-01-007, Revision 3, *Handbook for Safeguarding Sensitive PII* (December 4, 2017).

[5] *See generally*, U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014). *See also, generally*, DHS Privacy Policy Directive No. 047-01-007, Revision 3, *Handbook for Safeguarding Sensitive PII* (December 4, 2017) and U.S. Immigration and Customs Enforcement Privacy Guidance, *Requests for Information Under Section (b)(7) of the Privacy Act* (August 13, 2010).

[6] *See*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005) and U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.

camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices;

4. Any and all radio communications from 8:00 a.m. through 8:00 pm Central time on January 7, 2026, including, but not limited to, any and all dispatch calls and radio traffic;

5. Any and all immigration and federal law-enforcement reports related to the January 7 shooting, including but not limited to: incident reports; use-of-force reports; injury reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; weapons discharge logs for weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; investigative assessments, openings, or closing and related communications; and after-action reports and memoranda;

6. Any and all personnel and assignment logs listing the federal agents and officers on duty on January 7, 2026, in Minneapolis Hennepin County, Minnesota, who were involved in the January 7 shooting, or were at the scene of the shooting at any point on January 7. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers;

7. Access to interview federal agents and officers on duty on January 7, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 7 shooting, or were at the scene of the shooting at any point that day;

8. Any and all communications from witnesses pertaining to the January 7 shooting and to the circumstances surrounding that shooting, including, but not limited to: statements from federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; communications to, from, or among federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; and statements to or from civilian witnesses. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms;

9. Any and all operation plans in effect or in use on January 7, 2026, applicable to and/or provided to any of the federal agents or officers present at the scene of the shooting;

10. Any and all policies, regulations, procedures, and briefings in place on January 7, 2026, that pertain to: use of force and tactics; use of force and tactics regarding moving vehicles; firearms and other weapons use; de-escalation and risk mitigation; incident and use-of-force reporting; securing a crime scene and processing evidence; and any duty to or procedures for securing or providing medical assistance or treatment;

11. Any and all training materials for federal agents and officers involved in the January 7

shooting, or who were present on the scene at or near Ms. Good's vehicle, including but not limited to: records related to classroom instruction, hands-on training, and scenario training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC);

12. The following material from the personnel files for the federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action;

13. Any and all documentation related to a June 2025 vehicle encounter involving U.S. Immigration and Customs Enforcement Agent Jonathan Ross in Bloomington, Minnesota, including, but not limited to, incident reports, use-of-force reports, weapons discharge reports, injury reports and medical records, affidavits and other statements related to the incident by Agent Ross or any other federal agent or officer involved in or who responded to the incident;

14. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 7 shooting, or who were present on the scene at or near Ms. Good's vehicle; and,

15. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 7 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

After careful consideration of your request, ICE declines to share the requested information. Among other reasons, your requests may seek information protected from disclosure by statute or federal regulations.[7] For example, your request seeks personally identifying information of federal law enforcement officers, disclosure of which would jeopardize the safety and privacy of officers and other third parties.[8] Your request also seeks law-enforcement sensitive files, operational plans, logs, and reports, and interviews with ICE personnel without any identified scope or time limitations. This information (and information accessed through requested interviews) may not be disclosed as it pertains to open investigations and may reveal other sensitive operations.[9] This information is

[7] *Id*.
[8] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.6. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).
[9] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.

considered For Official Use Only[10]-Law Enforcement Sensitive,[11] and you have not established your need to know[12] the information requested.

Additionally, the information you seek likely includes third agency information subject to those agencies' policies and regulations concerning discussion and dissemination of the information.[13] The information may also contain deliberative process, attorney work product, and/or attorney client privileged information, as well as reports of investigations that contain third agency information and have additional dissemination and handling controls.[14]

Given the breadth and subject matter of your request, sharing of the information would compromise the mission of DHS, including by diverting agency resources, and would also potentially impede or prejudice ongoing law enforcement investigations.[15]

Thus, for the foregoing reasons, ICE declines to share the information you have requested.

Thank you,

SARA JAZAYERI

Digitally signed by SARA JAZAYERI
Date: 2026.06.04 23:32:05 -04'00'

Sara Jazayeri
Division Counsel
Government Information Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement

---

[10]The term For Official Use Only means Sensitive But Unclassified information that may or may not be categorized by statute or regulation, the unauthorized disclosure of which could adversely impact a person's privacy or welfare, the conduct of federal programs, or other programs or operations essential to the national interest. U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 3.3. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).

[11] Law Enforcement Sensitive information is a subset of For Official Use Only information that is compiled for law enforcement purposes and which the loss or misuse of, or unauthorized access to could adversely affect the national interest or the conduct of investigative work, disclose the identity of a confidential informant or source of information, endanger life or physical safety, or impact the privacy to which individuals are entitled under the Privacy Act or the DHS privacy policy. U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014).

[12] Need-to-know means that absent any compromise of the mission of DHS or ICE, or prohibition by law, policy, or established agreement, a determination made by an authorized holder of information that a prospective recipient requires access to specific information to perform or assist in a lawful and authorized government function. *Id*. at 3.12. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).

[13] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.6. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).

[14] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.

[15] *Id.*

CC: Office of the General Counsel
U.S. Department of Homeland Security
OGC@hq.dhs.gov

Jacqueline Coleman Snead
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch
Jacqueline.Snead@usdoj.gov

Sam Olson
Director
Immigration and Customs Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

Howard Weisman
Section Chief
Immigration and Customs Enforcement
500 12th St. SW, Suite 1049
Mailstop 5099
Washington, DC 20536-5005

General Counsel
Immigration and Customs Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

Chief Counsel
U.S. Customs and Border Protection
Minnesota Field Office
5600 W American Blvd., Suite 760
Bloomington, MN 55437

U.S. Attorney for the District of Minnesota,
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

# Exhibit 11

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
425 I Street, NW, Room 6100
Washington, DC 20536

**U.S. Immigration and Customs Enforcement**

June 4, 2026

Mary F. Moriarty
Hennepin County Attorney
A-1600 Government Center
300 South Sixth Street
Minneapolis, MN 55487

Drew Evans
Superintendent
Bureau of Criminal Apprehension
1430 Maryland Avenue East
St. Paul, MN 55106

Re: Letter Request for Information Concerning Investigation into the January 24, 2026 Death of Alex Jeffrey Pretti

Dear Ms. Moriarty and Mr. Evans:

Immigration and Customs Enforcement (ICE), a component of the U.S. Department of Homeland Security (DHS), received a copy of your request dated February 17, 2026 seeking records pertaining to your investigation of the January 24, 2026 death of Alex Pretti. The information you seek is not associated with an ongoing court action, so the DHS *Touhy* regulations, 6 C.F.R. §§5.41 et seq., do not apply.[1] Instead, ICE has processed your request as a discrete request for information shared between law enforcement agencies.[2] As discussed below, ICE declines your request.

As you know, law enforcement sharing requests are routine. Such requests may be made to ICE informally through established law enforcement sharing channels, pursuant to written information sharing and access agreements, pursuant to written requests for Privacy Act information in support of civil or criminal law enforcement activity under (b)(7) of the Privacy Act of 1974 (5 U.S.C. § 552a(b)(7)),[3] and pursuant to a routine use under (b)(3) of the Privacy Act of 1974 (5 U.S.C. §

---

[1] The scope of the DHS *Touhy* regulations covers requests that are "in connection with federal or state litigation," and "the term 'litigation' encompasses all pre-trial, trial, and post-trial stages…before courts, commissions, boards…grand juries, or other judicial or quasi-judicial bodies or tribunals." *See generally* 6 C.F.R. § 5.41.
[2] Section 5.41(i) provides that "[n]othing in this subpart affects the disclosure of official information …to federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings, e.g., extradition, deportation." 6 C.F.R. § 5.41(i).
[3] Privacy Act-protected information may be disclosed to a domestic agency conducting a civil or criminal law enforcement investigation or activity authorized by law pursuant to section (b)(7) of the Privacy Act (5 U.S.C. § 552a(b)(7)). U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7. ICE

552a(b)(3)).[4] Barring any applicable legal authorities, binding agreements, or any other mechanism that compels ICE to share information (none of which are present here), ICE maintains discretion whether to decline a request for information.[5]

ICE evaluates each request individually and assesses whether it can provide responsive materials based on the specific information requested. ICE may decline law enforcement sharing requests that seek personal or sensitive information that may compromise officer safety or the integrity of an investigation.[6]

Specifically, you requested:

1. Any and all physical evidence relevant to the January 24, 2026, shooting of Alex Jeffrey Pretti on Nicolett Avenue in Minneapolis, Minnesota (the “January 24 shooting”). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting, such as: discharged cartridge casings; any and all firearms; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; and any other item collected on the scene. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting, who interacted with Mr. Pretti, or who were present on the scene at any time on January 24, 2026. Further, you requested a chain of custody for any and all such evidence;

2. Any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 24 shooting, who interacted with Mr. Pretti, or who were present on the scene at any time on January 24, 2026. Further, you requested a chain of custody for any and all such evidence;

3. Any and all photographs, videos, measurements, and other imaging relevant to the January 24 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, and investigators; and material recorded by members of the public that was obtained by any

---

employees have the authority to disclose the information but are not required to make such disclosures. U.S. Immigration and Customs Enforcement Privacy Guidance, *Requests for Information Under Section (b)(7) of the Privacy Act* (August 13, 2010).

[4] ICE employees may disclose information outside of DHS if authority exists from subsection (b) of the Privacy Act pursuant to written permission from the individual to whom the record pertains, as authorized by the Privacy Act itself in subsection (b), or pursuant to one of the Privacy Act "Routine Uses" in applicable Privacy Act System or Records Notices (SORN(s)). When disclosures are authorized by the Privacy Act, these disclosures are discretionary. *See*, U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7. *See also*, *generally*, DHS Privacy Policy Directive No. 047-01-007, Revision 3, *Handbook for Safeguarding Sensitive PII* (December 4, 2017).

[5] *See generally*, U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014). *See also, generally*, DHS Privacy Policy Directive No. 047-01-007, Revision 3, *Handbook for Safeguarding Sensitive PII* (December 4, 2017) and U.S. Immigration and Customs Enforcement Privacy Guidance, *Requests for Information Under Section (b)(7) of the Privacy Act* (August 13, 2010).

[6] *See*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005) and U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.

federal agent, officer, or investigator. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices;

4. Any and all radio communications from 8:00 a.m. through 5:00 p.m. Central time on January 24, 2026, including, but not limited to, any and all dispatch calls and radio traffic;

5. Any and all immigration and federal law-enforcement reports related to the January 24 shooting, including but not limited to: incident reports; use-of-force reports, including those concerning individuals at the scene of the shooting other than Mr. Pretti; injury reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers at the scene; weapons discharge reports, including for firearms and chemical weapons, for weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; investigative assessments, openings, or closing and related communications; after action reports and memoranda; and any and all reports concerning the detention, questioning, or arrest of individuals who were at or near the scene of the January 24 shooting, including documentation of the purpose and legal basis for transporting any individual away from the scene and information about the location to which they were transferred;

6. Any and all personnel and assignment logs listing the federal agents and officers on duty on January 24, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 24 shooting, or were at the scene of the shooting at any point. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers;

7. Any and all travel and assignment logs showing the subsequent assignment or reassignment of any federal agents and officers involved in the January 24 shooting, including, but not limited to, documentation of any assignments to locations outside Hennepin County, Minnesota, following the January 24 shooting;

8. Access to interview federal agents and officers on duty on January 24, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 24 shooting, or were at the scene of the shooting at any point that day;

9. Any and all communications from witnesses pertaining to the January 24 shooting and to the circumstances surrounding that shooting, including, but not limited to: statements to, from, or among federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; and statements to or from civilian witnesses. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms;

10. Any and all operation plans that cover or pertain to January 24, 2026, in Minneapolis, Hennepin County, Minnesota, or that relate to any and all federal agents and officers who interacted with Mr. Pretti on January 24, 2026, or who were involved in the January 24 shooting;

11. Any and all policies, regulations, procedures, and briefings in place on January 24, 2026, that pertain to: use of force and tactics; firearms, chemical weapons, and other weapons use; deescalation and risk mitigation; responding to protests or civil disobedience; incident and use of-force reporting; evidence handling and processing; and any duty to or procedures for securing or providing medical assistance or treatment;

12. Any and all training materials for federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting at any time that day, or who interacted with Mr. Pretti on January 24, 2026. These materials should include, but are not limited to: records related to classroom instruction, hands-on training, and scenario-based training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC);

13. The following material from the personnel files for the federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting at any point that day, or who interacted with Mr. Pretti on January 24, 2026: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action;

14. Any and all documentation related to any interaction between Mr. Pretti and federal agents and officers that occurred at any time prior to the January 24 shooting, including any interaction on January 13, 2026. These materials should include, but are not limited to, reports, logs, video recordings, audio recordings, photographs, notes, communications in any format, and radio traffic;

15. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting, or who interacted with Mr. Pretti on January 24, 2026; and

16. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any civilian or any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 24 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

After careful consideration of your request, ICE declines to share the requested information. Among other reasons, your requests may seek information protected from disclosure by statute or

federal regulations.[7] For example, your request seeks personally identifying information of federal law enforcement officers, disclosure of which would jeopardize the safety and privacy of officers and other third parties.[8] Your request also seeks law-enforcement sensitive files, operational plans, logs, and reports, and interviews with ICE personnel without any identified scope or time limitations. This information (and information accessed through requested interviews) may not be disclosed as it pertains to open investigations and may reveal other sensitive operations.[9] This information is considered For Official Use Only[10]-Law Enforcement Sensitive,[11] and you have not established your need to know[12] the information requested.

Additionally, the information you seek likely includes third agency information subject to those agencies' policies and regulations concerning discussion and dissemination of the information.[13] The information may also contain deliberative process, attorney work product, and/or attorney client privileged information, as well as reports of investigations that contain third agency information and have additional dissemination and handling controls.[14]

Given the breadth and subject matter of your request, sharing of the information would compromise the mission of DHS, including by diverting agency resources, and would also potentially impede or prejudice ongoing law enforcement investigations.[15]

Thus, for the foregoing reasons, ICE declines to share the information you have requested.

---

[7] *Id*.

[8] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.6. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).

[9] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.

[10] The term For Official Use Only means Sensitive But Unclassified information that may or may not be categorized by statute or regulation, the unauthorized disclosure of which could adversely impact a person's privacy or welfare, the conduct of federal programs, or other programs or operations essential to the national interest. U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 3.3. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).

[11] Law Enforcement Sensitive information is a subset of For Official Use Only information that is compiled for law enforcement purposes and which the loss or misuse of, or unauthorized access to could adversely affect the national interest or the conduct of investigative work, disclose the identity of a confidential informant or source of information, endanger life or physical safety, or impact the privacy to which individuals are entitled under the Privacy Act or the DHS privacy policy. U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014).

[12] Need-to-know means that absent any compromise of the mission of DHS or ICE, or prohibition by law, policy, or established agreement, a determination made by an authorized holder of information that a prospective recipient requires access to specific information to perform or assist in a lawful and authorized government function. *Id*. at 3.12. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).

[13] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.6. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).

[14] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.

[15] *Id.*

Thank you,

SARA JAZAYERI Digitally signed by SARA JAZAYERI Date: 2026.06.04 23:38:41 -04'00'

Sara Jazayeri
Division Counsel
Government Information Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement

CC: Office of the General Counsel
U.S. Department of Homeland Security
OGC@hq.dhs.gov

Jacqueline Coleman Snead
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch
Jacqueline.Snead@usdoj.gov

Sam Olson
Director
Immigration and Customs Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

Howard Weisman
Section Chief
Immigration and Customs Enforcement
500 12th St. SW, Suite 1049
Mailstop 5099
Washington, DC 20536-5005

General Counsel
Immigration and Customs Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

Chief Counsel
U.S. Customs and Border Protection
Minnesota Field Office
5600 W American Blvd., Suite 760
Bloomington, MN 55437

U.S. Attorney for the District of Minnesota,
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

# Exhibit 12

1300 Pennsylvania Avenue, NW
Washington, DC 20229

U.S. Customs and
Border Protection

June 4, 2026

VIA ELECTRONIC MAIL
(Mary.Moriarty@hennepin.us

Mary F. Moriarty
Hennepin County Attorney
Hennepin County Attorney's Office
300 South Sixth Street
Minneapolis, MN 55487

Re: February 17, 2026 Demand for Production of Information, Documents, and Physical Items – Investigation into January 24, 2026 Death of Alex Jeffrey Pretti

Dear Ms. Moriarty:

This letter responds to your February 17, 2026 letter which you described as a "*Touhy* Demand" pursuant to the U.S. Department of Homeland Security (DHS) *Touhy* regulations at 6 C.F.R. § 5.41 et seq. and 19 C.F.R. § 103.21 et seq. demanding the production of 16 categories of information, documents, and interviews identified specifically in Attachment A to your letter in connection with a state investigation regarding the death of Mr. Alex Pretti, which took place on January 24, 2026. U.S. Customs and Border Protection (CBP) has been delegated by DHS to respond to your inquiry.

Specifically, you requested the following categories of documents:

1. Any and all physical evidence relevant to the January 24, 2026, shooting of Alex Jeffrey Pretti on Nicolett Avenue in Minneapolis, Minnesota (the "January 24 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting, such as: discharged cartridge casings; any and all firearms; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; and any other item collected on the scene. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting, who interacted with Mr. Pretti, or who were present on the scene at any time on January 24, 2026. We also request a chain of custody for any and all such evidence.

2. Any and all communications devices and computing devices, including but not limited to

cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 24 shooting, who interacted with Mr. Pretti, or who were present on the scene at any time on January 24, 2026. We also request a chain of custody for any and all such evidence.

3. Any and all photographs, videos, measurements, and other imaging relevant to the January 24 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, and investigators; and material recorded by members of the public that was obtained by any federal agent, officer, or investigator. It includes, but is not limited to, photographs and videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices.

4. Any and all radio communications from 8:00 a.m. through 5:00 p.m. Central time on January 24, 2026, including, but not limited to, any and all dispatch calls and radio traffic.

5. Any and all immigration and federal law-enforcement reports related to the January 24 shooting, including but not limited to: incident reports; use-of-force reports, including those concerning individuals at the scene of the shooting other than Mr. Pretti; injury reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers at the scene; weapons discharge reports, including for firearms and chemical weapons, for weapons assigned to or used by any and all federal agents and officers at the scene of the shooting; investigative assessments, openings, or closing and related communications; after action reports and memoranda; and any and all reports concerning the detention, questioning, or arrest of individuals who were at or near the scene of the January 24 shooting, including documentation of the purpose and legal basis for transporting any individual away from the scene and information about the location to which they were transferred.

6. Any and all personnel and assignment logs listing the federal agents and officers on duty on January 24, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 24 shooting, or were at the scene of the shooting at any point. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers.

7. Any and all travel and assignment logs showing the subsequent assignment or reassignment of any federal agents and officers involved in the January 24 shooting, including, but not limited to, documentation of any assignments to locations outside Hennepin County, Minnesota, following the January 24 shooting.

8. Access to interview federal agents and officers on duty on January 24, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 24 shooting, or were at the scene of the shooting at any point that day.

9. Any and all communications from witnesses pertaining to the January 24 shooting and to the circumstances surrounding that shooting, including, but not limited to: statements to, from, or

among federal agents and officers regarding the shooting, the circumstances of the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including fire, EMS, and other medical responders; and statements to or from civilian witnesses. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms.

10. Any and all operation plans that cover or pertain to January 24, 2026, in Minneapolis, Hennepin County, Minnesota, or that relate to any and all federal agents and officers who interacted with Mr. Pretti on January 24, 2026, or who were involved in the January 24 shooting.

11. Any and all policies, regulations, procedures, and briefings in place on January 24, 2026, that pertain to: use of force and tactics; firearms, chemical weapons, and other weapons use; deescalation and risk mitigation; responding to protests or civil disobedience; incident and use of-force reporting; evidence handling and processing; and any duty to or procedures for securing or providing medical assistance or treatment.

12. Any and all training materials for federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting at any time that day, or who interacted with Mr. Pretti on January 24, 2026. These materials should include, but are not limited to: records related to classroom instruction, hands-on training, and scenario-based training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC).

13. The following material from the personnel files for the federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting at any point that day, or who interacted with Mr. Pretti on January 24, 2026: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action.

14. Any and all documentation related to any interaction between Mr. Pretti and federal agents and officers that occurred at any time prior to the January 24 shooting, including any interaction on January 13, 2026. These materials should include, but are not limited to, reports, logs, video recordings, audio recordings, photographs, notes, communications in any format, and radio traffic.

15. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 24 shooting, who were present on the scene of the January 24 shooting, or who interacted with Mr. Pretti on January 24, 2026.

16. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any civilian or any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 24 shooting, whether that assessment, diagnosis, and treatment

occurred at the scene of the shooting or elsewhere.

Your compliance with CBP's *Touhy* regulations, which you purport to invoke, is a condition precedent to obtaining official information from CBP. *See Smith v. Cromer*, 159 F.3d 875, 879-80 (4th Cir. 1998). A state's criminal investigation alone does not meet the procedural requirements for a *Touhy* response. Rather, those regulations require that there be "federal, state, or local proceedings" tied to the matter; your request is not tied to pending litigation. 19 C.F.R. 103.21(a); *see also* 6 C.F.R. 5.41(a)(1) (DHS *Touhy* regulations implicated "in connection with federal or state litigation"). Thus, your request is not a *Touhy* request.

CBP does not authorize disclosure of the requested information at this time. For public information released by the agency, which may be responsive to your requests, please see the CBP FOIA reading room at https://www.cbp.gov/newsroom/accountability-and-transparency/foia-reading-room. We have copied the DHS Office of General Counsel and the DOJ attorneys that you copied on your letter. Thank you.

SUZANNE N ALMETICA
Digitally signed by SUZANNE N ALMETICA
Date: 2026.06.04 22:27:09 -04'00'

Suzanne N. Almetica
Acting Chief Counsel

CC:

Office of the General Counsel
U.S. Department of Homeland Security
OGC@hq.dhs.gov

Jacqueline Coleman Snead
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch
Jacqueline.Snead@usdoj.gov

Sam Olson
Director
Immigration and Customs Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

Howard Weisman
Section Chief
Immigration and Customs Enforcement
500 12th St. SW, Suite 1049

Mailstop 5099
Washington, DC 20536-5005

General Counsel
Immigration and Customs Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

U.S. Attorney for the District of Minnesota,
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

# Exhibit 13

*Office of the Principal Legal Advisor*

**U.S. Department of Homeland Security**
425 I Street, NW, Room 6100
Washington, DC 20536

U.S. Immigration and Customs Enforcement

June 4, 2026

Mary F. Moriarty
Hennepin County Attorney
A-1600 Government Center
300 South Sixth Street
Minneapolis, MN 55487

Re: Letter Request for Information Concerning Investigation into the January 14, 2026 shooting of Julio Cesar Sosa-Celis

Dear Ms. Moriarty:

Immigration and Customs Enforcement (ICE), a component of the U.S. Department of Homeland Security (DHS), received a copy of your request dated February 19, 2026 seeking records pertaining to your investigation of the January 14, 2026 shooting of Julio Cesar Sosa-Celis. The information you seek is not associated with an ongoing court action, so the DHS *Touhy* regulations, 6 C.F.R. §§5.41 et seq., do not apply.[1] Instead, ICE has processed your request as a discrete request for information shared between law enforcement agencies.[2] As discussed below, ICE declines your request.

As you know, law enforcement sharing requests are routine. Such requests may be made to ICE informally through established law enforcement sharing channels, pursuant to written information sharing and access agreements, pursuant to written requests for Privacy Act information in support of civil or criminal law enforcement activity under (b)(7) of the Privacy Act of 1974 (5 U.S.C. § 552a(b)(7)),[3] and pursuant to a routine use under (b)(3) of the Privacy Act of 1974 (5 U.S.C. § 552a(b)(3)).[4] Barring any applicable legal authorities, binding agreements, or any other mechanism

---

[1] The scope of the DHS *Touhy* regulations covers requests that are "in connection with federal or state litigation," and "the term 'litigation' encompasses all pre-trial, trial, and post-trial stages…before courts, commissions, boards…grand juries, or other judicial or quasi-judicial bodies or tribunals." *See generally* 6 C.F.R. § 5.41.

[2] Section 5.41(i) provides that "[n]othing in this subpart affects the disclosure of official information …to federal, state, local, or foreign prosecuting and law enforcement authorities in conjunction with criminal law enforcement investigations, prosecutions, or other proceedings, e.g., extradition, deportation." 6 C.F.R. § 5.41(i).

[3] Privacy Act-protected information may be disclosed to a domestic agency conducting a civil or criminal law enforcement investigation or activity authorized by law pursuant to section (b)(7) of the Privacy Act (5 U.S.C. § 552a(b)(7)). U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7. ICE employees have the authority to disclose the information but are not required to make such disclosures. U.S. Immigration and Customs Enforcement Privacy Guidance, *Requests for Information Under Section (b)(7) of the Privacy Act* (August 13, 2010).

[4] ICE employees may disclose information outside of DHS if authority exists from subsection (b) of the Privacy Act pursuant to written permission from the individual to whom the record pertains, as authorized by the Privacy Act itself in subsection (b), or pursuant to one of the Privacy Act "Routine Uses" in applicable Privacy Act System or Records Notices (SORN(s)). When disclosures are authorized by the Privacy Act, these disclosures are discretionary. *See*, U.S. Immigration and Customs Enforcement Directive No.

that compels ICE to share information (none of which are present here), ICE maintains discretion whether to decline a request for information.[5]

ICE evaluates each request individually and assesses whether it can provide responsive materials based on the specific information requested. ICE may decline law enforcement sharing requests that seek personal or sensitive information that may compromise officer safety or the integrity of an investigation.[6]

Specifically, you requested:

1. Any and all physical evidence relevant to the January 14, 2026, shooting of Julio Cesar Sosa-Celis in Minneapolis, Minnesota (the "January 14 shooting"). This evidence includes, but is not limited to, physical evidence located and/or recovered from the scene of the shooting or the pursuit leading up to the shooting, such as: discharged cartridge casings; any and all firearms; any physical objects used by any individuals involved in the incident; material collected for, and reports related to, any and all ballistics testing; material collected for, and reports related to, any and all forensics testing; motor vehicles and the contents thereof, including any GPS technologies; any other item collected on the scene; and any item related to the January 14 shooting collected pursuant to a search warrant. This evidence further includes, but is not limited to, uniforms for any and all federal agents and officers, and any tools, weapons, and weapon holsters carried by or on the person of any and all federal agents and officers, who were involved in the shooting or traffic stop and pursuit leading to the shooting, who interacted with Mr. Sosa-Celis, Alfredo Alejandro Aljorna, or Gabriel Alejandro Hernandez-Ledezma, or who were present on the scene of the shooting at any time on January 14, 2026. Further, you requested a chain of custody for any and all such evidence;
2. Any and all communications devices and computing devices, including but not limited to cellular phones, computers, and GPS devices, used by any and all federal agents and officers involved in the January 14 shooting or the traffic stop and pursuit leading to the shooting; who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026; or who were present on the scene of the shooting at any time on January14, 2026. Further, you requested a chain of custody for any and all such evidence;

3. Any and all photographs, videos, measurements, and other imaging relevant to the January 14 shooting. This evidence includes, but is not limited to, material that was recorded by any federal evidence response team; any other federal agents, officers, and investigators; and material recorded by members of the public that was obtained by any federal agent, officer, or investigator. It includes, but is not limited to, photographs and

---

4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7. *See also*, *generally*, DHS Privacy Policy Directive No. 047-01-007, Revision 3, *Handbook for Safeguarding Sensitive PII* (December 4, 2017).

[5] *See generally*, U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014). *See also, generally*, DHS Privacy Policy Directive No. 047-01-007, Revision 3, *Handbook for Safeguarding Sensitive PII* (December 4, 2017) and U.S. Immigration and Customs Enforcement Privacy Guidance, *Requests for Information Under Section (b)(7) of the Privacy Act* (August 13, 2010).

[6] *See*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005) and U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.

videos from official and personal devices, networks, and systems. It also includes any dashboard camera or body camera footage, as well as the devices used to make such recordings and the charging stations for those devices;

4. Any and all radio communications from 4:00 p.m. Central time on January 14, 2026, through 1:00 a.m. Central time on January 15, 2026, including, but not limited to, any and all dispatch calls and radio traffic;

5. Any and all immigration and federal law-enforcement reports related to the January 14 shooting, including but not limited to: incident reports; use-of-force reports, including those concerning Mr. Sosa-Celis, Mr. Aljorna, Mr. Hernandez-Ledezma, or any other individual at the scene of the January 14 shooting; injury reports; arrest reports; property damage reports; weapons logs showing the weapons assigned to or used by any and all federal agents and officers involved in or at the scene of the January 14 shooting or the pursuit leading to the shooting; weapons discharge reports for weapons assigned to or used by any and all federal agents and officers involved in or at the scene of the January 14 shooting or the pursuit leading to the shooting; investigative assessments, openings, or closing and related communications; administrative warrants; maps, measurements, and diagrams of the January 14 shooting scene and any area related to any pursuit leading to the scene; affidavits drafted in connection with the January 14 shooting incident; judicial search warrants sought and/or executed related to the January 14 shooting incident, including any affidavits and search warrant return documents; after-action reports and memoranda; any and all reports concerning the detention, questioning, or arrest of individuals who were at or near the scene of the January 14 shooting; and any and all reports concerning the arrest and detention of Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma;

6. Any and all personnel and assignment logs listing the federal agents and officers on duty on January 14, 2026, in Minneapolis, Hennepin County, Minnesota, and/or who were involved in the January 14 shooting, were at the scene of the shooting at any point, or were involved in any traffic stop or pursuit leading up to the shooting. Such material should include, but is not limited to, the names, personnel and badge numbers, assignment location, and designated role or task for any and all such federal agents and officers;

7. Any and all travel and assignment logs showing the subsequent assignment or reassignment of any federal agents and officers involved in the January 14 shooting and any traffic stop or pursuit leading up to the shooting, including, but not limited to, documentation of any assignments to locations outside Hennepin County, Minnesota, following the January14 shooting;

8. Any and all communications from witnesses pertaining to the January 14 shooting and to the circumstances leading up to and surrounding that shooting, including, but not limited to: statements to, from, or among federal agents and officers regarding the shooting, the circumstances leading up to and surrounding the shooting, or responding to, processing, or investigating the shooting; statements to or from state or local law enforcement officers regarding the shooting; statements to, from, or among first responders, including

fire, EMS, and other medical responders; statements to or from civilian witnesses; and any statements by Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma. These items may take the form of written statements, emails, video or audio recordings, text messages, and messages on Signal, WhatsApp, Teams, or other platforms;

9. Any and all operation plans that cover or pertain to January 14, 2026, in Minneapolis, Hennepin County, Minnesota, including any plans involving traffic stops and any plans that relate to federal agents and officers involved in the January 14 shooting or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026;

10. Any and all policies, regulations, procedures, and briefings in place on January 14, 2026, that pertain to: use of force and tactics; firearms, chemical weapons, and other weapons use; traffic stops; pursuits; legal authority and tactical guidance for entry of homes or other private places; de-escalation and risk mitigation; incident and use-of-force reporting; evidence handling and processing; and any duty to or procedures for securing or providing medical assistance or treatment;

11. Any and all training materials for federal agents and officers involved in the January 14 shooting or the pursuit leading up to the shooting, who were present on the scene of the January 14 shooting at any time that day, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026. These materials should include, but are not limited to: records related to classroom instruction, hands-on training, and scenario training; academy training, follow-up and refresher trainings; and any training or study at the Federal Law Enforcement Training Centers (FLETC);

12. The following material from the personnel files for the federal agents and officers involved in the January 14 shooting or the traffic stop or pursuit leading up to the shooting, who were present on the scene of the January 14 shooting at any point that day, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026: records of commendations, awards, promotions, complaints, demotions, disciplinary warnings and actions; records from administrative or internal affairs investigations, including any resulting conclusions and employment actions; incident and use-of-force reports related to prior uses of force; reports on or documentation of any and all prior weapons discharges, and any related disciplinary or remedial action;

13. Any and all documentation related to any interaction between Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma and federal agents and officers at any time prior to the January 24 shooting. These materials should include, but are not limited to, reports, logs, video recordings, audio recordings, photographs, notes, communications in any format, and radio traffic;

14. Any and all documentation related to weapons qualification and re-qualification for federal agents and officers involved in the January 14 shooting or the pursuit leading up to the shooting, or who interacted with Mr. Sosa-Celis, Mr. Aljorna, or Mr. Hernandez-Ledezma on January 14, 2026; and

15. Any and all reports of medical assessment, diagnosis, and treatment for any person, including any civilian or any federal agent or officer, who reported, was examined for, or was treated for injuries related to the January 14 shooting, whether that assessment, diagnosis, and treatment occurred at the scene of the shooting or elsewhere.

After careful consideration of your request, ICE declines to share the requested information. Among other reasons, your requests may seek information protected from disclosure by statute or federal regulations.[7] For example, your request seeks personally identifying information of federal law enforcement officers, disclosure of which would jeopardize the safety and privacy of officers and other third parties.[8] Your request also seeks law-enforcement sensitive files, operational plans, logs, and reports, and interviews with ICE personnel without any identified scope or time limitations. This information (and information accessed through requested interviews) may not be disclosed as it pertains to open investigations and may reveal other sensitive operations.[9] This information is considered For Official Use Only[10]-Law Enforcement Sensitive,[11] and you have not established your need to know[12] the information requested.

Additionally, the information you seek likely includes third agency information subject to those agencies' policies and regulations concerning discussion and dissemination of the information.[13] The information may also contain deliberative process, attorney work product, and/or attorney client privileged information, as well as reports of investigations that contain third agency information and have additional dissemination and handling controls.[14]

Given the breadth and subject matter of your request, sharing of the information would compromise the mission of DHS, including by diverting agency resources, and would also potentially impede or prejudice ongoing law enforcement investigations.[15]

---

[7] *Id*.
[8] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.6. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).
[9] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.
[10] The term For Official Use Only means Sensitive But Unclassified information that may or may not be categorized by statute or regulation, the unauthorized disclosure of which could adversely impact a person's privacy or welfare, the conduct of federal programs, or other programs or operations essential to the national interest. U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 3.3. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).
[11] Law Enforcement Sensitive information is a subset of For Official Use Only information that is compiled for law enforcement purposes and which the loss or misuse of, or unauthorized access to could adversely affect the national interest or the conduct of investigative work, disclose the identity of a confidential informant or source of information, endanger life or physical safety, or impact the privacy to which individuals are entitled under the Privacy Act or the DHS privacy policy. U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014).
[12] Need-to-know means that absent any compromise of the mission of DHS or ICE, or prohibition by law, policy, or established agreement, a determination made by an authorized holder of information that a prospective recipient requires access to specific information to perform or assist in a lawful and authorized government function. *Id*. at 3.12. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).
[13] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.6. *See also*, DHS Management Directive No. 11042.1, *Safeguarding Sensitive but Unclassified (For Official Use Only) Information* (January 6, 2005).
[14] U.S. Immigration and Customs Enforcement Directive No. 4003.2, *Safeguarding Law Enforcement Sensitive Information* (May 20, 2014) at 5.7.
[15] *Id.*

Thus, for the foregoing reasons, ICE declines to share the information you have requested.

Thank you,

SARA JAZAYERI Digitally signed by SARA JAZAYERI Date: 2026.06.04 23:35:08 -04'00'

Sara Jazayeri
Division Counsel
Government Information Law Division
Office of the Principal Legal Advisor
U.S. Immigration and Customs Enforcement

CC: Office of the General Counsel
U.S. Department of Homeland Security
OGC@hq.dhs.gov

Jacqueline Coleman Snead
Assistant Director
U.S. Department of Justice
Civil Division
Federal Programs Branch
Jacqueline.Snead@usdoj.gov

Sam Olson
Director
Immigration and Customs Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

Howard Weisman
Section Chief
Immigration and Customs Enforcement
500 12th St. SW, Suite 1049
Mailstop 5099
Washington, DC 20536-5005

General Counsel
Immigration and Customs Enforcement
Minnesota Field Office
1 Federal Drive, Suite 1601
Fort Snelling, MN 55111

Chief Counsel
U.S. Customs and Border Protection
Minnesota Field Office
5600 W American Blvd., Suite 760

Bloomington, MN 55437

U.S. Attorney for the District of Minnesota,
U.S. Department of Justice
300 S 4th Street, Suite 600
Minneapolis, MN 55415

# Exhibit 14

**U.S. Department of Justice**
United States Attorney
District of Minnesota

*600 United States Courthouse*
*300 South Fourth Street*
*Minneapolis, MN 55415*

*Telephone: (612) 664-5600*
*Fax: (612) 664-5787*

**Via Electronic Mail**

June 3, 2026

Mary F. Moriarty
Hennepin County Attorney's Office
A-1600 Government Center
300 South Sixth Street
Minneapolis, MN 55487

**Re: *Touhy* Demand, shooting of Renee Nicole Good**

Dear Ms. Moriarty:

This letter responds on behalf of the United States Attorney's Office for the District of Minnesota ("USAO-MN") to your letter dated February 2, 2026. That letter purportedly was submitted pursuant to the Department of Justice's *Touhy* regulations at 28 C.F.R. Part 16 Subpart B, and seeks production of evidence in connection with the fatal shooting of Renee Nicole Good. *See* Letter from Mary F. Moriarty to USAO-MN (Feb. 2, 2025). Specifically, you request "any and all:" physical evidence; communications devices and computing devices; photographs and other imaging; radio communications; law enforcement reports; personnel and assignment logs; travel logs; witness statements; applicable operation plans; policies, regulations, procedures, and briefings; training materials; information from personnel files; documentation related to prior interactions between Ms. Good and federal agents; weapons qualification; and medical assessments, all of which you allege is relevant to Minnesota state police investigations. For the reasons explained herein, the USAO-MN denies your request.

As you know, the Department of Justice has promulgated regulations governing requests for official information in federal and state proceedings. *See* 28 C.F.R. §§ 16.21-16.29 ("DOJ *Touhy* regulations"). Specifically, the DOJ *Touhy* regulations prohibit current and former employees from disclosing "any material contained in the files of the Department" and "any information relating to or based upon material contained in the files of the Department," without approval from the proper Department official. 28 C.F.R. § 16.21(a). Your compliance with the *Touhy* regulations is a condition precedent to obtaining information from a current or former DOJ employee. *See Smith v. Cromer*, 159 F.3d 875, 879-80 (4th Cir. 1998); *United States v. Wallace*, 32 F.3d 921 (5th Cir. 1994); *United States v. Bizzard*, 674 F.2d 1382 (11th Cir. 1982); *Liptak v, County*, 2016 WL 5662082 (D. Minn 2016).

Your request does not comply with the procedural requirements of the Department's *Touhy* regulations. 28 C.F.R. § 16.21(a)(2). Although those regulations permit "appropriate disclosure" in the "absence of a demand . . . to . . . state, local . . . law enforcement [and] prosecutive agencies," *id.* § 16.21(c), such discretionary disclosure would not be appropriate here, where the federal government has an open investigation into the incident, and disclosure would improperly reveal investigatory records and/or interfere with federal law enforcement investigations. *See* 28 C.F.R. § 16.26(b)(5). Accordingly, at this time, the USAO-MN declines to authorize disclosure of the requested information.

Sincerely,

*s/ Daniel N. Rosen*
DANIEL N. ROSEN
United States Attorney

# Exhibit 15

**U.S. Department of Justice**
United States Attorney
District of Minnesota

*600 United States Courthouse*
*300 South Fourth Street*
*Minneapolis, MN 55415*

*Telephone: (612) 664-5600*
*Fax: (612) 664-5787*

**Via Electronic Mail**

June 3, 2026

Mary F. Moriarty
Hennepin County Attorney's Office
A-1600 Government Center
300 South Sixth Street
Minneapolis, MN 55487

Drew Evans, Superintendent
Minnesota Bureau of Criminal Apprehension
1430 Maryland Avenue East
St. Paul, MN 55106

**Re: *Touhy* Demand, shooting of Alex Pretti**

Dear Ms. Moriarty and Mr. Evans:

This letter responds on behalf of the United States Attorney's Office for the District of Minnesota ("USAO-MN") to your letter dated February 17, 2026. That letter purportedly was submitted pursuant to the Department of Justice's *Touhy* regulations at 28 C.F.R. Part 16 Subpart B, and seeks production of evidence in connection with the fatal shooting of Alex Pretti. *See* Letter from Mary F. Moriarty and Drew Evans to USAO-MN (Feb. 17, 2026). Specifically, you request "any and all:" physical evidence; communications devices and computing devices; photographs and other imaging; radio communications; law enforcement reports; personnel and assignment logs; travel logs; witness statements; applicable operation plans; policies, regulations, procedures, and briefings; training materials; information from personnel files; documentation related to prior interactions between Mr. Pretti and federal agents; weapons qualification; and medical assessments, all of which you allege is relevant to Minnesota state police investigations. For the reasons explained herein, the USAO-MN denies your request.

As you know, the Department of Justice has promulgated regulations governing requests for official information in federal and state proceedings. *See* 28 C.F.R. §§ 16.21-16.29 ("DOJ *Touhy* regulations"). Specifically, the DOJ *Touhy* regulations prohibit current and former employees from disclosing "any material contained in the files of the Department" and "any information relating to or based upon material contained in the files of the Department," without approval from the proper Department official. 28 C.F.R. § 16.21(a). Your compliance with the *Touhy* regulations is a condition precedent to obtaining information from a current or former DOJ

employee. *See Smith v. Cromer*, 159 F.3d 875, 879-80 (4th Cir. 1998); *United States v. Wallace*, 32 F.3d 921 (5th Cir. 1994); *United States v. Bizzard*, 674 F.2d 1382 (11th Cir. 1982); *Liptak v, County*, 2016 WL 5662082 (D. Minn 2016).

Your request does not comply with the procedural requirements of the Department's *Touhy* regulations. 28 C.F.R. § 16.21(a)(2). Although those regulations permit "appropriate disclosure" in the "absence of a demand . . . to . . . state, local . . . law enforcement [and] prosecutive agencies," *id.* § 16.21(c), such discretionary disclosure would not be appropriate here, where the federal government has an open investigation into the incident, and disclosure would improperly reveal investigatory records and/or interfere with federal law enforcement investigations. *See* 28 C.F.R. § 16.26(b)(5). Accordingly, at this time, the USAO-MN declines to authorize disclosure of the requested information.

Sincerely,

*s/ Daniel N. Rosen*
DANIEL N. ROSEN
United States Attorney

# Exhibit 16

**U.S. Department of Justice**
United States Attorney
District of Minnesota

*600 United States Courthouse*
*300 South Fourth Street*
*Minneapolis, MN 55415*

*Telephone: (612) 664-5600*
*Fax: (612) 664-5787*

**Via Electronic Mail**

June 3, 2026

Mary F. Moriarty
Hennepin County Attorney's Office
A-1600 Government Center
300 South Sixth Street
Minneapolis, MN 55487

**Re: *Touhy* Demand, shooting of Julio Cesar Sosa-Celis**

Dear Ms. Moriarty:

This letter responds on behalf of the United States Attorney's Office for the District of Minnesota ("USAO-MN") to your letter dated February 19, 2026. That letter purportedly was submitted pursuant to the Department of Justice's *Touhy* regulations at 28 C.F.R. Part 16 Subpart B, and seeks production of evidence in connection with the non-fatal shooting of Julio Cesar Sosa-Celis. *See* Letter from Mary F. Moriarty to USAO-MN (Feb. 19, 2025). Specifically, you request "any and all:" physical evidence; communications devices and computing devices; photographs and other imaging; radio communications; law enforcement reports; personnel and assignment logs; travel logs; witness statements; applicable operation plans; policies, regulations, procedures, and briefings; training materials; information from personnel files; documentation related to prior interactions between Mr. Sosa-Celis and federal agents; weapons qualification; and medical assessments, all of which you allege is relevant to Minnesota state police investigations. For the reasons explained herein, the USAO-MN denies your request.

As you know, the Department of Justice has promulgated regulations governing requests for official information in federal and state proceedings. *See* 28 C.F.R. §§ 16.21-16.29 ("DOJ *Touhy* regulations"). Specifically, the DOJ *Touhy* regulations prohibit current and former employees from disclosing "any material contained in the files of the Department" and "any information relating to or based upon material contained in the files of the Department," without approval from the proper Department official. 28 C.F.R. § 16.21(a). Your compliance with the *Touhy* regulations is a condition precedent to obtaining information from a current or former DOJ employee. *See Smith v. Cromer*, 159 F.3d 875, 879-80 (4th Cir. 1998); *United States v. Wallace*, 32 F.3d 921 (5th Cir. 1994); *United States v. Bizzard*, 674 F.2d 1382 (11th Cir. 1982); *Liptak v, County*, 2016 WL 5662082 (D. Minn 2016).

Your request does not comply with the procedural requirements of the Department's *Touhy* regulations. 28 C.F.R. § 16.21(a)(2). Although those regulations permit "appropriate disclosure" in the "absence of a demand . . . to . . . state, local . . . law enforcement [and] prosecutive agencies," *id.* § 16.21(c), such discretionary disclosure would not be appropriate here, where the federal government has an open investigation into the incident, and disclosure would improperly reveal investigatory records and/or interfere with federal law enforcement investigations. *See* 28 C.F.R. § 16.26(b)(5). Accordingly, at this time, the USAO-MN declines to authorize disclosure of the requested information.

Sincerely,

*s/ Daniel N. Rosen*
DANIEL N. ROSEN
United States Attorney

# Exhibit 17

**U.S. Department of Justice**

United States Attorney
District of Minnesota

*600 United States Courthouse* *Telephone: (612) 664-5600*
*300 South Fourth Street* *Fax: (612) 664-5787*
*Minneapolis, MN 55415*

June 26, 2026

Dear Mr. Evans:

As we've discussed, the U.S. Attorney's Office is prepared to share evidence and collaborate as appropriate in the investigative matters relating to the federal officer-involved shootings that occurred in Minnesota during Operation Metro Surge. With the approval of the United States Attorney, the USAO and BCA will share evidence on these matters with the following understandings:

The USAO and BCA are independent from each other. Both the USAO and BCA enter into this understanding in good faith, with the goal of fairly and impartially bringing these investigations to their respective charging decisions in a thorough and appropriately expeditious manner. The USAO and BCA will consult with each other regarding the matters. The USAO and BCA may investigate these matters jointly but remain independent and neither will direct the investigation of the other.

BCA special agents may join the USAO prosecution teams as appropriate for the relevant matters under USAO investigation. As members of the USAO prosecution teams, assigned BCA agents will have full access to the USAO case file. BCA agents will have access to evidentiary materials from all investigative agencies that have participated in any of the federal officer-involved shootings, including the FBI, DHS and its subordinate agencies. Assigned agents will also be bound by federal rules of confidentiality and laws and regulations regarding secrecy of grand jury materials, which BCA has always upheld in past investigations with the USAO.

Independent of the USAO's investigations, the USAO and BCA will each share with the other all information and evidence relating to the matters. The USAO will make available all non-grand jury material, such as reports, interview memos, media, physical evidence, and search warrant evidence. Likewise, the USAO prosecution

team will have the same access to all evidence and information in the BCA's case file. The USAO will, within a reasonably prompt timeframe, move the federal court to disclose relevant grand jury material to the appropriate state prosecution office(s).

Any shared evidence may be used by a prosecutor's office (e.g., the USAO or the Hennepin County Attorney's Office) and in criminal court proceedings. Shared evidence will be treated by the USAO, BCA, HCAO, and any other prosecution office as criminal investigative data under state and federal law. As is often the case where the USAO and HCAO are investigating overlapping matters, each office will confer and share any appropriate information regarding charging decisions, timing, and other considerations.

Each party will make good faith efforts to ensure all government witnesses comply with any investigative or trial subpoenas.

This understanding does represent a change to this office's previous stance vis a vis the sharing of evidence and cooperation between our office and BCA in these investigations. We acknowledge that, ultimately, the best course for these investigations will be impartial and open sharing of information and evidence between the USAO and BCA. Please confirm these are your understandings too. We look forward to getting these investigations moving.

Sincerely,

*s/Kristian Weir*
Kristian Weir
Chief, Criminal Division
U.S. Attorney's Office
District of Minnesota